**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| RICHARD USHER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Civil Docket No. 23-cv-02086 (JMC) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7, Defendants United States Department of Justice, the United States Attorney General, and the Assistant Attorney General for the Antitrust Division of the United States Department of Justice (collectively, "Defendants") move for summary judgment. The reasons for the motion are set forth in the attached memorandum of law, as well as the supporting declarations of Kathy Hsu, Chief of the Freedom of Information/Privacy Act Unit of the Antitrust Division of the United States Department of Justice, Michael G. Seidel, the Section Chief of the Record/Information Dissemination Section, Information Management Division, of the Federal Bureau of Investigation, and John Robinson. A proposed order is attached.

Dated: March 4, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/ John Robinson
JOHN ROBINSON (Bar. No. 1044072)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RICHARD USHER,

               Plaintiff,

     v.

THE UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

              Defendants.

Civil Docket No. 23-cv-02086 (JMC)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    The Criminal Investigation and Prosecution of Mr. Usher.................................... 2

    B.    The OCC Proceeding and *Touhy* Request ............................................................ 4

    C.    The Brazil Proceeding and Usher's FOIA Request ............................................... 4

    D.    This Litigation...................................................................................................... 5

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.     THE GOVERNMENT PROPERLY WITHHELD ATTORNEY WORK
       PRODUCT UNDER EXEMPTION 5 ............................................................................ 7

II.    THE GOVERNMENT PROPERLY WITHHELD INFORMATION
       PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE UNDER
       EXEMPTION 5 ............................................................................................................ 17

III.   THE GOVERNMENT PROPERLY WITHHELD INFORMATION
       FURNISHED BY A CONFIDENTIAL SOURCE UNDER EXEMPTION 7(D) ........... 19

IV.   THE GOVERNMENT PROPERLY WITHHELD GRAND JURY MATERIALS
       UNDER EXEMPTION 3.............................................................................................. 22

V.    THE GOVERNMENT PROPERLY WITHHELD IDENTIFYING
       INFORMATION OF THIRD PARTIES UNDER EXEMPTIONS 6 AND 7(C)............ 24

VI.   THE GOVERNMENT COMPLIED WITH THE FORESEEABLE HARM
       STANDARD IN THE FOIA IMPROVEMENT ACT OF 2016 ..................................... 24

CONCLUSION.................................................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**

*Allnet Commc'n Servs. v. FCC*,
  800 F. Supp. 984 (D.D.C. 1992) ............................................................. 14

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ................................................................ 19

*Bloomberg, L.P. v. SEC*,
  357 F. Supp. 2d 156 (D.D.C. 2004) ........................................................ 18

*Borda v. U.S. Dep't of Just., Crim. Div.*,
  306 F. Supp. 3d 306 (D.D.C. 2018) ........................................................ 23

*Campbell v. DOJ*,
  164 F.3d 20 (D.C. Cir. 1998) .................................................................. 20

*Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
  600 F. Supp. 114 (D.D.C. 1984) ............................................................. 17

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ................................................................ 17

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ................................................... 13, 14, 15

*Davis v. DOJ*,
  968 F.2d 1276 (D.C. Cir. 1992) .............................................................. 24

*Defs. of Wildlife v. U.S. Border Patrol*,
  623 F. Supp. 2d 83 (D.D.C. 2009) ............................................................ 6

*Dep't of the Air Force v. Rose*,
  425 U.S. 352 (1976) ................................................................................ 24

*Diamond v. Atwood*,
  43 F.3d 1538 (D.C. Cir. 1995) .................................................................. 6

*Dow Jones & Co. v. DOJ*,
  917 F.2d 571 (D.C. Cir. 1990) ................................................................ 19

*Edmonds Inst. v. U.S. Dep't of Interior*,
  460 F. Supp. 2d 63 (D.D.C. 2006) .......................................................... 18

*Equity Analytics, LLC v. Lundin*,
    248 F.R.D. 331 (D.D.C. 2008) ................................................................. 13

*Erb v. DOJ,*
    572 F. Supp. 954 (W.D. Mich. 1983) ...................................................... 15

*FBI v. Abramson*,
    456 U.S. 615 (1982) ................................................................................. 7

*Garside v. Webster*,
    733 F. Supp. 1142 (S.D. Ohio 1989) ...................................................... 15

*\*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    243 F. Supp. 3d 155 (D.D.C. 2017) ................................................. 18, 19

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ....................................................................... 8, 15, 16

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................... 17

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982) ................................................. 8, 12, 13, 15

*\*Jud. Watch v. DOJ*,
    391 F. Supp. 3d 43 (D.D.C. 2019) .................................................. 1, 9, 10

*Jud. Watch, Inc. v. DOJ*,
    432 F.3d 366 (D.C. Cir. 2005) ................................................................. 8

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
    926 F. Supp. 2d 121 (D.D.C. 2013) ......................................................... 8

*Jud. Watch, Inc. v. DOJ*,
    800 F. Supp. 2d 202 (D.D.C. 2011) ....................................................... 12

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ................................................................. 7

*\*Leopold v. DOJ*,
    487 F. Supp. 3d 1 (D.D.C. 2020) .............................................. 1, 9, 10, 11

*Lewis v. DOJ*,
    609 F. Supp. 2d 80 (D.D.C. 2009) .................................................... 25, 26

*Lopez v. DOJ,*
   393 F.3d 1345 (D.C. Cir. 2005) .......................................................................... 23

*Manna v. DOJ,*
   815 F. Supp. 798 (D.N.J. 1993) .......................................................................... 15

*Mead Data Cent., Inc. v. Dep't of the Air Force,*
   566 F.2d 242 (D.C.Cir.1977) ............................................................................. 19

*Mehl v. EPA,*
   797 F. Supp. 43 (D.D.C. 1992) ........................................................................... 14

*Mingo v. DOJ,*
   Civ. Action No. 08-2197 (CKK), 2009 WL 2618129 (D.D.C. Aug. 24, 2009) ................ 14, 15

*NLRB v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975).................................................................... 7, 17, 18, 28

*N.Y. Times Co. v. DOJ,*
   138 F. Supp. 3d 462 (S.D.N.Y. 2015) .................................................................... 10

*Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Office for U.S. Att'ys,*
   844 F.3d 246 (D.C. Cir. 2016) ............................................................................. 8

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.,*
   71 F.3d 885 (D.C. Cir. 1995) .......................................................................... 25, 26

*Ortiz v. HHS,*
   70 F.3d 729 (2d Cir. 1995)............................................................................ 21, 22

*Petrucelli v. DOJ,*
   106 F. Supp. 3d 129 (D.D.C. 2015) ...................................................................... 21

*Pickering v. DOJ,*
   No. 19-CV-001F, 2021 WL 5810396 (W.D.N.Y. Dec. 7, 2021) .......................................... 10

*Plunkett v. DOJ,*
   924 F. Supp. 2d 289 (D.D.C. 2013) ...................................................................... 24

*Proctor v. DOJ,*
   72 F.3d 920 (D.C.Cir.1996)............................................................................... 21

*Reed v. NLRB,*
   927 F.2d 1249 (D.C. Cir. 1991) .......................................................................... 26

*Rockwell Int'l Corp. v. DOJ,*
    235 F.3d 598 (D.C. Cir. 2001) ............................................................ 12, 13, 14

*Rosenberg v. U.S. Dep't of Immigr. & Customs Enf't,*
    13 F. Supp. 3d 92 (D.D.C. 2014) ............................................................ 21, 22

*Roth v. DOJ,*
    642 F.3d 1161 (D.C. Cir. 2011) ............................................................ 22

*Schoenman v. FBI,*
    575 F. Supp. 2d 166 (D.D.C. 2008) ............................................................ 24

*Schrecker v. DOJ,*
    349 F.3d 657 (D.C. Cir. 2003) ............................................................ 25, 27

*Senate of the Commonwealth of P.R. v. DOJ,*
    823 F.2d 574 (D.C. Cir. 1987) ............................................................ 23

*Students Against Genocide v. Dep't of State,*
    257 F.3d 828 (D.C. Cir. 2001) ............................................................ 15

*Tax Analysts v. Internal Revenue Serv.,*
    117 F.3d 607 (D.C. Cir. 1997) ............................................................ 8, 19, 27

*Thelen v. DOJ,*
    169 F. Supp. 3d 128 (D.D.C. 2016) ............................................................ 17

*Thompson v. Exec. Off. for U.S. Att'ys,*
    587 F. Supp. 2d 202 (D.D.C. 2008) ............................................................ 24

*DOJ v. Landano,*
    508 U.S. 165 (1993) ............................................................ 20, 21, 22

*DOJ v. Reps. Comm. for Freedom of the Press,*
    489 U.S. 749 (1989) ............................................................ 25, 27

*U.S. Dep't of State v. Wash. Post Co.,*
    456 U.S. 595 (1982) ............................................................ 24

*U.S. Secs. Exch. Comm'n v. Collector's Coffee Inc.,*
    337 F.R.D. 70  (S.D.N.Y. 2020) ............................................................ 10

*United States ex rel. Touhy v. Ragen,*
    340 U.S. 462 (1951) ............................................................ 4

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010) .................................................................................. 12

*United States v. Jacques Dessange, Inc.*,
    No. S2 99 Cr.  (DLC), 2000 WL 310345 (S.D.N.Y. Mar. 27, 2000) ...................................... 16

*United States v. Nobles*,
    422 U.S. 225 (1975).................................................................................................... 9

*Usher v. DOJ*,
    --- F. Supp. 3d ----, 2023 WL 6796032 (D.D.C. Oct. 13, 2023)................................. 4

*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975) ............................................................................. 18

*Williams & Connolly v. Secs. Exch. Comm'n*,
    662 F.3d 1240 (D.C. Cir. 2011) ................................................................... 9, 11, 16

*Williams v. FBI*,
    69 F.3d 1155 (D.C. Cir. 1995) .............................................................................. 20

*Winterstein v. DOJ*,
    89 F. Supp. 2d 79 (D.D.C. 2000) ............................................................................ 9

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ................................................................................ 7

**STATUTES**

5 U.S.C. § 552 ............................................................................................... *passim*

15 U.S.C. § 1 ....................................................................................................... 21

**RULES**

Fed. R. Civ. P. 26 ................................................................................................... 8

Fed. R. Civ. P. 56 ................................................................................................... 6

Fed. R. Crim. P. 6 ................................................................................................. 23

**INTRODUCTION**

In this Freedom of Information Act ("FOIA") case, Plaintiff Richard Usher filed a FOIA request with the Department of Justice's Antitrust Division for FBI FD-302 forms and notes memorializing interviews conducted by FBI special agents during the course of an investigation into an alleged conspiracy to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange spot market.

The government has withheld the FD-302s and interview notes under FOIA Exemption 5 because they fall squarely within the work-product doctrine.  During the time period relevant to Plaintiffs' FOIA requests, federal prosecutors, working with the FBI, interviewed a cooperating witness, Matthew Gardiner, about the alleged price-fixing conspiracy.  The prosecutors conducted these interviews to evaluate whether criminal prosecutions were warranted and to gather evidence that might support criminal charges.  Those facts confirm that the FD-302s and interview notes were prepared in anticipation of litigation and are thus protected work product. *See, e.g.*, *Leopold v. DOJ*, 487 F. Supp. 3d 1, 10–15 (D.D.C. 2020) (holding that FD-302s were work product); *Judicial Watch v. DOJ*, 391 F. Supp. 3d 43, 49–53 (D.D.C. 2019) (same), *aff'd*, 806 F. App'x 5 (D.C. Cir. 2020).

The government did not waive work-product protection by producing these FD-302s and notes to Usher's counsel in his prior criminal case.  The government produced the documents in that case in fulfillment of its criminal discovery obligations, and courts have held that disclosure in such circumstances does not result in the waiver of a FOIA exemption.  Moreover, the government produced the documents under a protective order that prohibited Usher's counsel from sharing the documents with anyone and required his counsel to destroy the documents at the end of the criminal case.  The documents therefore never entered the public domain, as would

be required to result in a waiver.  Usher's contrary view—that prosecutors waive work-product protection whenever they produce criminal discovery—would render protective orders in criminal cases meaningless, as any FOIA requester could simply obtain the discovery once it is produced.

Because all of the requested documents fall squarely within the work-product doctrine, the Court can and should resolve this case on that basis alone.  But the documents are also exempt under FOIA for a number of other reasons.  The interview notes are protected by the deliberative process privilege because they reflect the pre-decisional, deliberative thoughts, ideas, and impressions of FBI special agents.  The FD-302s and notes are also exempt under Exemption 7(D) because they contain information furnished by a confidential source, Mr. Gardiner.  Several pages of interview notes are also exempt under Exemption 3 because they contain federal grand jury material.  And the names and identifying information of several individuals are exempt under Exemption 6 and 7(C) given those individuals' substantial privacy interests.

Accordingly, the Court should grant summary judgment to Defendants.

## BACKGROUND

**A.    The Criminal Investigation and Prosecution of Mr. Usher**

In January 2017, a grand jury indicted Plaintiff Richard Usher and two other traders (Rohan Ramchandani and Christopher Ashton) for their alleged roles in a conspiracy to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market.  *See United States v. Usher*, No. 17-cr-19 (S.D.N.Y.).  The investigation that led to Usher's arrest was a joint effort involving the FBI and the Department of Justice's Antitrust Division, including the Division's New York Field Office.  *See* Declaration of Kathy Hsu ¶¶ 10, 33; Declaration of Michael Seidel ¶ 27.

2

As part of the government's investigation into Usher, Antitrust Division attorneys working with the FBI interviewed a cooperating witness, Matthew Gardiner, about his participation and communication in an FX chatroom with individuals who worked at different banks.  Hsu Decl. ¶ 33.  The attorneys conducted these interviews in connection with their evaluation of whether criminal prosecutions were warranted and supported by available evidence.  *Id.*  The interviews of Mr. Gardiner were memorialized by the FBI in what are known as "Form FD-302s," as well as various interview notes.  *Id.*

As part of criminal discovery in the S.D.N.Y. proceeding, federal prosecutors produced to Usher's counsel the FD-302s and interview notes pertaining to Mr. Gardiner.  The government produced these documents pursuant to a protective order.  *See* Declaration of John Robinson Ex. A (Protective Order).  Under the protective order, Usher's counsel agreed that they would use the documents "only for the purposes of the defense of, and the pursuit of any appeals in, this [*i.e.*, the S.D.N.Y.] criminal action."  *Id.* ¶ 1.  Usher's counsel agreed not to disclose the documents to anyone, except for certain limited "designated persons" assisting in Usher's defense.  *Id.* ¶ 2(a)–(b).  The protective order further provided that, following the conclusion of the criminal case, the documents "[s]hall be returned to the Government or destroyed . . . , together with any and all copies thereof." *Id.* ¶ 2(c).

In October 2018, a jury acquitted Usher of the charge against him.  Compl. ¶ 48.  Following the trial, Usher's counsel moved to modify the protective order to allow him to use the criminal discovery in a parallel enforcement action brought by the Office of the Comptroller of the Currency (discussed below).  *See* Letter Seeking Leave to Modify the Protective Order, *United States v. Usher*, No. 17-cr-19 (S.D.N.Y. Aug. 14, 2020), ECF No. 244.  The court denied Usher's motion and ordered him to "destroy all disclosed documents forthwith, and in no event

later than October 4, 2021."  Order, *United States v. Usher*, No. 17-cr-19 (S.D.N.Y. Sept. 27,

2021), ECF No. 273.

**B.      The OCC Proceeding and *Touhy* Request**

Around the same time as the criminal indictment in the S.D.N.Y. proceeding, the Office

of the Comptroller of the Currency ("OCC") initiated a parallel civil enforcement action against

Usher.  Compl. ¶ 49.  The OCC proceeding was then stayed pending disposition of the criminal

case.  After the acquittal in the S.D.N.Y. proceeding, the OCC proceeded with its civil

enforcement action against Usher.

In connection with the OCC proceeding, Usher submitted a *Touhy* request[1] to the

Antitrust Division for, among other things, the FD-302s and interview notes pertaining to Mr.

Gardiner.  *Id.* ¶ 73.  The Antitrust Division denied the request for several reasons, including that

the request—which covered over 2 million documents—was overly broad and unduly

burdensome.  Robinson Decl. Ex. B (*Touhy* denial).  Usher then brought a *Touhy* action to

challenge the denial in this Court.  *See Usher v. DOJ*, No. 21-cv-654.  During the pendency of

his challenge, however, the OCC withdrew its charges against Usher with prejudice.  Compl.

¶¶ 57, 75.  The Court accordingly dismissed the *Touhy* action as moot.  *See Usher v. DOJ*, No.

CV 21-654 (JMC), --- F. Supp. 3d ----, 2023 WL 6796032 (D.D.C. Oct. 13, 2023).

**C.      The Brazil Proceeding and Usher's FOIA Request**

Usher alleges that he is now facing a third enforcement action related to his alleged

involvement in the FX price-fixing conspiracy—this time brought by the Government of Brazil's

Administrative Council for Economic Defense.  Compl. ¶ 10.  Usher alleges that it is "in the

---

[1] A *Touhy* request seeks documents or testimony from the government when the government is
not a party to the underlying litigation.  *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462,
468 (1951).

4

public interest" that he have access to the Gardiner interviews in order to defend himself in the Brazil proceeding.  *Id.*

On February 28, 2023, Usher's counsel submitted a FOIA request to the Antitrust Division seeking "FBI 302 report(s) of any and all interviews of Matthew Gardiner, and any and all notes related to such interview(s)" in connection with the S.D.N.Y. proceeding.  Hsu Decl. Ex. A.  The Antitrust Division acknowledged Usher's FOIA request by letter dated March 14, 2023.  Hsu Decl. Ex. B.  The Antitrust Division's letter explained that because Usher was seeking information about a third party (Mr. Gardiner), Usher needed to provide a signed consent form from Mr. Gardiner or identify an overriding public interest in the disclosure of the records. *See id.*  In response, Usher's counsel sent the Division a letter dated April 25, 2023, purporting to identify an "overriding public interest in disclosure," namely, Usher's interest in defending himself in the Brazil proceeding.  *Id.* Ex. C.

**D.    This Litigation**

Usher filed the complaint in this case on July 18, 2023.  After Defendants answered, *see* ECF No. 15, the parties conferred and submitted a joint status report outlining their respective positions on further proceedings.  ECF No. 16.  The Court entered a scheduling order setting a deadline for the government to release any responsive, nonexempt documents and for the parties to brief summary judgment.  ECF No. 19.  The government thereafter moved to extend the production and briefing deadlines to allow adequate time for all interest agencies to complete their review of the documents.  ECF No. 20.  The Court granted the motion in part and denied it in part, directing the government to release all nonexempt records, together with a *Vaughn* index and declarations supporting any withholdings, by February 14, 2024.  *See* 01/11/2024 Minute Order.  The Court also set a briefing schedule for summary judgment.  *Id.*

On January 19, the Antitrust Division produced a first tranche of documents, consisting of 124 pages of responsive records.  Hsu Decl. Ex. D.  On February 14, the Antitrust Division produced the remaining 443 pages of responsive records, along with a *Vaughn* index and declarations supporting the government's withholdings.  *Id.* Ex. E.

Following the government's productions, the parties conferred to identify which issues remained in dispute.  Usher's counsel conveyed that they are not challenging the government's withholdings of names and identifying information of FBI agents and other government personnel.  Usher's counsel further conveyed that they are not challenging the government's withholdings of names and identifying information of third parties merely mentioned in the FD-302s or third parties of investigative interest, except the four FX chatroom participants:  Matthew Gardiner, Richard Usher, Rohan Ramchandani, and Christopher Ashton.  Usher objects to the remainder of the government's withholdings.

In accordance with the briefing schedule this Court adopted, Defendants now move for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  "FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  The Court reviews the government's response to the FOIA request *de novo*.  5 U.S.C. § 552(a)(4)(B).

The government must justify any information withheld subject to FOIA's statutory exemptions.  Congress recognized "that legitimate governmental and private interests could be

harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

**ARGUMENT**

**I.  THE GOVERNMENT PROPERLY WITHHELD ATTORNEY WORK PRODUCT UNDER EXEMPTION 5**

**A.  The FD-302s And Interview Notes Are Attorney Work Product**

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). Thus, as a threshold matter, to invoke this exemption, a record must be of the type intended to be covered by the phrase "inter-agency or intra-agency memorandums." *Id.* Here, "the information withheld pursuant to Exemption 5 is located within FBI interview summaries, or FD-302s, and interview notes" that were "generated within the Executive Branch—specifically, by FBI investigative personnel assigned to work under the direction of Federal prosecutors with the Antitrust Division, Criminal Division, and SEC." Hsu Decl. ¶ 31. Thus, the FD-302s and notes satisfy the "inter-/intra-agency" threshold. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (stating that the "source must be a Government agency").

7

Exemption 5 applies to records that would "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Accordingly, Exemption 5 "allows the government to withhold records from FOIA disclosure under at least three privileges: the deliberative-process privilege, the attorney-client privilege, and," as relevant here, "the attorney work-product privilege."  *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

"The work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'"  *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)). The doctrine covers "the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in anticipation of litigation."  *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997).

The D.C. Circuit has recognized that the work-product doctrine "should be interpreted broadly and held largely inviolate."  *Jud. Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005).  The doctrine serves "a complex of interrelated interests," ranging from "clients' interests in obtaining good legal advice, undistorted by mechanisms to avoid discovery, to the interests of attorneys in their own intellectual product."  *In re Sealed Case*, 676 F.2d 793, 809 n.56 (D.C. Cir. 1982) (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).  "Proper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."  *Hickman*, 329 U.S. at 511.  "Were [attorney work product] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten."  *Id.*  "Inefficiency, unfairness and sharp practices would inevitably develop in the

giving of legal advice and in the preparation of cases for trial . . . [,] [a]nd the interests of the clients and the cause of justice would be poorly served.  *Id.*at 511–12.

In the criminal context, the work-product doctrine's "role in assuring the proper functioning of the criminal justice system is even more vital." *United States v. Nobles*, 422 U.S. 225, 238 (1975).   Accordingly, courts routinely hold that documents prepared in anticipation of criminal prosecution may be withheld as attorney work product.  *See, e.g.*, *Winterstein v. DOJ*, 89 F. Supp. 2d 79, 79, 81 (D.D.C. 2000) (concluding there was "no question" that a DOJ Office of Special Investigations memorandum "prepared during the course of an investigation" was prepared in anticipation of litigation given "the contemplated prosecution" of the investigation's target).  And unlike in the civil discovery context, where "work product protection may be overcome for cause," FOIA does not include a "for cause" provision.  *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011).   "[A]ny materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA."  *Id.* (citation omitted).

Applying these principles, courts have repeatedly held that FBI FD-302s are protected under the work-product doctrine.  *See, e.g.*, *Leopold v. DOJ*, 487 F. Supp. 3d 1, 10–15 (D.D.C. 2020); *Judicial Watch v. DOJ*, 391 F. Supp. 3d 43, 49–53 (D.D.C. 2019), *aff'd*, 806 F. App'x 5 (D.C. Cir. 2020).   For example, in *Leopold*, the court held that FD-302s memorializing interviews conducted as part of Special Counsel Mueller's investigation into Russian interference into the 2016 election fell "squarely within the scope of the [attorney work product] privilege."  487 F. Supp. 3d at 11.   That was because the interviews, like the interviews here, were prepared "in anticipation of the potential for criminal charges" and "for the purpose of

gathering or otherwise assessing the extent to which evidence could be obtained to support criminal charges." *Id.*

Similarly, in *Judicial Watch*, the court held that FD-302s memorializing interviews conducted as part the FBI's investigation into Rod Blagojevich were attorney work product. 391 F. Supp. 3d at 47. "FBI agents prepared the Form 302s after witness interviews for which the AUSAs had selected the subjects, coordinated the questioning and strategy, and had been participants." *Id.* at 53. The court held that "[b]ecause the Forms 302 were prepared in anticipation of impending litigation by FBI agents acting under the substantial direction of Assistant United States Attorneys," they were attorney work product and were properly withheld under Exemption 5. *Id.*; *see also N.Y. Times Co. v. DOJ*, 138 F. Supp. 3d 462, 475–76 (S.D.N.Y. 2015) (holding that FD-302s were work product), *aff'd in part, rev'd in part on other grounds*, 939 F.3d 479 (2d Cir. 2019); *Pickering v. DOJ*, No. 19-CV-001F, 2021 WL 5810396, at *13 (W.D.N.Y. Dec. 7, 2021) (same); *SEC v. Collector's Coffee Inc.*, 337 F.R.D. 70, 76–80 (S.D.N.Y. 2020) (interview notes related to FD-302 were attorney work product), *objections overruled,* No. 19 CIV. 4355 (VM), 2021 WL 391298 (S.D.N.Y. Feb. 4, 2021).

As in these cases, the FD-302s and associated interview notes at issue here "fall[] squarely within the scope of the [work product] privilege." *Leopold*, 487 F. Supp. 3d at 11. As in the cases described above, the FD-302s and notes were prepared in anticipation of litigation. Hsu Decl. ¶ 33; Seidel Decl. ¶ 27. Specifically, the documents were prepared during the Antitrust Division's investigation into possible violations of the federal antitrust laws by participants in the FX Spot Market, including Usher. Hsu Decl. ¶¶ 10, 33. Attorneys conducted these interviews "in connection with their evaluation of whether criminal prosecutions were warranted and supported by available evidence" and "for the purpose of gathering or otherwise

assessing the extent to which evidence could be obtained to support criminal charges." *Id.* ¶ 33. The FD-302s and notes "reflect strategic considerations on the part of DOJ attorneys, including what to ask, what not to ask, and how to confront the witness with information or documents." Seidel Decl. ¶ 27.  "All this analysis reflects the mental impressions and strategic determinations of DOJ attorneys and is incorporated into the FD-302s at issue that were drafted by FBI personnel in anticipation of a potential prosecution." *Id.*  Public disclosure of the attorney work product revealed by the FD-302s and notes "would reveal the mental impressions and strategy of the prosecutors while investigating the case and undermine the Department's core function to investigate potential criminal conduct." Hsu Decl. ¶ 34.

   For purposes of whether the work-product doctrine applies, it is irrelevant that the government previously produced the documents to Usher's counsel in his criminal case.  As the *Leopold* court recognized, "the decision of the Department to disclosure the FD-302s in a criminal proceeding has no bearing on whether the FOIA permits the Department to withhold such information."  487 F. Supp. 3d at 12 (alterations omitted) (quoting *Williams & Connolly*, 662 F.3d at 1244).  "'[I]n criminal trials, evidentiary privileges may give way for any number of reasons,' and 'disclosure in criminal trials is based on different legal standards than disclosure under the FOIA, which turns on whether a document would usually be discoverable in a civil case.'" *Id.* (alterations omitted) (quoting *Williams & Connolly*, 662 F.3d at 1244–45).  "Similar documents . . . are not—indeed must not be—treated similarly in the two different types of proceedings." *Williams & Connolly*, 662 F.3d at 1245.

   Accordingly, as in *Leopold*, *Judicial Watch*, and the other cases cited above, the FD-302s and interview notes are subject to the work-product doctrine.  They may therefore be withheld in

their entirety under Exemption 5.  *See Jud. Watch, Inc. v. DOJ*, 800 F. Supp. 2d 202, 211

(D.D.C. 2011) (segregability not required for work-product documents under Exemption 5).

### B.    The Government Did Not Waive the Work-Product Privilege

Usher nonetheless contends that "[a]ny work-product privilege has . . . been waived"

because the government previously produced the FD-302s to Usher's counsel in his criminal

case.  Compl. ¶ 1.  Not so.

The D.C. Circuit has recognized that even voluntary disclosure "does not necessarily

waive work-product protection."  *United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir.

2010).  That is because, in contrast to the attorney-client privilege, the purposes underlying the

work-product privilege are "more complex."  *In re Sealed Case*, 676 F.2d at 818.  As noted,

those purposes include broadly promoting the "vitality of the adversary system itself, rather than

simply seeking to preserve confidentiality."  *Id.* at 809.  Thus, courts have held that selective

disclosure of information—"even in some circumstances to an adversary"—will not necessarily

result in waiver of the work-product protection.  *Id.* at 818.  Rather, the key question is whether

the party claiming the privilege "seeks to use it in a way that is not consistent with the purpose of

the privilege."  *Id.*

Applying these principles, in *Rockwell International Corp. v. DOJ*, 235 F.3d 598 (D.C.

Cir. 2001), the D.C. Circuit held that DOJ had not waived work-product protection by providing

certain documents to a Congressional committee and relying on them in a public report.  *Id.* at

600, 605.  The Court held that DOJ had not waived work-product protection because "none of

the Department's [prior] actions was inconsistent with keeping the documents secret."  *Id.* at

605.  The Court emphasized the "steps the Department took to maintain [the documents']

confidentiality, such as securing a promise of confidentiality from" the Congressional

committee.  *Id.*  And the Court observed that DOJ's limited disclosure under an assurance of

confidentiality should not mean that "*any* plaintiff suing the agency . . . would be able to obtain disclosure of those documents."  *Id.* at 607.

Here, as in *Rockwell*, the government's reliance on the work-product doctrine to withhold the FD-302s and interview notes is "consistent with the purpose of the privilege."  *In re Sealed Case*, 676 F.2d at 818.  As an initial matter, the government did not produce the documents voluntarily, but rather in fulfillment of its criminal discovery obligations.  *See* Robinson Decl. Ex. C (12/18/2020 Letter) at 8 (noting that documents were produced in "fulfillment of the Government's Rule 16, *Brady*, and *Giglio* obligations").  As the D.C. Circuit recognized in *In re Sealed Case*, "if the party's prior disclosure, even to an adversary, resulted from judicial compulsion, courts will not imply a waiver."  676 F.2d at 817.  For example, in *Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999), the Circuit held that disclosure of *Brady* material did not waive a FOIA exemption because "constitutionally compelled disclosure to a single party simply does not enter the public domain."  *Id.* at 556; *see also Equity Analytics, LLC v. Lundin*, 248 F.R.D. 331, 334 (D.D.C. 2008) ("[A] judicially compelled disclosure of otherwise privileged information is not a waiver.").  Similarly, here, the FD-302s and interview notes have never "enter[ed] the public domain," but rather were "simply provided to . . . counsel as *Brady* [and other criminal discovery] material."  *Cottone*, 193 F.3d at 556.[2]

---

[2] As explained in the Seidel declaration, certain select portions of the FD-302s were identical to portions of information contained in trial transcripts from the S.D.N.Y. proceeding.  Seidel Decl. ¶ 9 n.4.  The FBI reviewed all of the responsive records and released those portions of the FD-302s that had entered the public domain as part of the S.D.N.Y. criminal trial.  *See Cottone*, 193 F.3d at 556 (holding that otherwise exempt wiretapped recordings that had been played in open court during criminal trial were no longer exempt from disclosure under FOIA, whereas recordings that were simply provided to counsel in criminal discovery retained their exemption). The withheld portions of the FD-302s have not entered the public domain.  Seidel Decl. ¶ 9.

Moreover, and significantly, the government produced the FD-302s and interview notes to Usher's counsel pursuant to a protective order that ensured they would be kept confidential. *See* Robinson Decl. Ex. A (Protective Order).  Usher's counsel expressly agreed that Usher and his counsel would use the documents "*only* for the purposes of the defense of, and the pursuit of any appeals in, this [i.e., the S.D.N.Y.] criminal action."  Protective Order ¶ 1 (emphasis added). Usher's counsel agreed not to disclose the documents to anyone, except for certain limited "designated persons" assisting in Usher's defense.  *Id.* ¶ 2(a)–(b).  And Usher's counsel agreed to destroy or return to the government or destroy all of the documents following the conclusion of the S.D.N.Y. proceeding.  *Id.* ¶ 2(c).  These actions by the government, including "the steps the Department took to maintain [the documents'] confidentiality" demonstrate "a desire to keep the [documents] secret."  *Rockwell*, 235 F.3d at 605.  And they ensured that the documents did not "enter the public domain" but rather were disclosed only to defense counsel for the limited purpose of defending Usher in the S.D.N.Y. proceeding.  *Cottone*, 193 F.3d at 556; *see also Allnet Commc'n Servs. v. FCC*, 800 F. Supp. 984, 989 (D.D.C. 1992) (finding no waiver where information was made available "pursuant to strict confidentiality agreements"); *Mehl v. EPA*, 797 F. Supp. 43, 47 (D.D.C. 1992) ("The existence and scope of a waiver depends on the scope of the disclosure.").

Courts in similar circumstances have held that the government's disclosure of information in a criminal proceeding does not result in a waiver of a FOIA exemption.  *See, e.g.*, *Mingo v. DOJ*, No. 08-2197 (CKK), 2009 WL 2618129, at *2 (D.D.C. Aug. 24, 2009) ("The fact that plaintiff may have received a document during discovery in a criminal proceeding is not material to the issue of whether [the government] fulfilled its statutory obligations under the FOIA.").  "Unlike a *Brady* disclosure made only to the individual defendant, 'a disclosure made

14

to any FOIA requester is effectively a disclosure to the world at large.'"  *Id.* (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001)).  Thus, "*Brady* does not foreclose the government from asserting FOIA exemptions even as to information that may have been previously disclosed to a defendant in a criminal proceeding."  *Id.*; *see also Cottone*, 193 F.3d at 556; *Manna v. DOJ*, 815 F. Supp. 798, 813 (D.N.J. 1993) ("Disclosure of information during the course of a criminal proceeding does not constitute a waiver of a FOIA exemption."); *Garside v. Webster*, 733 F. Supp. 1142, 1147 (S.D. Ohio 1989) (similar); *Erb v. DOJ*, 572 F. Supp. 954, 956 (W.D. Mich. 1983) (similar).

Under Usher's view, by contrast, the government would forever waive work-product protection whenever it produces documents in criminal discovery, even when it produces those documents only to defense counsel under a protective order requiring counsel to destroy the documents at the conclusion of the criminal case.  That cannot be correct.  It would render protective orders in criminal cases essentially meaningless, as any FOIA requester could simply obtain the prosecution's complete discovery file once it is produced to the defense.  *See Students Against Genocide*, 257 F.3d at 836 ("[A] disclosure made to any FOIA requester is effectively a disclosure to the world at large.")  Nothing would then prevent the requester from making the prosecution's discovery file—including any core work-product materials—broadly available to the public.  *See id.* ("[C]ourts lack authority to limit the dissemination of documents once they are released under FOIA.").  Nothing could be more inconsistent with the purposes underlying the work-product doctrine.  *See In re Sealed Case*, 676 F.2d at 809 & n.56 (doctrine designed to allow attorney to prepare case "undistorted by mechanisms to avoid discovery"); *Hickman*, 329 U.S. at 511 ("Were [work product] materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore

15

inviolate, would not be his own."); *United States v. Jacques Dessange, Inc.*, No. S2 99 Cr. 1182 (DLC), 2000 WL 310345, at *3 (S.D.N.Y. Mar. 27, 2000) (recognizing the "heightened need for thorough preparation in criminal cases unhampered by the fear of compelled disclosure").

Usher's view could also lead to unintended and undesirable consequences for the criminal justice system more broadly.  Under current practice, prosecutors often err on the side of producing more criminal discovery to defense counsel than is required, "in an abundance of caution."  Robinson Decl. Ex C (12/18/2020 Letter) at 8 (explaining practice in the Southern District of New York).  This practice benefits both prosecutors, who need not sift through each page of discovery to determine what truly must be produced, and defendants, who benefit from receiving more discovery than may actually be required.  But if Usher were correct—and prosecutors cannot use protective orders to shield otherwise privileged criminal discovery from future FOIA requests—then prosecutors would have to be more circumspect in what they produce to the defense.  "To uphold [Usher's] waiver theory would be to impinge on [prosecutorial] discretion and to deter [prosecutors] from voluntarily" producing criminal discovery.  *Williams & Connolly*, 662 F.3d at 1245.  "Sharp practices would inevitably develop . . . , [a]nd the interests of the clients and the cause of justice would be poorly served."  *Hickman*, 329 U.S. at 511.  The work-product doctrine does not require that result.

Accordingly, because the FD-302s and interview notes are attorney work product, and because the government has not waived the work-product protection, the Court should uphold the government's work-product withholdings under Exemption 5.[3]

---

[3] The government invoked attorney work product to defend all of its withholdings, except for a cover page to one set of interview notes.  Seidel Decl. Ex. A at 5 (FBI Bates No. 65).  The government withheld a third party's name and phone number on that cover page under exemptions (b)(6) and (b)(7)(C).  As noted above, Usher's counsel does not object to this

**II.     THE GOVERNMENT PROPERLY WITHHELD INFORMATION PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE UNDER EXEMPTION 5**

The government withheld draft typed and handwritten investigative interview notes that are protected from disclosure by the deliberative process privilege under Exemption 5.  The deliberative process privilege applies to "decisionmaking of executive officials generally," and protects documents containing deliberations that are part of the process by which government decisions are formulated.  *In re Sealed Case*, 121 F.3d 729, 737, 745 (D.C. Cir. 1997).  The purpose of the privilege is to "prevent injury to the quality of agency decisions" by "encourag[ing] frank discussion of policy matters, prevent[ing] premature disclosure of proposed policies, and avoid[ing] public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action."  *Thelen v. DOJ*, 169 F. Supp. 3d 128, 138 (D.D.C. 2016) (quoting *NLRB*, 421 U.S. at 151).

To fall within the scope of the deliberative process privilege, the material must be both pre-decisional and deliberative.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Material is pre-decisional if "it was generated before the adoption of an agency policy."  *Id.*  Material is deliberative if "it reflects the give-and-take of the consultative process." *Id.*  The privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Id.*

"There should be considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take—of the deliberative process—by which the decision itself is made.'" *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp.

---

withholding.  Accordingly, if the Court upholds the government's withholdings under the work-product exemption, it need not consider or address the other exemptions discussed below.

114, 118 (D.D.C. 1984) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).  The

agency is best situated "to know what confidentiality is needed 'to prevent injury to the quality

of agency decisions.'" *Id.* at 118 (quoting *NLRB*, 421 U.S. at 151).

As explained in the Seidel and Hsu declarations and the *Vaughn* index, the government

has invoked Exemption 5 to withhold draft typed and handwritten investigative interview notes.

These notes "contain the Special Agents' shorthand notes containing thoughts, ideas,

impressions and interpretations of the verbal interview of [Mr. Gardiner], as well as the

information conveyed during the interview the Special Agents determined should be noted for

purposes of further analysis and consideration."  Seidel Decl. ¶ 23.  These thoughts, ideas,

impressions, interpretations, and information are then "fleshed out and distilled during the

editorial process for the creation of the official FD-302," which "reflects the FBI's final decision

regarding the relevance of the impression and information gleaned during the interview."  *Id.*

The notes "may not reflect the entire scope of information covered during the interview," as

"additional information may be added to the official FD-302 during the editing phase."  *Id.*

Likewise, there "could also be information contained within the typed and handwritten notes that

is not included in the official FD-302."  *Id.*

Such "interview notes and summaries are routinely found to be subject to Exemption 5."

*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 169–70

(D.D.C. 2017); *see also, e.g.*, *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 71

(D.D.C. 2006) (holding that Exemption 5 applies where "disclosure of material considered for

but not utilized in" public reports "would reveal the editorial judgment of" agency staff);

*Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (holding that notes taken by

SEC officials in meetings were subject to Exemption 5 because they "distill[ed] discussions

reflecting the impressions of SEC officials").  The notes represent "summaries 'culled by [FBI

Special Agents] from a much larger universe of facts presented to [them]' and therefore 'reflect

an exercise of judgment as to what issues are most relevant to the pre-decisional findings and

recommendations.'"  *Hardy*, 243 F. Supp. 3d at 169 (quoting *Ancient Coin Collectors Guild v.

U.S. Dep't of State*, 641 F.3d 504, 513–14 (D.C. Cir. 2011)).

  The deliberative process privilege "reflect[s] the legislative judgment that 'the quality of

administrative decision-making would be seriously undermined if agencies were forced to

'operate in a fishbowl.'"  *Tax Analysts*, 117 F.3d at 617 (quoting *Mead Data Cent., Inc. v.

Department of the Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977)).  As the Seidel declaration

explains, release of special agents' notes "would have a chilling effect on special agents'

willingness to documents their thoughts, impressions, interpretations, and . . . investigative

strategies."  Seidel Decl. ¶ 24.  This would "lead to FD-302 reports that are less comprehensive

and thus less helpful to the FBI's investigative process."  *Id.*  This is precisely the kind of harm

to agency decision-making that the deliberative process privilege is designed to prevent.

Because the interview notes fall under the deliberative process privilege, the government

properly withheld them under Exemption 5.

## III.   THE GOVERNMENT PROPERLY WITHHELD INFORMATION FURNISHED BY A CONFIDENTIAL SOURCE UNDER EXEMPTION 7(D)

The government also withheld the FD-302s and interview notes under Exemption 7(D),

which permits the withholding of law enforcement records if their release "could reasonably be

expected to disclose the identity of a confidential source . . . and, in the case of a record or

information compiled by a criminal law enforcement authority in the course of a criminal

investigation . . . information furnished by a confidential source."  Exemption 7(D) requires no

balancing of public and private interests.  *See Dow Jones & Co. v. DOJ*, 917 F.2d 571, 575–76

(D.C. Cir. 1990) (quoting 5 U.S.C. § 552(b)(7)(D)).  The exemption applies if the government

establishes that a source has provided information under either an express or implied promise of

confidentiality.  *See Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995).  A confidential

source is one who "provided information under an express assurance of confidentiality or in

circumstances from which such an assurance could be reasonably inferred."  *DOJ v. Landano*,

508 U.S. 165, 172 (1993) (citation omitted).  An implied assurance of confidentiality may be

found "when circumstances such as the nature of the crime investigated and the witness' relation

to it support an inference of confidentiality."  *Id.* at 181.

Here, the government asserted Exemption 7(D) to protect the identifying information of

and information provided by Mr. Gardiner, who provided information to the FBI under an

implied assurance of confidentiality.  Seidel Decl. ¶ 42; Hsu Decl. ¶¶ 54, 56.  As the FBI

explained, Gardiner provided the FBI with "specific[,] detailed" information concerning the

criminal activities of subjects of the money market manipulation investigation at issue.  Seidel

Decl. ¶ 42.  Gardiner provided such information pursuant to a proffer agreement under which he

was provided an assurance against full prosecution if he provided the government with

information regarding the investigation.  *Id.* ¶ 43.  Based on (1) "the singularity of the

information provided by Mr. Gardiner," (2) "the proximity of Mr. Gardiner to the investigative

subjects and events he described," and (3) "the nature of the criminal acts he described," the FBI

concluded that Mr. Gardiner provided information to the FBI only because he believed his

identifying information, and the information he provided, would remain confidential.  *Id.* ¶ 42;

*see also* Hsu Decl. ¶ 55.  "Because the FBI specializes in law enforcement," these judgments are

"entitled to deference."  *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998).

The government's withholding of Gardiner's identifying information,[4] and the

information he provided, was therefore proper.  The most important factors in determining

whether implied confidentiality exists are "[t]he nature of the crime and the source's relation to

it."  *Landano*, 508 U.S. at 179.  There can be no dispute that the federal crime Gardiner reported

on was serious—Usher and his codefendants were charged with conspiring to violate the

Sherman Act in violation of 15 U.S.C. § 1, a crime punishable by up to 10 years in prison.

While the crime may not have been violent, Exemption 7(D) is not limited to situations involving

violent crimes, and "[c]ourts have found informants to have spoken under implied assurances of

confidentiality when they provided information about similarly severe non-violent financial

crimes."  *Rosenberg v. United States Dep't of Immigr. & Customs Enf't*, 13 F. Supp. 3d 92,

111–12 (D.D.C. 2014) (collecting cases); *see also Ortiz v. HHS*, 70 F.3d 729, 733 (2d Cir. 1995)

(Exemption 7(D)'s protection "extends to situations where the danger of retaliation encompasses

more than the source's physical safety").  For example, in *Rosenberg*, the Court held that the

"severity of the [nonviolent] crime and the close association that certain informants had with

[defendants'] fraudulent activity" permitted "a reasonable inference that for these informants 'the

communication in all likelihood would not have been made if confidentiality had not been

assured.'"  13 F. Supp. 3d at 110 (quoting *Ortiz*, 70 F.3d at 734).

---

[4] It is appropriate to withhold the identifying information of a confidential source under
Exemption 7(D) even if the source eventually testifies publicly at trial, as Mr. Gardiner did.  *See
Proctor v. DOJ*, 72 F.3d 920 (D.C.Cir.1996) ("The fact that individuals who testified or were
listed as possible witnesses may have been confidential informants did not waive the FBI's right
pursuant to Exemption 7(D) to withhold the information"); *Petrucelli v. DOJ*, 106 F. Supp. 3d
129, 136–37 (D.D.C. 2015) ("Nor is the FBI obligated to release information pertaining to any
third party merely because the third party testified at trial . . . .).

Moreover, as in *Rosenberg*, the FBI appropriately relied on Gardiner's "proximity . . . to the investigative subjects and events he described" in concluding that he likely expected that the information he provided would remain confidential.  Seidel Decl. ¶ 42; *see Landano*, 508 U.S. at 179–80.  Gardiner provided information about his participation and communication in the FX chatroom with individuals who worked at different banks, including Usher and his codefendants. Hsu Decl. ¶ 33.  The chatroom participants engaged in "near-daily conversations" in these chat rooms, discussing "among other things, past, current, and future customer orders and trades." Hsu Decl. Ex. F (Indictment) ¶ 23(a).  Gardiner provided information about these conversations over the course of at least eight interviews with federal authorities that spanned more than two years.  *See Roth v. DOJ*, 642 F.3d 1161, 1184 (D.C. Cir. 2011) (noting a source's "ongoing relationship" with law enforcement as another factor suggesting an implied assurance of confidentiality).

Accordingly, the Court should uphold the government's withholdings under Exemption 7(D).

## IV.   THE GOVERNMENT PROPERLY WITHHELD GRAND JURY MATERIALS UNDER EXEMPTION 3

The government also withheld certain information on nine pages of one set of interview notes for the additional reason that it falls under FOIA exemption 3.  Hsu Decl. ¶ 60; Seidel Decl. ¶ 16 & Ex. A at 8.  Exemption 3 applies to matters "specifically exempted from disclosure by statute" provided that such statute (A) "requires that the matters be withheld from the public in such manner as to leave no discretion on the issue," or (B) "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

The government relied on Federal Rule 6(e) of the Federal Rules of Criminal Procedure to withhold federal grand jury information.  Hsu Decl. ¶¶ 59–60, Seidel Decl. ¶¶ 14–17.  The

D.C. Circuit "recognized long ago that requests for documents related to grand jury investigations implicate FOIA's third exception, because Rule 6(e) of the Federal Rules of Criminal Procedure prohibits government attorneys and others from 'disclos[ing] a matter occurring before the grand jury.'" *Lopez v. DOJ*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (quoting Fed. R. Crim. P. 6(e)(2)(B). "The relevant inquiry for th[e] Court is whether disclosure of the information requested would 'tend to reveal some secret aspect of the grand jury's investigation, such . . . as the identities of witnesses or jurors, the substance of testimony, the [strategic] direction of the investigation, the deliberations or questions of jurors, and the like.'" *Id.* (quoting *Senate of the Commonwealth of P.R. v. DOJ*, 823 F.2d 574, 582 (D.C. Cir. 1987).

Here, the government redacted information in one set of the interview notes that "contains information that identifies specific records subpoenaed by a federal grand jury." Seidel Decl. ¶ 15. Specifically, the withheld material includes information that "explicitly references grand jury exhibits and provides details about the contents of those documents." *Id.* ¶ 16. This information "reveals specific aspects of the [grand jury's] investigation," and its release would "reveal[] the secret, inner workings of the [grand jury], including the type of information sought, collected and relied upon by the [grand jury] in its investigation, the focus and scope [of] the [grand jury] investigation, the strategy and direction of the [grand jury] investigation including where the grand jury sought evidence, and the steps the grand jury took in its investigation." *Id.* Accordingly, the government properly withheld this information under exemption 3. *See, e.g.*, *Thompson v. Exec. Off. for U.S. Att'ys*, 587 F. Supp. 2d 202, 206 (D.D.C. 2008) ("Clearly, . . . grand jury exhibits fall within the . . . categories of protected information."); *Borda v. U.S. Dep't of Just., Crim. Div.*, 306 F. Supp. 3d 306, 317 (D.D.C. 2018) (holding that

grand jury exhibit was exempt from disclosure under Exemption 3); *Plunkett v. DOJ*, 924 F. Supp. 2d 289, 299 (D.D.C. 2013) (same).

## V.   THE GOVERNMENT PROPERLY WITHHELD IDENTIFYING INFORMATION OF THIRD PARTIES UNDER EXEMPTIONS 6 AND 7(C)

The names and identifying information of several categories of individuals mentioned in the 302s are exempt under Exemptions 6 and 7(C).  Exemption 6 allows an agency to withhold information in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  For this exemption to apply, the information at issue must be maintained in a government file and apply to a particular individual.  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982).  Once this threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure.  *See Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976).

Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7), (b)(7)(C).  As a threshold matter, for Exemption 7(C) to apply the records at issue must have been compiled for law enforcement purposes.  *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008).  Once it has been determined that a record was compiled for law enforcement purposes, as with Exemption 6, Exemption 7(C) requires the agency to balance the relevant individual privacy rights against the public interest in disclosure.  *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989); *Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  In assessing privacy interests, the D.C. Circuit has consistently held that Exemption 7(C) protects the privacy interests

of all persons mentioned in law enforcement records, including investigators, suspects, witnesses, and informants. *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003). "[S]uch third-party information is 'categorically exempt' from disclosure under exemption 7(C), in the absence of an overriding public interest in its disclosure." *Lewis v. DOJ*, 609 F. Supp. 2d 80, 84 (D.D.C. 2009), *aff'd*, No. 09-5225, 2010 WL 1632835 (D.C. Cir. Apr. 7, 2010) (quoting *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995)).

The balancing analysis for Exemption 7(C) is similar to the analysis conducted under Exemption 6, but the analysis under Exemption 7(C) tilts more in favor of nondisclosure. *See Reps. Comm.*, 489 U.S. at 755-56 (comparing statutory language of Exemption 6 and Exemption 7(C)); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991) (explaining similarity of Exemption 6 analysis and Exemption 7(C) analysis). Because the analyses under Exemptions 6 and 7(C) are similar, case law pertaining to one of the privacy exemptions is often germane in considering the other. *See e.g.*, *Reed*, 927 F.2d at 1251.

Exemptions 6 and 7(C) apply to five categories of individuals mentioned in the 302s: (1) FBI special agents, (2) third parties who provided information to the FBI, (3) other third parties mentioned in the witness interviews, (4) other third parties of investigative interests, and (5) personnel from non-FBI federal government agencies (including the Antitrust Division, the DOJ's Criminal Division, and the Securities and Exchange Commission). Seidel Decl. ¶ 12. As noted above, Usher does not challenge the government's withholdings as to categories (1) and (5) (FBI special agents and other government personnel).

Usher does challenge the government's withholding as to category (2), which pertains to the identifying information of Mr. Gardiner. As the Seidel declaration explains, the identifying information includes personal information of Mr. Gardiner such as "his date of birth, mailing

address, home and cellular telephone numbers, and information concerning his employment and education history."  Seidel Decl. ¶ 36.  As noted, the D.C. Circuit has held that such third-party information is "categorically exempt" from disclosure "in the absence of an overriding public interest in its disclosure."  *Lewis*, 609 F. Supp. 2d at 84 (quoting *Nation Mag.*, 71 F.3d at 896).  The FBI "could identify no cognizable public interest in the disclosure of this information because disclosure of Mr. Gardiner's identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI."  Seidel Decl. ¶ 37.  Accordingly, the government properly withheld this information under Exemptions 6 and 7(C).

Usher also challenges the government's withholding as to categories (3) and (4) to the extent they apply to the four FX chatroom participants:  Matthew Gardiner, Richard Usher, Rohan Ramchandani, and Chris Ashton.  The government withheld the names and identifying information of Mr. Gardiner, Mr. Ramchandani, and Mr. Ashton because it determined that those individuals had substantial privacy interests in not having that information publicly disclosed.  Seidel Decl. ¶ 39; Hsu Decl. ¶ 46.  Some of the individuals were eventually acquitted of criminal wrongdoing, and releasing the FD-302s with their names unredacted could subject them to harassment, embarrassment, and undue public attention.  Hsu Decl. ¶ 46; Seidel Decl. ¶ 39.  The government accordingly determined that these individuals had substantial privacy interests in not having their identities disclosed.  By contrast, disclosing personal information about these individuals "would not significantly increase the public's understanding of the [Antitrust Division's or FBI's] performance of its mission."  Hsu Decl. ¶ 47; Seidel Decl. ¶ 39.  The government thus concluded that there was no public interest sufficient to override the individual's privacy interests.  Hsu Decl. ¶ 47; Seidel Decl. ¶ 39; *see also Schrecker*, 349 F.3d at

661 ("The public interest in disclosure must be evaluated in light of FOIA's central purpose: 'to open *agency* action to the light of public scrutiny.'" (emphasis added) (quoting *Reps. Comm.*, 489 U.S. at 772)).

Accordingly, the government properly withheld names and identifying under Exemptions 6 and 7(C).

## VI.   THE GOVERNMENT COMPLIED WITH THE FORESEEABLE HARM STANDARD IN THE FOIA IMPROVEMENT ACT OF 2016

The FOIA Improvement Act of 2016 requires that agencies "withhold information . . . only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)."  5 U.S.C. § 552(a)(8)(i)(I).

The government's declarations easily meet this standard for each category of withholdings asserted by the agencies.[5]  Beginning with attorney work product under Exemption 5, as noted, the work-product doctrine is designed to protect "the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in anticipation of litigation."  *Tax Analysts*, 117 F.3d at 620.  Here, the government's declarations explained that "[p]ublic disclosure of the attorney work-product revealed by the FD-302[s] and notes would reveal the mental impressions and strategy of the prosecutors while investigating the case and undermine the Department's core function to investigate potential criminal conduct." Hsu Decl. ¶ 34; *see also* Seidel Decl. ¶ 27.  Publicly revealing the FD-302s and notes would also "inhibit the ability of attorneys to conduct future investigations."  Hsu Decl. ¶ 34.

---

[5] The agencies need not show foreseeable harm for its Exemption 3 withholdings because the Act states that "[n]othing [in the Act] requires disclosure of information that is . . . otherwise exempted from disclosure under subsection (b)(3) [Exemption 3]."  *Id.* § 552(a)(8)(B).  The government therefore need not show foreseeable harm to withhold documents under Exemption 3.  *Ball v. U.S. Marshals Serv.*, No. CV 19-1230 (JEB), 2021 WL 4860590, at *9 (D.D.C. Oct. 19, 2021).

Similarly, the deliberative process privilege exists to "prevent injury to the quality of agency decisions" by permitting "the withholding of all papers which reflect the agency's group thinking in the process of working out its policy." *NLRB*, 421 U.S. at 151. Again, the government's declarations explained several ways in which release of the interview notes would "result in . . . foreseeable harm." Seidel Decl. ¶ 24; *see also* Hsu Decl. ¶ 38. "First, it would have a chilling effect on special agents' willingness to document their thoughts, impressions, interpretations, and in some instances, investigative strategies, which is imperative to their ability to prepare the official FD-302 interview report." Seidel Decl. ¶ 24. "Second, release of the typed handwritten interview notes would reveal special agents' internal deliberations . . . ." *Id.* "Finally, release of the typed and handwritten interview notes would also create public confusion as it will reveal information noted in the handwritten interview notes that special agents later determined was not necessary for inclusion in the final, official FD-302 interview report." *Id.*; *see also* Hsu Decl. ¶ 38.

The government has made similarly persuasive showings with respect to Exemption 6 and 7. As the Seidel declaration explains, releasing the information provided by Mr. Gardiner "could have disastrous consequences." Seidel Decl. ¶ 44. Among other things, Gardiner could be subject to "violent reprisals," "defamation of [his] character among [his] peers/family," or "economic reprisal (deprivation of employment/business opportunities)." *Id.*; *see also* Hsu Decl. ¶ 56. The government's declarants similarly explained why releasing the names and identifying information of certain other third parties would result in foreseeable harm. *See* Seidel Decl. ¶¶ 35–40; Hsu Decl. ¶¶ 42–49. Accordingly, the government has complied with the foreseeable harm standard.

**CONCLUSION**

The Court should grant Defendants' motion for summary judgment.


Dated:  March 4, 2024                      Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           ELIZABETH J. SHAPIRO
                                           Deputy Branch Director

                                           /s/ John Robinson
                                           JOHN ROBINSON (Bar. No. 1044072)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L. Street, NW
                                           Washington D.C. 20005
                                           (202) 616-8489
                                           john.j.robinson@usdoj.gov

                                           *Counsel for Defendants*