**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICHARD USHER,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>1:23-cv-02086-JMC |

**PLAINTIFF RICHARD USHER'S MEMORANDUM IN SUPPORT OF CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Introduction ..... 1

Factual Background ..... 3

I. DOJ Charged Mr. Usher in a Baseless Antitrust Prosecution and Lost ..... 3

A. Background on Foreign Exchange ("Forex" or "FX") Market Basics ..... 3

B. The Forex Investigation and Prosecution of the Banks Was the DOJ Antitrust Division's Largest Criminal Case Ever ..... 4

1. DOJ's Investigation Centered on a Bloomberg Chatroom that Mr. Usher Participated In ..... 4

2. Mr. Gardiner Cooperated with DOJ in Exchange for Immunity ..... 5

3. In 2015, Two Years Before Mr. Usher Was Indicted, Shirley Barrow Told DOJ It Was Impossible for FX Traders to Rig the WMR Fix ..... 6

4. The Banks Pleaded Guilty to the Largest Ever Criminal Antitrust Fines ..... 7

C. In 2017, DOJ Charged Mr. Usher and Other Traders with Violating the Sherman Act and Issued a Series of Press Releases About the FX Chatroom Criminal Case ..... 9

1. In January and July 2017, DOJ's Senior Officials Issued Highly Inflammatory Press Releases Announcing Charges Against Mr. Usher and Alleging Hundreds of Billions of Dollars in FX Manipulation ..... 9

2. But the Evidence at the October 2018 Trial in SDNY, Including Mr. Gardiner's Testimony, Demonstrated Mr. Usher's Innocence ..... 10

D. The SDNY Jury Acquitted Mr. Usher, Mr. Ashton, and Mr. Ramchandani of Criminal Antitrust Charges in October 2018 ..... 11

II. DOJ Has Repeatedly Blocked Mr. Usher's Attempts to Obtain the Gardiner 302s and Other Evidence to Help Him Defend Against Civil Follow-On Prosecutions ..... 12

A. The Office of the Comptroller of the Currency Targeted Mr. Usher With Baseless Civil Antitrust Charges After His SDNY Acquittal of Criminal Antitrust Charges ..... 12

B. DOJ Refused to Consent to Mr. Usher's Use of the Gardiner 302s in the OCC Proceeding in 2020 and 2021 ..... 12

C. DOJ Opposed an Amendment to the SDNY Protective Order, Moved the SDNY Court to Seal the Public 2018 Trial Exhibits, Including the Shirley Barrow Memorandum, and Urged Mr. Usher to Submit a *Touhy* Request ..... 12

D. Mr. Usher Pursued a *Touhy* Request in 2021, Which DOJ Denied in Toto; this Court Dismissed Mr. Usher's *Touhy* Complaint as Moot After OCC Abandoned its Case Following Extensive Discovery .......... 13

E. Also in 2021, the OCC's ALJ Carefully Reviewed Mr. Usher's Subpoenas to DOJ and Issued Them, but DOJ Refused to Comply with the Subpoena .......... 14

III. Mr. Usher Sought the Gardiner 302s under FOIA, and DOJ Released Heavily Redacted Records .......... 14

A. DOJ Took One Year to Process Mr. Usher's Narrow FOIA Request .......... 14

B. DOJ Redacted Nearly Every Word from the Gardiner 302s .......... 14

C. Mr. Usher's Objections .......... 15

Legal Standard .......... 16

Argument .......... 17

I. The Gardiner 302s Are Not Exempt from FOIA Disclosure Under Exemption 5 as Attorney Work Product .......... 17

A. DOJ Waived the Attorney Work Product Protection by Voluntarily Disclosing the Gardiner 302s to Mr. Usher, Mr. Ashton, and Mr. Ramchandani During the SDNY Criminal Case .......... 17

B. DOJ Makes Unpersuasive Arguments to the Contrary .......... 19

C. DOJ Conflates Waiver of Work Product with Waiver of FOIA Exemptions for Information in the Public Domain .......... 21

D. DOJ's Remaining Cases Do Not Support Withholding the Gardiner 302s .......... 22

E. DOJ Has Not Carried Its Burden of Showing Foreseeable Harm from the Release of the Gardiner 302s Six Years After Mr. Usher's Acquittal .......... 24

1. Ordering DOJ to Release the Gardiner 302s Will Have No Effect on Criminal Protective Orders .......... 24

2. This Case is About the Gardiner 302s, Not All 302s and Not All Work Product .......... 26

II. Mr. Usher, Mr. Ashton, and Mr. Ramchandani Consent to the Release of the Gardiner 302s Notwithstanding DOJ's Invocation of their Privacy Interests .......... 29

III. Mr. Gardiner's Purported Privacy Interests Do Not Justify Withholding Under Exemptions 6 and 7(c) .......... 29

A. Mr. Gardiner Has No Legitimate Privacy Interest .......... 30

B. The Public Interest Significantly Outweighs Gardiner's Privacy Interests .......... 31

C. DOJ Has Not Demonstrated and Cannot Demonstrate Foreseeable Harm to Mr. Gardiner ... 34

IV. DOJ Cannot Withhold the Gardiner 302s on Grounds that They Are Confidential Source Material Under Exemption 7(d) ... 35

A. Mr. Gardiner Had No Implied Assurance of Confidentiality and Testified Publicly at the 2018 SDNY Trial ... 35

1. Mr. Gardiner Is Demonstrably Not at Risk of Retaliation Based on His Cooperation in an Antitrust Investigation ... 36

2. Mr. Gardiner's Proximity to Chat 1 Does Not Support an Inference of Confidentiality ... 38

3. Mr. Gardiner Voluntarily Gave Up His Privacy Years Ago in Exchange for Immunity ... 39

4. Mr. Gardiner's Cooperation Ended Long Ago; There is No "Ongoing Relationship" with Law Enforcement Six Years After the SDNY Trial ... 39

B. DOJ Cannot Show Foreseeable Harm ... 40

V. DOJ Has Not Established that the Gardiner Notes Contain Grand Jury Materials ... 41

VI. The Deliberative Process Privilege Does Not Shield the Gardiner Notes from Release Under Exemption 5 ... 43

A. DOJ Has Waived the Deliberative Process Privilege ... 43

B. DOJ Has Not Established that Disclosure Would Result in Foreseeable Harm ... 44

C. DOJ Failed to Meet Its Segregability Burden ... 45

Conclusion ... 45

# TABLE OF AUTHORITIES

## Cases

*ACLU of Mass., Inc. v. ICE*, No. 22-cv-10407-PBS, --- F. Supp. 3d ---, 2023 WL5110418 (D. Mass. Aug. 9, 2023) .......... 27

*Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984 (D.D.C. 1992) .......... 22

*Am. Oversight v. DOJ*, 45 F.4th 579 (2d Cir. 2022) .......... 23

*Ams. for Fair Treatment v. USPS*, 663 F.Supp.3d 39 (D.D.C. 2023) .......... 44

*Amuso v. DOJ*, 600 F. Supp. 2d 78 (D.D.C. 2009) .......... 37

*Animal Legal Def. Fund v. Dep't of Air Force*, 44 F. Supp. 2d 295 (D.C. Cir. 1999) .......... 43

*Bagwell v. DOJ*, 588 F. Supp. 3d 58 (D.D.C. 2022) .......... 35, 38, 42, 43

*Barouch v. DOJ*, 962 F. Supp. 2d 30 (D.D.C. 2013) .......... 45

*Bartko v. DOJ*, 62 F. Supp. 3d 134 (D.D.C. 2014) .......... 36

*Boehm v. FBI*, 983 F. Supp. 2d 154 (D.D.C. 2013) .......... 42

*CIA v. Sims*, 471 U.S. 159 (1985) .......... 16

*Climate Investigations Ctr. v. DOE*, No. 16-CV-00124 (APM), 2022 WL 3277350 (D.D.C. Aug. 11, 2022) .......... 34

*Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897 (D.C. Cir. 1996) .......... 37

*Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) .......... 22

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) .......... 16

*DOJ v. Julian*, 486 U.S. 1 (1988) .......... 16, 17

*DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749 (1989) .......... 33

*Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712 (D.C. Cir. 2021) .......... 31, 33

*Erb v. DOJ*, 572 F. Supp. 954 (W.D. Mich. 1983) .......... 22

*Garside v. Webster*, 733 F. Supp. 1142 (S.D. Ohio 1989) .......... 22

*Georgia v. DOJ*, 657 F. Supp. 3d 1 (D.D.C. 2023), *appeal filed* 23-5083 (April 24, 2023) .......... 16

*Hodge v. FBI*, 703 F.3d 575 (D.C. Cir. 2013) .......... 37

*In re Grand Jury Impanelled Oct. 2, 1978*, 510 F. Supp. 112 (D.D.C.1981) .............................. 42

*In re Grand Jury Inv. Of Ocean Transp.*, 604 F.2d 672 (D.C. Cir. 1979) .................................. 18

*Jordan v. DOJ*, 591 F.2d 753 (D.C. Cir. 1978) (en banc) ........................................................ 27

*Jud. Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93 (D.D.C. 2019) ...................................... 34

*Jud. Watch, Inc. v. DOJ*, No. 17-cv-00832 (CKK), 2019 WL. 4644029 (D.D.C. Sept. 24, 2019) ........................................................................................................................ 17

*King & Spalding LLP v. Dep't of Health & Hum. Servs.*, 330 F. Supp. 3d 477 (D.D.C. 2018) .................................................................................................................. 37, 38

*Labow v. DOJ*, 831 F.3d 523 (D.C. Cir. 2016) ........................................................ 37, 38, 39, 41

*Leopold v. DOJ*, 487 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 23

*Manna v. DOJ*, 815 F. Supp. 798 (D.N.J. 1993) ........................................................................ 22

*Mays v. DEA*, 234 F.3d 1324 (D.C. Cir. 2000) .......................................................................... 35

*Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ......................... 18

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984) ......................................................................... 16

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) ................................................ 32

*Nat'l Pub. Radio, Inc. v. DHS*, No. 1:20-cv-2468-RCL, 2022 WL 4534730 (D.D.C. Sept. 28, 2022) ................................................................................................................................ 27

*Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............................................ 31

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) .............................. 45

*Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162 (D.D.C. 2018) ........ 21, 22

*Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021) ....................... 16, 34

*Reps. Comm. for Freedom of the Press v. U.S Customs & Border Prot.*, 567 F. Supp. 3d 97 (D.D.C. 2021) ..................................................................................................... 27

*Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598 (D.C. Cir. 2001) ............................................... 23, 24

*Rosenberg v. ICE*, 13 F. Supp. 3d 92 (D.D.C. 2014) ................................................................. 37

*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ............................................................................ 36

*Sennett v. DOJ*, 39 F. Supp. 3d 72 (D.D.C. 2014) ..................................................................... 39

*Shapiro v. DOJ*, 205 F. Supp. 3d 68 (D.D.C. 2016) .................................................................. 42

*Shapiro v. DOJ*, No. 12-CV-313 (BAH), 2020 WL 3615511 (D.D.C. July 2, 2020) ................. 39

*Stolt-Nielsen v. DOJ*, 534 F.3d 728 (D.C. Cir. 2008) ........................................................... 42

*Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001) ............................. 22

*United States v. All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. 103 (D.D.C. 2016) ........................................................................................................ 18

*United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285 (D.C. Cir. 1980) ........................................ 19

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 1:01cv8854, 2004 WL 2375819 (S.D.N.Y. Oct. 19, 2004) ............................................................................. 18

*Usher v. DOJ*, --- F. Supp. 3d ---, 2023 WL 6796032, (D.D.C. Oct. 13, 2023)...................... 1, 13

*Williams & Connolly v. SEC*, 662 F.3d 1240 (D.C. Cir. 2011) ........................................... 22, 23

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ............................................................................ 16

**Statutes**

5 U.S.C. § 552(a)(4)(B) .............................................................................................................. 16

5 U.S.C. § 552(a)(8)(A)(i)(I) ........................................................................................................ 16

5 U.S.C. § 552(b) ........................................................................................................................ 43

5 U.S.C. § 552(b)(5) .................................................................................................................... 17

5 U.S.C. § 552(b)(7)(A) ............................................................................................................... 24

5 U.S.C. § 552(b)(7)(D) ............................................................................................................... 35

**Other Authorities**

FBI, Domestic Investigations & Operations Guide § 18.5.6.4.15 (Sept. 28, 2016) ..................... 28

FBI, Domestic Investigations & Operations Guide § 18.5.6.4.16 (Sept. 28, 2016) ..................... 28

H.R. Rep. NO. 391-114th Cong. (2016) ....................................................................................... 44

Table D-4—U.S. District Courts—Criminal Statistical Tables for the Federal Judiciary (December 31, 2023), U.S. Courts, available at https://www.uscourts.gov/statistics/table/d-4/statistical-tables-federal-judiciary/2023/12/31. ........................................................................................... 25

**Rules**

Fed. R. Evid. 502(b) ........................................................................................................ 19

## Introduction

The Department of Justice ("DOJ") destroyed Plaintiff Richard Usher's career and reputation, and caused him major financial losses, because it indicted him in the largest antitrust prosecution in history even though its files contained irrefutable evidence of his innocence. A British national, Mr. Usher showed the greatest respect for the U.S. legal system by waiving a strong defense to extradition and insisting on a trial, despite facing a ten-year prison sentence. Vindicated by the jury's acquittal six years ago, he still faces injury caused by the false publicity DOJ generated when it indicted him and publicized its charges as if they were unassailable.

This motion for summary judgment is just one more step in Mr. Usher's long, quixotic struggle to force DOJ to provide the evidence that will ameliorate this injury and expose to the public just how flawed DOJ's foreign exchange prosecution was. To prevent more truthful but, for them, embarrassing exposures, DOJ has heaped on every boilerplate platitude it could think of to oppose Mr. Usher's compelling request for documents he has already seen and which the public has every right to see. As justification for redacting nearly every word from every document Mr. Usher requested, *see generally* Gidley Decl. Exs. 1, 2, DOJ resorted to precisely the sort of one-size-fits-all declarations that courts have routinely found inadequate in FOIA litigation. As a result, DOJ's declarations are silent on critical issues; are littered with speculation about what "could" or "may" be; and consist almost entirely of generic statements that are untethered from the facts of this case. Because of DOJ's improper response to Mr. Usher's FOIA request, the instant proceeding has unfortunately devolved into Mr. Usher's latest round of "whack-a-mole."[1]

---

[1] *Usher v. DOJ*, --- F. Supp. 3d ---, 2023 WL 6796032, at *3 (D.D.C. Oct. 13, 2023) ("Between his attempts to modify the protective order, use the DOJ's *Touhy* procedures, secure an ALJ subpoena, and obtain relief from this Court, his efforts to acquire this evidence sound like a game of whack-a-mole.").

Perhaps most egregiously, DOJ states that to release 302 reports and notes from interviews of Matthew Gardiner (the "Gardiner 302s") would expose Mr. Gardiner as a cooperating witness, infringe on his right to privacy, and place him at risk of "violent reprisals" or "even death." Seidel Decl. ¶¶ 36, 44; *see* Hsu Decl. ¶¶ 44, 56; Defs' Mot., at 28. Mr. Gardiner's status as a government witness has been public knowledge since at least April 2016, and Mr. Gardiner testified over six trial days at Mr. Usher's high profile criminal trial in 2018. Given the lack of reprisals against Mr. Gardiner to date, the suggestion that "revealing" Mr. Gardiner's cooperator status would lead to *any* negative consequences for him, let alone make him a target for assassination, is farcical.

Similar absurdities pervade DOJ's declarations. It is obvious that DOJ wants the Court to avoid delving into the facts of this case and instead to decide the issues at the highest level of generality. For example:

- DOJ asserts that 302 reports are, in general, work product, but DOJ fails to acknowledge the letter it authored on August 4, 2017 stating that it was "voluntarily" producing the Gardiner 302s to Mr. Usher prior to Mr. Usher's 2018 criminal trial. Gidley Decl. Ex. 3. This voluntary production waived the work-product protection. DOJ instead cites a December 2020 letter it wrote to the court overseeing Mr. Usher's criminal case, in which it stated that it produced certain discovery pursuant to *Brady v. Maryland*; DOJ argues that there can be no waiver from a compulsory disclosure under *Brady*. But DOJ's December 2020 letter does not concern the Gardiner 302s; it pertains to other documents DOJ produced in discovery, which the December 2020 letter itself clearly states on page 2.
- In arguing that Mr. Gardiner was a "confidential" source, DOJ claims "[i]t has been the practice of [DOJ] to keep non-prosecution agreements confidential." Hsu Decl. ¶ 54. But Mr. Gardiner's immunity agreement was an *exhibit at Mr. Usher's trial* and is, therefore, a public document. *See* Gidley Decl. Ex. 4; Gidley Decl. ¶ 84. The court overseeing Mr. Usher's 2018 criminal trial rejected DOJ's bid to seal the *Usher* trial exhibits, so DOJ is well aware that Mr. Gardiner's immunity agreement is public record.
- According to DOJ, informants "furnish information only with the understanding that their identities and the information they provided will not be divulged to others outside the investigation." Hsu ¶ 53. But Mr. Gardiner continued to meet with DOJ after signing his immunity agreement in August 2015, even though that agreement required him to testify in open court if called upon to do so by DOJ (which, in fact, happened).

Because of its persistent failure and refusal to grapple with the factual record, DOJ has not carried its burden to withhold the Gardiner 302s. That DOJ directly copied significant portions of its

declarations from pre-existing FOIA declarations it has used in easily distinguishable cases is emblematic of DOJ's cookie-cutter approach to this litigation. There could not be a clearer example of DOJ failing to appreciate that the Court must decide this case based on its factual record, and not based on fuzzy generalizations that may apply to some other cases, but not here.

Ultimately, DOJ's unserious response shows that it holds the same disdain for this proceeding as it has shown to Mr. Usher in the last nearly four years he has spent seeking the Gardiner 302s. DOJ's stonewalling response is particularly disappointing in light of the October 3, 2023, status hearing, at which the Court set clear parameters for this case to proceed expeditiously. DOJ is clearly operating under the hope and expectation that, even if its boilerplate arguments do not prevail in the first instance, the Court will give DOJ a "second chance" to submit proper declarations. No second chance is warranted here, however, because the facts plainly reveal that none of FOIA's exemptions apply. Moreover, unlike virtually all FOIA cases, DOJ has been fighting Mr. Usher for years over these documents and has known for years its reasons for refusing Mr. Usher access to them. DOJ does not need or deserve any further opportunity to justify its withholdings, and the Court should enter summary judgment in Mr. Usher's favor.

## Factual Background

### I. DOJ Charged Mr. Usher in a Baseless Antitrust Prosecution and Lost

#### A. Background on Foreign Exchange ("Forex" or "FX") Market Basics

Prior to 2014, Mr. Usher was an FX spot trader, first for the Royal Bank of Scotland and then for JP Morgan (Europe) Limited. SOMF ¶ 27. An FX transaction consists of counterparties trading a quantity of one currency for a quantity of another currency. *Id.* ¶ 28. The FX market is the world's largest financial market, with trillions of dollars in daily transactions. *Id.* The most heavily traded currency pair is Euros and U.S. dollars ("euro-dollar"). *Id.* ¶ 29. Mr. Usher traded euro-dollar. *Id.* ¶ 29. The FX market is over-the-counter, meaning there is no centralized exchange

to facilitate FX transactions. *Id.* ¶ 28. As a result, the FX market relies on "market-makers," i.e., banks that stand ready to buy and sell currencies from customers at any time. *Id.* ¶ 30.

The market-making banks do not stockpile the millions or billions in various currencies they need to fill FX customer orders on any given day. *Id.* Instead, they rely on traders to buy and sell currencies in real time from fellow traders at other banks as required to fill customer orders. *Id.* Since at least 2007, traders commonly participated in online chatrooms administered by third parties such as Bloomberg. *Id.* ¶ 31. Traders used these chatrooms to collect "market color" (i.e., helpful information for bank customers that, in most other financial markets, would be available from a centralized exchange) and to find counterparties for trades. *Id.*

The decentralized nature of the FX market means that counterparties privately negotiate the price for each transaction; there is no set price for a currency pair at any given moment. *Id.* ¶ 30. There are, however, currency "fixes." *Id.* ¶ 33. A currency fix is a price benchmark published at the same time each day. *Id.* Various entities calculate fixes using non-public formulae or methodologies. *Id.* The most common fixes for euro-dollar are the 1:15 p.m. GMT European Central Bank fix ("ECB fix") and the 4:00 p.m. GMT World Market/Reuters fix ("WMR fix"). *Id.* It is common for FX traders to make "fix" orders, meaning they agree in advance with a counterparty to make a trade at the price of the next upcoming fix, at whatever the fix price is. *Id.*

### B. The Forex Investigation and Prosecution of the Banks Was the DOJ Antitrust Division's Largest Criminal Case Ever

#### 1. DOJ's Investigation Centered on a Bloomberg Chatroom that Mr. Usher Participated In

In 2013, the Antitrust Division began investigating whether market-making banks had conspired to fix prices in the FX market in violation of the Sherman Act; it quickly zeroed in on the activities of traders in a specific Bloomberg chatroom ("Chat 1"). *Id.* ¶ 34. The members of the Chat 1 chatroom were Mr. Usher, Matthew Gardiner, Rohan Ramchandani, and Chris Ashton,

all of whom were euro-dollar traders for different market-making banks. *Id.* ¶ 32. They spoke to each other in Chat 1 to exchange market color, make trades with one another, and socialize. *Id.* ¶ 31. With bravado typical of such trader chatrooms, they jokingly referred to Chat 1 by multiple names, including "the mafia," "the cartel," and (before Mr. Ashton joined Chat 1) "two and a half men." *Id.* ¶ 32. In October 2013, the press reported that several of the Chat 1 traders, including Mr. Gardiner, had been suspended by their respective employers because of investigations by U.S., U.K., Swiss, and other governments into potential antitrust violations by the market-making banks. *Id.* ¶ 34. News outlets reported that the traders' suspensions came amid investigations into "alleged rigging of the foreign exchange market." *Id.*

### 2. Mr. Gardiner Cooperated with DOJ in Exchange for Immunity

After learning he was at the center of DOJ's investigation, Mr. Gardiner contacted DOJ through counsel and offered to cooperate. *Id.* ¶ 35. DOJ accepted this offer, and Mr. Gardiner had his first meeting with the Antitrust Division and the FBI on December 5, 2013. *Id.* Mr. Gardiner continued to meet with DOJ for several years; he had 15 meetings with DOJ between December 2013 and May 2016 that are memorialized in the Gardiner 302s. *Id.* ¶ 36.

In Mr. Gardiner's early meetings with DOJ, he stated that neither he nor his fellow traders had done anything wrong. *Id.* ¶ 38. As unredacted portions of the Gardiner 302s show, Mr. Gardiner maintained this view until *after* July 2, 2014, when he was told DOJ could prosecute him (and was considering prosecuting him) for separate fraud charges unrelated to Mr. Usher. *Id.* For instance, in his very first meeting with DOJ, on December 5, 2013, Mr. Gardiner said that the Chat 1 traders' behavior was commonplace in the forex market and he did not think it was wrong:

> Around the time GARDINER left CITI and began at Barclays traders began to stop perceiving other traders as competitors and started viewing them more as counterparts.
>
> . . . .

> GARDINER did not previously believe that the discussions he had with USHER and RAMCHANDANI regarding the fix to include matching off risk positions was wrong in so much as it was a prevalent market practice.

Gidley Decl. Ex. 2, at 13, 27. But Mr. Gardiner sang a different tune a year later, on December 3, 2014, in his first meeting with DOJ after being threatened with fraud charges:

> GARDINER now understands that the information [the traders] shared equated with coordination of trading.

*Id.* at 196. Likewise, on May 2, 2016, Mr. Gardiner said:

> At the time, GARDINER did not think what he was doing was wrong but feels differently today because through his cooperation with the DOJ he realizes a lot of what was occurring in the chat with USHER, RAMCHANDANI, and later ASHTON was in transgression of U.S. competition laws.

Gidley Decl. Ex. 1, at 53.

Mr. Gardiner rejected a plea offer in July 2014 and eventually parlayed his cooperation into immunity, signing a Cooperation and Nonprosecution Agreement on August 5, 2015. SOMF ¶ 39; *see* Gidley Decl. Ex. 4. That agreement required Mr. Gardiner to testify at trial "when called upon to do so by the Antitrust Division." Gidley Decl. Ex. 4, at 2. After executing this agreement, Mr. Gardiner met with DOJ four more times (March 9, 2016, March 10, 2016, May 2, 2016, and May 4, 2016) in meetings that are memorialized in the Gardiner 302s. SOMF ¶ 36.

#### 3. In 2015, Two Years Before Mr. Usher Was Indicted, Shirley Barrow Told DOJ It Was Impossible for FX Traders to Rig the WMR Fix

The Antitrust Division spoke to Shirley Barrow on March 12, 2015. *Id.* ¶ 41. At the time, Ms. Barrow was the head of the organization that calculated the WMR fix and had been for over a decade. *Id.* A memorandum summarizing the Barrow interview, authored by the Antitrust Division, reflects that Ms. Barrow told the Antitrust Division: "no one can predict and take advantage of or manipulate the fix because of [WMR's] system." Gidley Decl. Ex. 7, at 1. This is because the calculation of the WMR fix was specifically designed to be immune to such efforts

at manipulation. SOMF ¶ 42. To calculate its 4:00 p.m. fix price, the WMR creates a sample of 61 euro-dollar trades that occur around 4:00 p.m. each day: one randomly selected trade per second from 3:59:30 p.m. to 4:00:30 p.m. *Id.*; Gidley Decl. Ex. 7, at 1. Because more than one euro-dollar trade occurs each second across the huge FX market, WMR would have several trades from which to select for each one-second period. Gidley Decl. Ex. 7, at 1-2.

To make these selections, WMR chooses a specific fraction of a second—a factor not known to the public or to FX traders—and selects for its sample the last trade that occurred before that fraction of a second ends. *Id.* That way, it is impossible for a trader—who cannot know what fraction of a second WMR will select—to perfectly "time" his trade to ensure that his trade is included in the sample. *Id.* at 1, 5. This is especially true for the Chat 1 traders, who placed trades by manually pressing a computer key, which made it impossible to time a trade within a fraction of a second. SOMF ¶ 42. And even if a trader could accomplish that, his trade is only one of 61 in the sample. Gidley Decl. Ex. 7, at 1. The fix price is the median price of that sample, *id.* at 2, meaning an outlier would not have an outsized impact on the fix price. The median is unweighted with respect to trade volume: a one-million-dollar trade counts the same as a billion-dollar trade, *id.*, which, again, prevents any one trade from disproportionately affecting the fix price.[2]

#### 4. The Banks Pleaded Guilty to the Largest Ever Criminal Antitrust Fines

Just two months after Ms. Barrow explained to the Antitrust Division that it is impossible

---

[2] To suggest that anyone could rig the 1:15 p.m. ECB fix is equally untrue. Only the European Central Bank knows the manner of calculating the ECF fix; for many years, it has been adamant that its benchmark rate is determined by non-public means. SOMF ¶ 62. DOJ did not present evidence at Mr. Usher's trial concerning how the ECB fix is calculated, and as Mr. Usher's expert testified, it is far from clear whether the ECB fix is even based on a mathematical formula like WMR's methodology. *Id.* All that is known is that (1) the European Central Bank uses a "concertation" process whereby it cross-references its price estimates with other central banks, and (2) the ECB fix price often did not align with the prices that on the electronic trading platform, EBS, used by the Chat 1 traders. *Id.*; *see* Gidley Decl. Ex. 5, at 1846-50 (defense expert testimony concerning the manner of calculating the 1:15 p.m. ECB fix).

for traders to "rig" the WMR fix, Barclays, Citicorp, JPMorgan Chase, and the Royal Bank of Scotland ("RBS") pleaded guilty to violations of the Sherman Act. SOMF ¶ 43. One of the core allegations to which the banks admitted was that they had conspired to rig the ECB and WMR fixes. *Id.* The plea agreements for Barclays, Citicorp, JPMorgan Chase, and RBS all stated:

> The defendant and its co-conspirators carried out the conspiracy to eliminate competition in the purchase and sale of the EUR/USD currency pair by various means and methods, including, in certain instances by: (i) coordinating the trading of the EUR/USD currency pair in connection with the European Central Bank and World Markets/Reuters benchmark currency "fixes" which occurred at 2:15 PM (CET) [i.e., 1:15 PM GMT] and 4:00 PM (GMT) each trading day . . . .

*Id.* Because banks make all their fix orders in advance of the fix time, traders know whether, in the aggregate, they are net buyers at the fix or net sellers. *Id.* ¶ 33. A trader who is a net seller at the fix hopes the fix price will be high, and a trader who is a net buyer hopes the fix price will be low. *Id.* ¶ 33. A key admission from the banks was that their traders rigged the fixes by coordinating trades with each other during the "fix windows" (i.e., for the WMR fix, the 61-second period 3:59:30 p.m. to 4:00:30 p.m.), with the purpose of manipulating the fix prices for their benefit by having their trades be incorporated into the calculations of the fix prices. *Id.* ¶ 43.

The fines paid by Citicorp, Barclays, and JPMorgan are, to this day, the three largest criminal antitrust fines in U.S. history, and RBS's is the ninth largest. *Id.* ¶ 44. The day of the guilty pleas, top DOJ officials derided the banks at a press conference; William Baer, the then-Assistant Attorney General for the Antitrust Division, told the public that the banks did what Ms. Barrow said could not be done:

> [T]hey agreed to rig the 1:15 p.m. and 4 p.m. "fixes." These fixes are designed to be snapshots of the euro–dollar exchange rates at a given point in time, reported by unbiased third parties. The snapshot rates become the price paid for billions of dollars of currency bought or sold on any given day. "The Cartel" conspirators used chat room communications in the minutes and seconds leading ***up to the snapshot moment to move the fix price*** in the direction that would be most profitable to them, thereby cheating customers who relied on those fixes to fairly reflect market prices.

*Id.* ¶ 45 (emphasis added). The guilty pleas were frontpage news in the world's leading media outlets, with the NEW YORK TIMES, the WALL STREET JOURNAL, BLOOMBERG, FORBES, and REUTERS, among others, reporting on them. *Id.* ¶ 46. Though DOJ did not explicitly identify the traders involved by name, they did not need to. The day of the banks' guilty pleas, the WALL STREET JOURNAL ran a piece stating that JPMorgan Chase's $892 million in fines were "principally attributable" to Mr. Usher. *See* Gidley Decl. Ex. 12, at 12-14.

**C. In 2017, DOJ Charged Mr. Usher and Other Traders with Violating the Sherman Act and Issued a Series of Press Releases About the FX Chatroom Criminal Case**

Since 2015, the federal government has failed to secure criminal convictions, or even civil penalties, against the traders who supposedly rigged the euro-dollar market, including Mr. Usher.

**1. In January and July 2017, DOJ's Senior Officials Issued Highly Inflammatory Press Releases Announcing Charges Against Mr. Usher and Alleging Hundreds of Billions of Dollars in FX Manipulation**

On January 10, 2017, DOJ indicted Mr. Usher, Mr. Ramchandani, and Mr. Ashton in the United States District Court for the Southern District of New York (the "SDNY Court") in *United States v. Usher et al.*, No. 1:17cr19 (SDNY) (the "SDNY Case"), on one count of violating the Sherman Act. *Id.* ¶ 47. The allegations in the indictment mirrored the banks' guilty pleas. *Id.* One of the indictment's key allegations was that Mr. Usher and his co-defendants rigged the WMR and ECB fixes by coordinating their trades to influence the fix prices. *Id.*

The day the indictment was filed, DOJ issued a press release condemning Mr. Usher and his fellow traders. *Id.* ¶ 48. The press release quoted Assistant AG Baer as saying, "The charged conspiracy involved competitors manipulating the exchange rate for the *hundreds of billions of dollars* traded on foreign exchange markets for their benefit and to the detriment of their customers." *Id.* (emphasis added). The press release directly blamed the traders for the conduct

to which the banks pleaded guilty and paid billions in fines. *Id.* DOJ issued another inflammatory press release on the day of Mr. Usher's arraignment, July 17, 2017, repeating the claim that the "Mafia" or "Cartel" chatroom (i.e., Chat 1) traders conspired to rig the euro-dollar fixes. *Id.*

**2. But the Evidence at the October 2018 Trial in SDNY, Including Mr. Gardiner's Testimony, Demonstrated Mr. Usher's Innocence**

Mr. Usher and his co-defendants proceeded to trial in October 2018. *Id.* ¶ 56. Mr. Gardiner was DOJ's star witness and the only percipient witness to the goings-on of the Chat 1 chatroom. *Id.* ¶ 57. His testimony began on October 11, 2018, and continued until October 18, 2018, comprising four full trial days and portions of two others. *Id.* The content of Mr. Gardiner's testimony overlapped significantly with the content of the Gardiner 302s. *Id.* The Gardiner 302s mostly consist of Mr. Gardiner's interpretations of transcripts of the Chat 1 traders' discussions. *Id.* Mr. Gardiner's testimony was similarly focused on explaining to the jury the context and meaning of the Chat 1 traders' discussions. *Id.* Many of the transcript exhibits about which Mr. Gardiner testified were chat excerpts that Mr. Gardiner also discussed with DOJ, as memorialized in the Gardiner 302s. *Id.* The parties introduced 47 Chat 1 transcripts through Mr. Gardiner. *Id.*

The trial evidence, including Mr. Gardiner's testimony, revealed the lack of merit to DOJ's charges. Both Mr. Gardiner and expert testimony established that while the market-making banks compete against one another for *customer* FX orders, they are not horizontal competitors when making trades with one another to fill those orders, i.e., the types of trades that Mr. Usher and his co-defendants made with one another. *Id.* ¶ 58. Instead, they are counterparties who have a vertical buy-sell relationship. *Id.* Thus, to say that two market-making banks "colluded" on the price of an FX transaction is like saying that a home buyer and seller "colluded" to determine the sale price—that is, they "fixed" the sale price from opposite sides of the transaction.

Testimony from DOJ's own expert showed that the traders in Chat 1 did not have enough

market share to affect euro-dollar prices. *Id.* ¶ 59. DOJ tried to show the Chat 1 traders' market power with evidence that their trades comprised a significant portion of the euro-dollar trades that occurred on a platform called EBS. *Id.* But the euro-dollar market sees trades totaling trillions of dollars per day, substantial amounts of which did not take place on EBS. *Id.* Moreover, the proper antitrust market for DOJ's charges was not the *euro-dollar* market, but the entire FX market because traders, assisted by computer algorithms, can bypass the euro-dollar market by making essentially the same trade in two steps, e.g., euros-for-yen, and yen-for-dollars. *Id.* If the price for euro-dollar became artificially high due to collusion, computerized trading entities would instantly bypass that artificial price with a two-step trade. *Id.* Thus, when compared to the entire FX market, the four Chat 1 traders could not move prices even if they had wanted and agreed to. *Id.*

Perhaps most importantly, the trial evidence showed what was not made public when the banks pleaded guilty: that it was impossible for traders to rig the WMR fix. Through expert testimony, the defense established what Ms. Barrow had told the Antitrust Division years ago: the WMR fix was specifically designed to prevent manipulations by traders, directly contrary to the core thesis of DOJ's case. *Id.* ¶ 60. DOJ likewise possessed no evidence that it was possible to rig the ECB fix; DOJ did not even present evidence that showed how the ECB fix was calculated. *Id.* ¶ 62. Incredibly, the evidence also showed that DOJ had walled off its key trial witnesses from the contents of Ms. Barrow's interview. *Id.* ¶ 61. Neither the lead FBI agent nor DOJ's two expert witnesses were exposed to Ms. Barrow's explanation of how the WMR fix was calculated and how it was impossible to rig. *Id.* Thus, DOJ brought criminal charges for moving the FX benchmarks even though it knew it was impossible for the traders to move those benchmarks.

### D. The SDNY Jury Acquitted Mr. Usher, Mr. Ashton, and Mr. Ramchandani of Criminal Antitrust Charges in October 2018

After a three-week trial, the jury found Mr. Usher and his co-defendants, Mr. Ramchandani

and Mr. Ashton, not guilty after approximately four hours of deliberations. *Id.* ¶ 63.

## II. DOJ Has Repeatedly Blocked Mr. Usher's Attempts to Obtain the Gardiner 302s and Other Evidence to Help Him Defend Against Civil Follow-On Prosecutions

### A. The Office of the Comptroller of the Currency Targeted Mr. Usher With Baseless Civil Antitrust Charges After His SDNY Acquittal of Criminal Antitrust Charges

On January 10, 2017, the same day DOJ indicted Mr. Usher, the Office of the Comptroller of the Currency ("OCC") issued a Notice of Charges for Prohibition and Notice of Assessment of Civil Money Penalty against Mr. Usher ("Notice of Charges"). *Id.* ¶ 65. Just like the SDNY indictment, the OCC's Notice of Charges alleged that Mr. Usher violated Section 1 of the Sherman Act. *Id.* The OCC civil proceeding was stayed pending the outcome of the SDNY Case. *Id.* ¶ 66. After Mr. Usher's October 2018 acquittal, the OCC case did not restart until early 2020. *Id.*

### B. DOJ Refused to Consent to Mr. Usher's Use of the Gardiner 302s in the OCC Proceeding in 2020 and 2021

Pursuant to the protective order entered in the SDNY Case, Mr. Usher and his counsel were no longer permitted to access or use documents DOJ produced to them, the Gardiner 302s included, following the trial. *Id.* ¶ 64. Because Mr. Usher wanted to use the Gardiner 302s and other criminal discovery records to aid in his defense against the OCC charges, he sought to regain access to those documents. *Id.* ¶ 68. Mr. Usher initially asked DOJ for its consent for Mr. Usher to use those records, but DOJ refused. *Id.* Mr. Usher also asked OCC to produce the Gardiner 302s in civil discovery after OCC's counsel revealed that DOJ had shared the Gardiner 302s with OCC, but OCC refused to produce them unless DOJ granted permission, which it did not. *Id.*

### C. DOJ Opposed an Amendment to the SDNY Protective Order, Moved the SDNY Court to Seal the Public 2018 Trial Exhibits, Including the Shirley Barrow Memorandum, and Urged Mr. Usher to Submit a *Touhy* Request

On August 14, 2020, Mr. Usher sought an amendment to the SDNY protective order that would allow Mr. Usher to use certain documents from his criminal case in the OCC proceeding.

*Id.* ¶ 69. In an August 21, 2020, opposition, DOJ asked the SDNY Court to deny Mr. Usher's request. *Id.* DOJ cynically asserted that Mr. Usher should seek access to the documents he wanted through a *Touhy* request submitted directly to DOJ, and not by an amendment of the protective order. *Id.* ¶ 69. DOJ reiterated that a *Touhy* request was the proper avenue for Mr. Usher to regain access to the Gardiner 302s at a November 4, 2020, hearing before the SDNY Court. *Id.* ¶ 69. In related December 2020 filings, DOJ also asked that the SDNY Court to order that any existing copies of *the exhibits from the 2018 criminal trial* be destroyed on the ground that they were not public documents. *Id.* ¶ 70. The SDNY Court denied both Mr. Usher's request for an amendment to the protective order and DOJ's request to prevent Mr. Usher's use of the trial exhibits. *Id.*

### D. Mr. Usher Pursued a *Touhy* Request in 2021, Which DOJ Denied in Toto; this Court Dismissed Mr. Usher's *Touhy* Complaint as Moot After OCC Abandoned its Case Following Extensive Discovery

Shortly after DOJ insisted that Mr. Usher file a *Touhy* request, he did so. On January 14, 2021, Mr. Usher submitted a letter to DOJ pursuant to its *Touhy* regulations, seeking the documents he needed to defend himself in the OCC proceeding. *Id.* ¶ 72. DOJ denied this request in full in a February 9, 2021, letter on numerous grounds, including overbreadth, undue burden, and the privacy interests of third parties. *Id.*

Mr. Usher filed a lawsuit under *Touhy* in this Court on March 11, 2021, and moved for summary judgment on June 30, 2021. *Id.* ¶ 73. Days later, on July 8, 2021—after significant fact and expert discovery—OCC unilaterally withdrew its charges and dismissed the case against Mr. Usher—his second victory over the federal government in connection with the same conduct. *Id.* DOJ thereafter asked the Court to dismiss Mr. Usher's *Touhy* complaint as moot. *Id.* ¶ 74. Mr. Usher argued that exceptions to the mootness doctrine applied, but the Court dismissed Mr. Usher's *Touhy* complaint on October 13, 2023. *Id.*; *see Usher*, 2023 WL 6796032, at *3.

### E. Also in 2021, the OCC's ALJ Carefully Reviewed Mr. Usher's Subpoenas to DOJ and Issued Them, but DOJ Refused to Comply with the Subpoena

In January 2021, Mr. Usher sought leave to serve a subpoena on the Antitrust Division for the entirety of the criminal discovery file. *Id.* ¶ 75. The administrative law judge directed Mr. Usher to narrow his request, and thereafter approved a modified subpoena for approximately 500 documents, the Gardiner 302s included, on April 15, 2021. *Id.* DOJ refused to comply with the subpoena and informed Mr. Usher that it would not produce any documents in response. *Id.*

## III. Mr. Usher Sought the Gardiner 302s under FOIA, and DOJ Released Heavily Redacted Records

### A. DOJ Took One Year to Process Mr. Usher's Narrow FOIA Request

On February 28, 2023, Mr. Usher submitted a FOIA request to the Antitrust Division seeking "FBI 302 report(s) of any and all interviews of Matthew Gardiner, and any and all notes related to such interview(s)." *Id.* ¶ 76. This request encompassed 567 pages of records. *Id.* ¶ 78. DOJ did not act on Mr. Usher's FOIA request until months later—after Mr. Usher filed this lawsuit on July 18, 2023. In the September 25, 2023, Joint Status Report, DOJ indicated that it did not even provide the Gardiner 302s to the FBI for it to review until September 14, 2023, two months after Mr. Usher filed the complaint and almost seven months after Mr. Usher submitted his FOIA request. ECF No. 16, at 5. At the October 3, 2023, hearing, the Court ordered DOJ to process the Gardiner 302s by January 19, 2024, and set a briefing schedule for any disputed withholdings. ECF No. 19. At DOJ's request, the Court amended the schedule to allow DOJ to release records in two tranches on January 19, 2024, and February 14, 2024. *See* Jan. 11, 2024, Minute Order.

### B. DOJ Redacted Nearly Every Word from the Gardiner 302s

DOJ released responsive records to Mr. Usher in accordance with the amended schedule. DOJ also provided Mr. Usher with a *Vaughn* index and the declarations of Kathy Hsu (Antitrust Division) and Michael Seidel (FBI) on February 14, 2024. All but two pages of the records DOJ

released are heavily or fully redacted. The originals of those two pages are blank, and there was nothing to redact. *See* Gidley Decl. Ex. 2, at 525, 565. Of the remaining 565 pages of the Gardiner 302s, nearly all are fully redacted, other than footers that identify the documents as 302s and opening paragraphs with the time, place, and participants of the interview. *See* Gidley Decl. Exs. 1, 2. DOJ asserted the following FOIA exemptions to withhold the Gardiner 302s:

| FOIA Exemption | Basis for Asserting Exemption | Pages |
|---|---|---|
| Exemption 3 | Fed. R. Crim. P. 6(e) (grand jury materials) | 116-124 |
| Exemption 5 | Attorney work product | Every non-blank page |
| Exemption 5 | Deliberative process privilege | Every non-blank page of the handwritten or typewritten notes[3] |
| Exemptions 6 and 7(c) | Privacy interests of Mr. Gardiner, targets, government personnel, and other | Every non-blank page |
| Exemption 7(d) | Information provided by confidential informant (Mr. Gardiner) | Every non-blank page |

**C. Mr. Usher's Objections**

Mr. Usher objects to DOJ's withholdings under Exemptions 3, 5, and 7(d) in full. Mr. Usher also challenges DOJ's withholdings under Exemptions 6 and 7(c) to the extent DOJ invokes the privacy interests of Mr. Usher, Mr. Gardiner, Mr. Ramchandani, or Mr. Ashton. Mr. Usher does not object to DOJ's withholdings under Exemption 6 and 7(c) to the extent those withholdings are for the purpose of redacting only the names and personal identifying information ("PII") of FBI agents and other government personnel. To the extent DOJ relied on Exemptions 6 and 7(c) to redact only the names and PII of any person who is not a government employee or one of the Chat 1 traders, Mr. Usher does not object, so long as DOJ replaces the names of such persons with unique identifiers (e.g., "Person 1," "Person 2") so as to retain the full intelligibility of the

[3] DOJ did not invoke the deliberative process privilege as to the FD-302 reports themselves—only as to the attorney and FBI agent notes taken during the Gardiner interviews.

document while preserving those individuals' privacy interests.[4]

## Legal Standard

FOIA's purpose is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Thus, "FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exemptions." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citing *CIA v. Sims*, 471 U.S. 159, 166 (1985)). Because FOIA's default rule is disclosure, the "exemptions are to be narrowly construed." *DOJ v. Julian*, 486 U.S. 1, 8 (1988). The agency bears the burden of showing that documents fall into one of FOIA's exemptions. 5 U.S.C. § 552(a)(4)(B); *see Georgia v. DOJ*, 657 F. Supp. 3d 1, 8 (D.D.C. 2023), *appeal filed* 23-5083 (Apr. 24, 2023). The Court decides the applicability of FOIA's exemptions *de novo*, with no deference to the agency's withholding decisions. *See Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). "[A]n agency loses if its affidavits fail to 'describe the justifications for nondisclosure with reasonably specific detail.'" *Georgia*, 657 F. Supp. 3d at 8 (quoting *Wolf*, 473 F.3d at 374).

An agency also bears the burden of showing that it "reasonably foresees that disclosure would harm an interest protected by" the exemption under which a record was withheld. 5 U.S.C. § 552(a)(8)(A)(i)(I). The foreseeable-harm requirement "imposes an independent and meaningful burden on agencies." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021). To meet this burden, the government must "identify specific harms to the relevant protected

---

[4] Mr. Usher made this redaction proposal to DOJ in a February 26, 2024, email. Gidley Decl. Ex. 29. DOJ did not reflect Mr. Usher's proposal in its own brief when summarizing Mr. Usher's objections to DOJ's withholdings, instead stating, incorrectly, that "Usher's counsel further conveyed that they are not challenging the government's withholdings of names and identifying information of third parties merely mentioned in the FD-302s or third parties of investigative interest, except the four FX chatroom participants: Matthew Gardiner, Richard Usher, Rohan Ramchandani, and Christopher Ashton." Defs' Mot. at 6.

interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials," and "connect[] the harms in [a] meaningful way to the information withheld." *Jud. Watch, Inc. v. DOJ*, No. 17-cv-00832 (CKK), 2019 WL. 4644029, at *3 (D.D.C. Sept. 24, 2019).

## Argument

DOJ withheld nearly every word from every page of the Gardiner 302s, relying on a myriad of inapplicable exemptions. DOJ's withholdings were all improper, and Mr. Usher is entitled to summary judgment and the release of unredacted versions of the Gardiner 302s.

### I. The Gardiner 302s Are Not Exempt from FOIA Disclosure Under Exemption 5 as Attorney Work Product

DOJ withheld all but two pages (both of which are blank) of the Gardiner 302s on the ground that they constitute work product and are therefore protected from disclosure under Exemption 5, which permits DOJ to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see Vaughn* Index. Exemption 5 "exempts those documents, and only those documents, normally privileged in the civil discovery context." *Julian*, 486 U.S. at 11. DOJ's wholesale withholding under Exemption 5 was improper because the Gardiner 302s would be discoverable in civil litigation against DOJ today. DOJ waived any work-product protection that otherwise might have shielded the Gardiner 302s when it voluntarily disclosed them to Mr. Usher and others prior to Mr. Usher's 2018 criminal trial. DOJ has also failed to show that any foreseeable harm would result from the release of the Gardiner 302s.

#### A. DOJ Waived the Attorney Work Product Protection by Voluntarily Disclosing the Gardiner 302s to Mr. Usher, Mr. Ashton, and Mr. Ramchandani During the SDNY Criminal Case

Exemption 5 does not apply to once-privileged records for which the government has waived the privilege. *See Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 253 (D.C.

Cir. 1977). A party's voluntary disclosure of its work product to an adversary waives the work-product protection. *See United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010). These two principles are sufficient to dispense with DOJ's claim that the Gardiner 302s are protected work product. DOJ produced the Gardiner 302s to Mr. Usher and his co-defendants during criminal discovery. The accompanying August 4, 2017, production letter states,

> While the Government is not required to make this production under Rule 16 of the Federal Rules of Criminal Procedure, it is nevertheless ***voluntarily producing this material***, at this very early stage, to assist the defendants. ***By producing these materials voluntarily*** the Government is not waiving any privileges or committing to any further voluntarily productions. However, the Government is continuing to review its files and it is its intention to provide additional voluntary productions.

Gidley Decl. Ex. 3 (emphases added). This disclosure waived work-product protection because Mr. Usher was DOJ's adversary and the disclosure was voluntary, as DOJ's letter makes clear. *See United States v. All Assets Held at Bank Julius Baer*, 315 F.R.D. 103, 109 (D.D.C. 2016).

DOJ cannot salvage its privilege based on the statement in the August 4, 2017, letter that DOJ "is not waiving any privileges." A party cannot preserve privilege merely by saying so when that party's conduct is inconsistent with maintaining privilege. *See In re Grand Jury Inv. Of Ocean Transp.*, 604 F.2d 672, 675 (D.C. Cir. 1979) ("An intent to waive one's privilege is not necessary for such a waiver to occur."); *see also Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 480 (S.D.N.Y. 1993) (collecting cases and explaining, "the intent of the party and its attorney not to cause an implied waiver is immaterial if they intentionally undertake actions that have the effect of causing such a waiver"). For a similar reason, the fact that the SDNY protective order prohibited *public* disclosure of discovery records is irrelevant to whether DOJ waived any privilege by voluntarily disclosing documents to its *adversary*. *See Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 1:01cv8854, 2004 WL 2375819, at *5 (S.D.N.Y. Oct. 19, 2004).

Indeed, DOJ included the same language—that it "is not waiving any privileges"—even

when making productions that consisted solely of documents that were obviously *not* privileged and *never* privileged, such as a grand jury transcript. Gidley Decl. Ex. 30. It appears that this language was nothing more than a boilerplate reservation of rights, for instance, to prevent an inadvertent waiver of privilege. *See, e.g.*, Fed. R. Evid. 502(b). DOJ cannot indiscriminately throw such a disclaimer on its productions, and then rely on that language even when its actions are inconsistent with maintaining privilege. DOJ also routinely redacted its work product from discovery records when it wanted to preserve privilege, stated as much in its production letters, and even did so when it produced certain interview reports and notes in Mr. Usher's case. Gidley Decl. Exs. 31, 32, 33. But when DOJ produced the Gardiner 302s, it expressly acknowledged that it was doing so voluntarily, and it therefore waived the work-product protection.

**B. DOJ Makes Unpersuasive Arguments to the Contrary**

DOJ claims that "even voluntary disclosure 'does not necessarily waive work-product privilege,'" and that voluntary disclosure does not waive privilege "even in some circumstances to an adversary." Defs' Mot., at 12 (first quoting *Deloitte*, 610 F.3d at 139, and then quoting *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982)). To the contrary, the D.C. Circuit has squarely held that a voluntary disclosure of work product waives privilege if "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy *from the disclosing party's adversary*." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (emphasis added). And DOJ's quotation from *In re Sealed Case* is incomplete. The full quotation is:

> The purposes of the work product privilege are more complex, and they are not inconsistent *with selective disclosure*—even in some circumstances to an adversary.

676 F.2d at 818 (emphasis added). This passage stands for the proposition that a voluntary, but selective, disclosure of work product does not result in a subject-matter waiver as to undisclosed work product. *In re Sealed Case* does not undercut the principle that voluntary disclosure of work

product to an adversary waives the protection as to the documents actually disclosed.

Next, DOJ claims that it produced the Gardiner 302s pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, that such productions were compulsory, and therefore no waiver occurred. Defs' Mot., at 13. In support, DOJ points to its December 18, 2020, letter to the SDNY Court, two years after the trial, concerning Mr. Ramchandani's request to amend the SDNY protective order. In that letter, DOJ stated that it produced certain records "in (partial) fulfillment of the Government's Rule 16, *Brady*, and *Giglio* obligations." Robinson Decl. Ex. C, at 8.

DOJ's reliance on this letter is misplaced because ***the Gardiner 302s are not among the records discussed in that December 18, 2020, letter***. The 58 documents at issue in that letter were:

- 32 "[t]ranscripts of electronic chatroom conversations."
- 18 "[d]ocuments reflect[ing] non-privileged communications between bank counsel and the DOJ."
- 8 "[d]ocuments reflect[ing] communications between the DOJ and *counsel for* the DOJ's cooperating witness, Matthew Gardiner."

*Id.* at 2 (emphasis added). Mr. Usher's FOIA request does not encompass notes from proffers by Mr. Gardiner's counsel. Hence, the documents referenced in the letter on which DOJ relies do not intersect at all with the Gardiner 302s. The December 18, 2020, letter is irrelevant to this issue.

To the extent DOJ would make the same claim, but without any evidentiary support, this argument is foreclosed by the only contemporaneous document, authored by DOJ, that describes the nature of DOJ's production of the Gardiner 302s: the August 4, 2017, production letter, wherein DOJ stated that it was producing the Gardiner 302s "voluntarily." Gidley Decl. Ex. 3, at 1. In that letter, DOJ also denied that Rule 16 required production of the Gardiner 302s. *Id.* Nor did DOJ produce the Gardiner 302s because it was compelled to do so by *Brady v. Maryland*, because when DOJ produced evidence under *Brady*, it consistently stated that it was producing documents "pursuant to" *Brady*. *Id.* Exs. 19, 20, 21. DOJ even produced some documents to Mr. Usher with

an apparent acknowledgement that they *might* be *Brady* evidence, even though DOJ insisted on producing them "[w]ithout . . . conceding that the nature of the information being provided is exculpatory pursuant to *Brady v. Maryland*." *Id.* Ex. 22; *see id.* Exs. 23 (similar), 24 (similar). When DOJ produced the Gardiner 302s, however, it did not identify them as *Brady* evidence, or even as potential *Brady* evidence. DOJ also stated 11 times in its Answer that it did not produce the Gardiner 302s pursuant to *Brady*. Answer ¶¶ 1, 3, 4, 6, 8, 9, 46, 75, 82. DOJ cannot rely on a theory of compulsory disclosure when its own documents and statements belie that assertion.

### C. DOJ Conflates Waiver of Work Product with Waiver of FOIA Exemptions for Information in the Public Domain

To support its work-product argument, DOJ mostly cites cases that do not concern Exemption 5, the work-product doctrine, or waiver of any privilege. Instead, most of DOJ's cases concern whether an agency waived its right to assert *any FOIA exemption* as to documents containing information (1) in the public domain or (2) that an agency has officially acknowledged. Such cases do not bear on waiver of evidentiary privileges and are irrelevant to this case.

A waiver of work product occurs when disclosure is made to an adversary; it does not matter whether the documents were disclosed to the public. *See Bowne, Inc.*, 150 F.R.D. at 480. Thus, there is a difference between a waiver argument based on an agency placing information in the public domain—which waives all FOIA exemptions—and an agency's waiver of an evidentiary privilege through a voluntary disclosure, which only precludes the government's reliance on Exemption 5. *See Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 171 n.3 (D.D.C. 2018) (differentiating between these arguments).[5]

---

[5] The court in *Protect Democracy* explained the difference between these two theories of waiver, though it found that—under the particular facts before it—the two waiver arguments "mostly overlap[ped]" because the plaintiff's Exemption 5 waiver argument in that case was predicated on the government's public disclosure of the information it sought. 320 F. Supp. 3d at

For example, DOJ cites *Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999), to argue that the Gardiner 302s never entered the "public domain," and therefore that the work-product protection was not waived. Defs' Mot., at 13-15. *Cottone* is not an Exemption 5 case; it held that Title III wiretaps were subject to FOIA disclosure notwithstanding Exemption 3 (which applies to documents made confidential by statute) if and only if the recordings were played at the plaintiff's public criminal trial. 193 F.3d at 556. Unlike with Exemption 3, however, agencies can waive the work-product protection, and hence Exemption 5, without a public disclosure. *Cottone* says nothing about waiver of the work-product protection or the applicability of Exemption 5.[6]

**D. DOJ's Remaining Cases Do Not Support Withholding the Gardiner 302s**

DOJ's other cases are easily distinguishable. The facts of this case are different from those in *Williams & Connolly v. SEC*, 662 F.3d 1240, 1244 (D.C. Cir. 2011). There, the D.C. Circuit held that the SEC was not required to release 114 sets of investigation interview notes where the plaintiff asserted that the government waived the work-product protection by producing 11 of those sets of notes in criminal discovery. *See id.* The court concluded that the controversy was moot as to the 11 sets already produced (because the plaintiff already had them) and found no waiver as to the 103 remaining sets because the disclosure of some work product does not result in a subject-

171 n.3. In the instant case, however, Mr. Usher's Exemption 5 waiver argument is not based on a public disclosure. Therefore, the two waiver arguments do not overlap in Mr. Usher's case.

6 Many of the cases DOJ cites are similarly off-point. Defs' Mot. at 13-15; *see Students Against Genocide v. Dep't of State*, 257 F.3d 828, 831 (D.C. Cir. 2001) (permitting State Department to withhold under Exemptions 1 and 3 photographs shown to United Nations Security Council, but not shared publicly); *Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 989 (D.D.C. 1992) (allowing government to withhold, under Exemption 4, "confidential commercial information" that was shared to select persons subject to confidentiality restrictions); *Manna v. DOJ*, 815 F. Supp. 798, 813 (D.N.J. 1993) (disclosure during criminal discovery did not waive the government's right to withhold grand jury materials *under Exemption 3* because, unlike Exemption 5, Exemption 3 can only be waived by a public disclosure); *Garside v. Webster*, 733 F. Supp. 1142, 1147 (S.D. Ohio 1989) (similar); *Erb v. DOJ*, 572 F. Supp. 954, 956 (W.D. Mich. 1983) (no waiver of Exemption 7(a) based on disclosure of law enforcement records to state prosecutor).

matter waiver as to other undisclosed work product. *See id.* at 1245. Thus, the court concluded, "the notes *not turned over* in Forbes's criminal trial still remain—as Williams & Connolly admits—work product material not ordinarily discoverable in civil proceedings." *Id.* at 44 (emphasis added). Mr. Usher, in contrast, only seeks documents that DOJ has voluntarily turned over to him (and to Mr. Ramchandani and Mr. Ashton). Mr. Usher is not relying on a subject-matter waiver. DOJ's citation to a case in which the documents at issue were never disclosed is unpersuasive. *See Am. Oversight v. DOJ*, 45 F.4th 579, 595 (2d Cir. 2022) (rejecting similar waiver argument but noting, "the fact that the [302s] themselves were never disclosed is relevant").

Next, DOJ cites *Leopold v. DOJ*, 487 F. Supp. 3d 1, 12-13 (D.D.C. 2020), for the proposition that "the decision of [DOJ] to disclose the FD-302s in a criminal proceeding has no bearing on whether the FOIA permits the Department to withhold such information." (Quoting *Williams & Connolly*, 662 F.3d at 1244). *Leopold* does not address waiver of the work-product protection. All *Leopold* says is that a document's discoverability in a criminal case does not imply its discoverability in a civil case, and, therefore, a document being produced in a criminal case does not automatically foreclose DOJ from invoking Exemption 5. *See id.* This is a distinct issue from whether DOJ's prior *voluntary* disclosure waived the work-product protection. To be clear, Mr. Usher does not argue that Exemption 5 is inapplicable merely because the Gardiner 302s were produced in criminal discovery. Rather, Mr. Usher maintains that the Gardiner 302s would be discoverable in *civil* litigation today because DOJ's prior voluntary disclosure resulted in a waiver of the work-product protection. *Leopold* did not address this waiver argument, and its reasoning does not apply here.

Lastly, DOJ cites *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 601 (D.C. Cir. 2001), in which the court found no waiver of the work-product protection where DOJ disclosed its work

product *to Congress*. The court observed, "[DOJ] did not use [its work product] in an adversary proceeding, nor in anything related to or even remotely resembling an adversary proceeding." *Id.* at 607. There was no disclosure in *Rockwell* of work product *to an adversary*, making the facts of that case a far cry from the facts here.

### E. DOJ Has Not Carried Its Burden of Showing Foreseeable Harm from the Release of the Gardiner 302s Six Years After Mr. Usher's Acquittal

Even if DOJ had not waived the work-product protection, withholding the Gardiner 302s under Exemption 5 would still be improper because DOJ has not shown that releasing them would cause foreseeable harm. DOJ wrongly insists that to grant Mr. Usher relief would encourage criminal defendants to circumvent protective orders, and otherwise relies on boilerplate averments of foreseeable harm that do nothing more than state the underlying purpose of the work-product doctrine. This is insufficient to carry DOJ's burden.

#### 1. Ordering DOJ to Release the Gardiner 302s Will Have No Effect on Criminal Protective Orders

DOJ's primary foreseeable-harm argument is that criminal protective orders will become "meaningless" if the Court orders DOJ to release the Gardiner 302s because "any FOIA requester could simply obtain the prosecution's complete discovery file once it is produced to the defense." Defs' Mot., at 15. In truth, DOJ can withhold discovery records under Exemption 7(a) whenever a criminal case is pending or anticipated and disclosure would "interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Exemption 7(b) would likely also apply in such cases because public disclosure of the criminal discovery file prior to trial would create a risk of prejudicing the defendant's "right to a fair trial." 5 U.S.C. § 552(b)(7)(B). A ruling for Mr. Usher would not allow anyone to circumvent a protective order entered in a criminal case.

And when criminal proceedings conclude, DOJ can invoke any number of exemptions to withhold records contained in a prosecutor's files—just as it has always done—including:

- Exemption 1 for records that implicate national security.
- Exemption 3 for grand jury materials and wiretap recordings.
- Exemption 4 for any person's confidential commercial or financial information.
- Exemption 5, to the extent DOJ did not previously waive any applicable privilege by voluntarily producing its privileged internal documents.
- Exemptions 6 and 7(c) to protect the privacy interests of targets, witnesses, government personnel, and bystanders.
- Exemptions 7(d), (e), and (f) to protect the identities of confidential witnesses, the information those witnesses provide, and documents whose disclosure would reveal law enforcement tactics or endanger the life or safety of any person.

In short, it is just not true that ordering the release of the Gardiner 302s will spell the doomsday that DOJ portends. In fact, Mr. Usher's is the exceedingly rare case in which a narrowly crafted FOIA request passes through all these hurdles. Most importantly, the main reason that Exemptions 6 and 7(c) do not apply in this case is that Mr. Gardiner publicly testified at Mr. Usher's trial about the very same topics and events that the Gardiner 302s discuss. *See infra* Sections IV, V. However, 97.5% of federal prosecutions that reached a disposition in 2023 did *not* go to trial.[7] In most cases, DOJ will prevail for this reason alone. Further weakening DOJ's use of Exemptions 6 and 7(c) in this case is the fact that Mr. Usher obtained privacy waivers from his co-defendants. *See* Ashton Decl. ¶ 6; Ramchandani Decl. ¶ 12. There is no reason to believe that persons with strong privacy interests will frequently waive those interests in other cases.

Furthermore, Mr. Usher did not request "the prosecution's complete discovery file." Defs' Mot., at 15. Mr. Usher requested 20 or so documents out of millions produced to him in discovery. If Mr. Usher *had* requested the full discovery file, DOJ certainly would have invoked Exemption 4 (for confidential commercial or financial information) as to any documents it obtained from the

[7] Table D-4—U.S. District Courts—Criminal Statistical Tables for the Federal Judiciary (December 31, 2023), U.S. Courts, available at https://www.uscourts.gov/statistics/table/d-4/statistical-tables-federal-judiciary/2023/12/31.

banks and Exemption 8 (for records concerning the regulation and supervision of financial institutions) as to government-created records regarding the banks.[8] And DOJ would have invoked Exemptions 6, 7(c), and 7(d) as to documents containing information obtained from witnesses other than Mr. Gardiner. These exemptions would likely protect most of the *Usher* discovery file.

DOJ's unsupported prediction about wholesale disclosure of criminal discovery files does not reflect reality. Rather, its concern seems to boil down to a mistaken view that DOJ should never have to produce documents under FOIA if those documents were at one time subject to a protective order. This is not the law. DOJ may find this truth uncomfortable, but the documents in a prosecutor's file are agency records and, protective order or not, must be released under FOIA unless an exemption applies—the same as any other agency records.

### 2. This Case is About the Gardiner 302s, Not All 302s and Not All Work Product

In a three-sentence analysis, DOJ states that releasing the Gardiner 302s would result in foreseeable harm, though its argument does little more than identify the rationale for the work-product doctrine: DOJ says only that releasing the Gardiner 302s (1) "would reveal the mental impressions and strategy of the prosecutors while investigating the case and undermine the Department's core function to investigate potential criminal conduct," and (2) "would also 'inhibit the ability of attorneys to conduct future investigations.'" Defs' Mot. at 27 (quoting Hsu Decl. ¶ 34); *see* Hsu Decl. ¶ 34; Seidel Decl. ¶ 27. DOJ's declarations contain no further explanation.

This generic and conclusory rationale is inadequate to carry DOJ's foreseeable-harm burden. "[E]ven if a document is protected by the work-product doctrine, it is not properly withheld unless there is foreseeable harm to the integrity of the litigation process." *ACLU of Mass.,*

8 In fact, the OCC did precisely that—withhold records in full under Exemption 8—in response to a separate FOIA request Mr. Usher made for documents related to his case other than the Gardiner 302s. SOMF ¶ 77; *see* Gidley Decl. Ex. 34.

*Inc. v. ICE*, No. 22-cv-10407-PBS, --- F. Supp. 3d ---, 2023 WL 5110418, at *3 (D. Mass. Aug. 9, 2023) (rejecting certain work product withholdings); *see Reps. Comm. for Freedom of the Press v. U.S Customs & Border Prot.*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021) (requiring agencies to link the withheld information and a foreseeable harm to an interest protected by Exemption 5). DOJ cannot carry this burden simply by parroting the rationale for an exemption and insisting, without justification, that to release documents would harm the interests the exemption exists to protect. *See, e.g.*, *Nat'l Pub. Radio, Inc. v. DHS*, No. 1:20-cv-2468-RCL, 2022 WL 4534730, at *8 (D.D.C. Sept. 28, 2022) (rejecting foreseeable harm arguments where agency failed to explain "*why* disclosure of these *specific types* of reports" would be more harmful than releasing "any generic documents" that fall under a privilege exemption). Instead, DOJ "must articulate, in a focused and concrete way, the harm that would result from disclosure, including the basis and likelihood of that harm." *Reps. Comm.*, 567 F. Supp. 3d at 110 (quotation marks omitted).

DOJ has not done this or even tried to do this. As an initial matter, the work-product doctrine exists to protect "the integrity of the adversary trial process itself." *Jordan v. DOJ*, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc). There is no ongoing case to which the Gardiner 302s relate, Answer ¶ 1, and hence no risk that DOJ will be prejudiced in any litigation by their release.

DOJ has also not shown that releasing the Gardiner 302s would in any way impair the adversarial process in the future. DOJ wants the Court to address this issue by considering whether the release of 302 reports *generally*, or even work product *generally*, would alter the way FBI agents and DOJ lawyers create their work product. That is not the question before the Court. The question the Court must answer is whether DOJ has shown that the release of *the Gardiner 302s* would result in such consequences. *See Nat'l Pub. Radio*, 2022 WL 4534730, at *8.

The answer is no. The Gardiner 302s are between eight and ten years old. Contrary to

DOJ's representations, it is not true that the Gardiner 302s contain "mental impressions" or the like. *Id.* ¶ 55. They are strictly fact work product, as they only contain a synopsis of the things Mr. Gardiner told DOJ during their meetings. *Id.* The Gardiner 302s do not discuss legal theories or strategies, nor do they contain other subjective thoughts, such as the agent's assessment of Mr. Gardiner's credibility. *Id.* ¶ 55.[9]

And most importantly, the substance of the Gardiner 302s overlaps significantly with Mr. Gardiner's trial testimony. The Gardiner 302s largely concern Mr. Gardiner's interpretation of Chat 1 transcripts. SOMF ¶ 55. At Mr. Usher's trial, the parties collectively admitted into evidence approximately 47 Chat 1 transcripts through Mr. Gardiner during his six days of testimony. *Id.* ¶ 57. A significant amount of his sprawling testimony consisted of interpreting Chat 1 transcripts—just like the Gardiner 302s. *Id.* ¶¶ 55, 57. There is also substantial overlap between the chat transcripts discussed in the Gardiner 302s and the chat transcripts introduced as exhibits at trial. *Id.* Many of the chat transcripts on which DOJ relied most heavily at trial are addressed in both the Gardiner 302s and Mr. Gardiner's testimony. *Id.*

Under these circumstances, DOJ has not shown that releasing the Gardiner 302s would undermine the adversary process. There is no support in the record for the claim that FBI agents would be hindered in recording information in 302 reports if they knew those reports might eventually become public nearly a decade later, long after any investigation or prosecution has concluded, and only *after* the subject of the 302 reports gave six days of wide-ranging testimony

[9] For the authoring agent to include such information in the Gardiner 302s would have violated FBI policy concerning the creation of 302 reports. *See* FBI, Domestic Investigations & Operations Guide § 18.5.6.4.15 (Sept. 28, 2016) ("The FD-302 must contain a record of statements made by the interviewee and not contain the interviewer's opinion or contextual comments."); *see also id.* § 18.5.6.4.16 ("Any matter that may be testimonial must be documented using an FD-302 . . . ."; "If agents elect to prepare a composite FD-302, they must, without exception, ensure the composite FD-302 captures all material information in the extended interviews.").

at a public trial about largely the same events to which the 302s pertain. This is particularly true since FBI agents are constrained to record all material information, and no extraneous information, when preparing a 302 report. *See supra* note 9. DOJ has not shown foreseeable harm because it relies on a cookie-cutter foreseeable-harm justification that, on a generalized level could apply to any work product, but which does not apply to the specific work product at issue in this case.

## II. Mr. Usher, Mr. Ashton, and Mr. Ramchandani Consent to the Release of the Gardiner 302s Notwithstanding DOJ's Invocation of their Privacy Interests

DOJ invoked Exemptions 6 and 7(c) to protect the privacy interests of persons of investigative interest—presumably, Mr. Usher, Mr. Ashton, Mr. Ramchandani, and Mr. Gardiner. Mr. Usher obviously consents to disclosure of the Gardiner 302s given that he submitted the FOIA request at issue. Mr. Ashton and Mr. Ramchandani also consent to disclosure. *See* Ashton Decl. ¶ 6; Ramchandani Decl. ¶ 12. And Mr. Gardiner has no legitimate privacy interest. *See infra* Section IV. Accordingly, DOJ has no basis to invoke Exemptions 6 and 7(c) to protect the identities of the four Chat 1 traders.

Mr. Usher does not object to redacting the names of FBI agents and other government personnel. Mr. Usher also does not object to redacting the names and personal identifying information ("PII") of third parties of investigative interest or merely mentioned—other than the four individuals above—so long as DOJ replaces those names and PII with unique identifiers (e.g., "Person A," "Person B") that will preserve the full intelligibility of the documents. *See supra* note 4. DOJ's representation to the Court that Mr. Usher is not challenging DOJ's redactions of such persons' names and PII, Defs' Mot. at 6, is incomplete because DOJ did not include Mr. Usher's condition that such names be replaced by unique identifiers.

## III. Mr. Gardiner's Purported Privacy Interests Do Not Justify Withholding Under Exemptions 6 and 7(c)

DOJ states that to release the Gardiner 302s would be an unwarranted infringement on Mr.

Gardiner's solitude. For DOJ to make this argument now is especially improper because it lays bare DOJ's efforts to use Mr. Gardiner as a sword and a shield depending on its needs at any given moment. DOJ was not concerned about Mr. Gardiner's privacy when it entered into proffer and immunity agreements that required Mr. Gardiner to testify publicly, nor when prosecutors put him on the stand at Mr. Usher's trial. Not so coincidentally, DOJ's newfound interest in protecting Mr. Gardiner's privacy has surfaced at the precise moment when to do so aligns with DOJ's interests. DOJ cannot have it both ways. Having been responsible for destroying any privacy interest Mr. Gardiner might have had, DOJ cannot now hide behind those same privacy interests to resist disclosure under FOIA.

### A. Mr. Gardiner Has No Legitimate Privacy Interest

When a FOIA request seeks investigatory documents from DOJ about a particular individual, that individual has two potential privacy interests: (1) "his interest in avoiding the stigma of having his name associated with a criminal investigation," and a (2) "privacy interest in the contents of the investigative files." *Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1091-92 (D.C. Cir. 2014).

Neither applies to Mr. Gardiner. Mr. Gardiner was first publicly linked to the foreign exchange case in October 2013, when news outlets identified him as one of the traders involved in the "alleged rigging of the foreign exchange market." SOMF ¶ 34. He was publicly outed as a cooperating witness for the government no later than July 2016. *Id.* ¶ 35. Around the same time, the Federal Reserve publicly issued Mr. Gardiner a lifetime ban from the banking industry. *Id.* ¶ 37. In October 2018, Mr. Gardiner gave six days of sprawling testimony at Mr. Usher's trial. *Id.* ¶¶ 57-58. Mr. Gardiner was the subject of significant media attention every step of the way. *See* Gidley Decl. Ex. 6. It goes without saying that Mr. Gardiner is forever publicly linked to DOJ's foreign exchange investigation and prosecutions—by his own actions, as well as DOJ's.

He has no privacy interest in "avoiding the stigma" of being associated with DOJ's forex case. *Citizens for Resp. & Ethics in Washington*, 746 F.3d at 1091; *see Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 888 (D.C. Cir. 1995).

Mr. Gardiner also has no legitimate privacy interest in the contents of the Gardiner 302s, which concern the same topics about which Mr. Gardiner testified in open court over the course of at least 800 pages of trial transcript. DOJ's justifications for invoking Mr. Gardiner's purported privacy interests, despite his expansive testimony, are not grounded in the facts of this case. For example, the Antitrust Division's declaration states,

> ***[Mr. Gardiner] maintains substantial and legitimate privacy interests in not having the substance and extent of his cooperation with or connection to a federal criminal investigation publicly disclosed.*** Considering that the Antitrust Division is an investigative agency, disclosure of this individual's identifying information in connection with FD-302 and interview notes carries an extremely negative connotation.

Hsu Decl. ¶ 43 (emphasis added); *see* Seidel Decl. ¶ 36. These boilerplate statements notwithstanding, Mr. Gardiner's trial testimony is already public record. At Mr. Usher's trial, the parties admitted approximately 47 Chat 1 transcripts through Mr. Gardiner, and he testified at length about these exhibits. SOMF ¶ 57. Substantial portions of the Gardiner 302s similarly contain Mr. Gardiner's statements interpreting and explaining such Bloomberg chats. *Id.* ¶¶ 55, 57. DOJ cannot assert Mr. Gardiner's privacy interest in the contents of the Gardiner 302s in light of Mr. Gardiner's sweeping testimony, and in light of the government's extraordinary efforts to publicize its forex cases against Mr. Gardiner and others.

### B. The Public Interest Significantly Outweighs Gardiner's Privacy Interests

The Court need not consider the public interest because the public interest is only material to Exemption 7(c) "[o]nce the agency shows that the 'privacy concerns addressed by Exemption 7(C) are present.'" *Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 718 (D.C. Cir. 2021) (quoting *Nat'l*

*Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004)). None of Mr. Gardiner, Mr. Usher, Mr. Ashton, or Mr. Ramchandani has any privacy interest in these records, and Mr. Usher's request does not implicate the privacy interests of any other individuals because he consents to redactions of such person's names. Therefore, Exemptions 6 and 7(c) are not applicable.

Even if Mr. Gardiner were to have some marginal privacy interest, it is insubstantial compared to the public's interest in disclosure of the Gardiner 302s. The release of the Gardiner 302s would shed light on DOJ's basis for charging the banks and traders with rigging the currency fixes, even though DOJ had evidence in its possession that it was not possible to do so. The banks pleaded guilty to price fixing on the ground that they manipulated the WMR and ECB fixes, but a jury acquitted Mr. Usher and his codefendants of the same accusation.

A key reason for this incongruity is that the jury heard evidence that DOJ obfuscated from the public view when announcing the banks' guilty pleas. The jury heard that Shirley Barrow, the head of the group that calculates the WMR fix, told DOJ it is impossible for traders to influence the WMR fix price because the fix is calculated in a way that was secret and is immune to such efforts. SOMF ¶¶ 41-42. According to DOJ's own notes of its meeting with Ms. Barrow, "no one can predict and take advantage of or manipulate the fix." *Id.* ¶ 41. This is because the fix is calculated as the median price of 61 randomly selected trades—one per second over the 61 seconds that precede the time of the fix. *Id.* ¶ 42. Given the large volume of euro-dollar trading, it is impossible for a trader to ensure that *his* trade is included in the randomly selected sample. *Id.* And every trade that is included in the sample is only one of 61 data points. *Id.* The fix price is the unweighted median of this sample, so a trader cannot influence the fix price by placing a large order around the time of the fix, even if he could ensure his trade is included in the sample. *Id.*

Ms. Barrow told this to DOJ two months *before* the banks pleaded guilty. *Id.* ¶ 43.

Despite having this information in hand from such a knowledgeable source, DOJ forged ahead with charging the banks—without informing the FBI's lead agent, DOJ's own expert economist and data analyst, or Mr. Gardiner what Ms. Barrow said. *Id.* ¶¶ 60-61. The supposed fix-rigging was a critical component of the banks' guilty pleas: the banks' written pleas identified only two specific unlawful acts, one of which was rigging the fix price. Gidley Decl. Ex. 9, at 6.

The public has a significant interest in knowing what DOJ's basis was for charging the banks with this conduct—and obtaining the largest criminal penalties in the history of the Antitrust Division—when Ms. Barrow had already told DOJ that rigging the fix was like dividing by zero: a mathematical impossibility. *See DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). It is well established that the public has a substantial "interest in the manner in which the DOJ carries out substantive law enforcement policy" in high-profile matters. *Citizens for Responsibility & Ethics in Wash.*, 746 F.3d at 1092-93 (exercise of prosecutorial discretion in political investigation implicated "weighty" and substantial public interests). Moreover, the D.C. Circuit has found a significant public interest in "[w]hether the [prosecutor] adequately investigated and reached proper declination decisions as to potential crimes[.]" *Elec. Priv. Info. Ctr.*, 18 F.4th at 720.

Here, there is a public interest in knowing whether DOJ "adequately investigated" and "reached proper" *charging* "decisions as to potential crimes." *Id.* As DOJ's sole percipient witness to Chat 1, Mr. Gardiner was DOJ's only source of information as to what happened in Chat 1. Stunningly, however, DOJ never presented Mr. Gardiner with Ms. Barrow's analysis or asked him how it was possible for the traders in Chat 1 to influence the fix price given that Ms. Barrow provided a detailed explanation documenting that this could not be done. SOMF ¶¶ 41-42; Gidley Decl. Ex. 7. The public deserves the opportunity to examine the evidence on which DOJ

relied—that is, the statements of Mr. Gardiner—when it charged conduct that Ms. Barrow told prosecutors could not possibly have happened. *See Citizens for Responsibility & Ethics in Wash.*, 746 F.3d at 1093. Accordingly, even if Mr. Gardiner were to somehow maintain a privacy interest in the Gardiner 302s, that interest must nevertheless yield to the public's right to know "what their government [wa]s up to." *Reps. Comm.*, 489 U.S. at 773.

### C. DOJ Has Not Demonstrated and Cannot Demonstrate Foreseeable Harm to Mr. Gardiner

No foreseeable harm to Mr. Gardiner's purported privacy interests would result from disclosure of the Gardiner 302s, even if Exemption 7(c) were to otherwise apply. Dispositively, "[m]ere speculation about potential harm or boilerplate justifications are insufficient" to establish foreseeable harm. *Climate Investigations Ctr. v. DOE*, No. 16-CV-00124 (APM), 2022 WL 3277350, at *6 (D.D.C. Aug. 11, 2022) (citing *Jud. Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019)). In other words, the question when it comes to foreseeable harm is what "would" happen, not what "could" happen. *Reps. Comm.*, 3 F.4th at 369. DOJ's one-size-fits-all 302 declarations fall far short of carrying this burden here:

> Considering the FBI is an investigative and intelligence agency, disclosure of Mr. Gardiner's identifying information ***could*** subject him to harassment or embarrassment, undue public attention, and unwanted inquiries for information related to his assistance. He ***could*** also be targeted for retaliation by investigative subjects or by those who simply disparage cooperation with law enforcement. Exposure of the extent of Mr. Gardiner's cooperation with law enforcement ***could*** also lead to legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death."

Seidel Decl. ¶ 36 (emphases added); *see* Hsu Decl. ¶ 44 (containing nearly verbatim language).

DOJ offers no basis to believe that any such consequences "would" occur, and there is plenty of reason to believe they will not. Despite the public having known that Mr. Gardiner was a government cooperator since at least April 2016, SOMF ¶ 37, there is no evidence that Mr. Gardiner has ever suffered harassment, retaliation, physical harm, or any other negative

consequence whatsoever. There is not a scintilla of indication of any violence by Mr. Usher, Mr. Ashton, or Mr. Ramchandani—who are all white-collar professionals, and not the violent criminals that DOJ's declarations make them out to be. DOJ has no good faith basis for this red herring and should be ashamed to have suggested that Mr. Usher or his co-defendants would commit a violent act against Mr. Gardiner. Suffice to say that if Mr. Gardiner has not suffered such reprisals by now—nearly eight years after he was revealed as a cooperating witness and more than five years after his sprawling public testimony—it is absurd to suggest that releasing the Gardiner 302s would cause those harms in 2024 or beyond. Because DOJ offers no serious suggestion that releasing the Gardiner 302s would, in fact, cause any harm to Mr. Gardiner, DOJ has not carried its burden.

## IV. DOJ Cannot Withhold the Gardiner 302s on Grounds that They Are Confidential Source Material Under Exemption 7(d)

DOJ improperly invoked Exemption 7(d) to withhold every non-blank page of the Gardiner 302s. Exemption 7(d) permits DOJ to withhold law enforcement records that "could reasonably be expected to disclose the identity of a confidential source" or that contain "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). "The applicability of this exemption . . . 'depends upon whether the particular source who furnished the information at issue was granted confidentiality, either expressly or by implication.'" *Bagwell v. DOJ*, 588 F. Supp. 3d 58, 71 (D.D.C. 2022) (quoting *Mays v. DEA*, 234 F.3d 1324, 1328 (D.C. Cir. 2000)). DOJ has not, and cannot, meet its burden to withhold the Gardiner 302s under this exemption because Mr. Gardiner was never a confidential source for DOJ and never had any assurance of confidentiality. Therefore, the Court should grant Mr. Usher summary judgment on Exemption 7(d).

### A. Mr. Gardiner Had No Implied Assurance of Confidentiality and Testified Publicly at the 2018 SDNY Trial

Because DOJ concedes Mr. Gardiner received no express assurance of confidentiality, it is DOJ's burden to show that Mr. Gardiner had an *implied* assurance of confidentiality. *See Roth v.*

*DOJ*, 642 F.3d 1161, 1184 (D.C. Cir. 2011). "[I]t is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis." *Id.* Rather, DOJ must "point to more narrowly defined circumstances that will support the inference" of confidentiality. *DOJ v. Landano*, 508 U.S. 165, 179 (1993). The Court must weigh the following factors: (1) "the character of the crime at issue," (2) "the source's relation to the crime," (3) "whether the source received payment," and (4) "whether the source has an 'ongoing relationship' with the law enforcement agency." *Roth*, 642 F.3d at 1184. DOJ's declarations do nothing more than state in conclusory fashion that it considered some of these factors and found that they support an inference of confidentiality, which is inadequate to carry DOJ's burden. *See Bartko v. DOJ*, 62 F. Supp. 3d 134, 148 (D.D.C. 2014).

**1. Mr. Gardiner Is Demonstrably Not at Risk of Retaliation Based on His Cooperation in an Antitrust Investigation**

The character of the alleged crime weighs heavily in Mr. Usher's favor because Mr. Gardiner's cooperation does not place him at any risk of retaliation. The FBI argued otherwise in its declaration. Mr. Usher quotes the FBI's full rationale below, as merely to repeat the argument is to both refute it and lay bare its absurdity:

> Additionally, the disclosure of the information provided by Mr. Gardiner ***could have disastrous consequences***. Mr. Gardiner could be subject to ***violent reprisals***, as disclosure of this information would reveal the specific crimes and/or individuals that Mr. Gardiner reported on pursuant to his proffer agreement. Mr. Gardiner provided information of value to law enforcement concerning the FBI's investigation, and in doing so, ***has placed himself in harm's way should others become aware of the extent of his cooperation with law enforcement***. Such reprisal can take many forms, to include defamation of the source's character among their peers/family; economic reprisal (deprivation of employment/business opportunities); ***violent threats*** aimed at instilling fear and doubt; or ***even violence itself (physical harm/murder)***.

Seidel Decl. ¶ 44 (emphases added); *see* Defs' Mot., at 28 (citing possibility of "violent reprisals").

Mr. Usher assumes the FBI does not really believe any of this but, rather, mindlessly copied

this paragraph from another FOIA declaration. Indeed, the passage above includes statements that are word-for-word identical to declarations the FBI has used in FOIA cases where an informant whose identity was actually confidential provided information about violent criminals.[10]

Needless to say, such cases bear no resemblance to Mr. Usher's. "While the D.C. Circuit 'ha[s] credited the FBI's assessment of risks faced by informants even if described in relatively broad strokes,' it has only done so where inferences about those risks 'can reasonably be drawn from the type of crime committed.'" *King & Spalding LLP v. Dep't of Health & Hum. Servs.*, 330 F. Supp. 3d 477, 492 (D.D.C. 2018) (quoting *Labow*, 831 F.3d at 531). Thus, courts have rejected DOJ's use of Exemption 7(d) where the nature of the underlying crime does not support an inference of retaliation. *See id.*; *Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 906 (D.C. Cir. 1996). DOJ has provided no information to support an inference of retaliation.

Instead, DOJ cites *Rosenberg v. ICE*, 13 F. Supp. 3d 92 (D.D.C. 2014), for the proposition that an informant has an implied assurance of confidentiality when he provides information about a "serious" non-violent financial crime. Defs' Mot., at 21. DOJ's reading of *Rosenberg* as creating a presumption of confidentiality for any crime the FBI considers "serious" is inconsistent with Supreme Court precedent. *See Landano*, 508 U.S. at 181 (stating that no such presumption exists). And critically, DOJ offers no limiting principle to its reading of *Rosenberg*. The FBI presumably thinks every crime it investigates is serious, so there would appear to be no meaningful constraint on DOJ's ability to invoke Exemption 7(d) under its reading of *Rosenberg.* *Rosenberg* is not

---

[10] *See Labow v. DOJ*, 831 F.3d 523, 531 (D.C. Cir. 2016) (upholding use of Exemption 7(d), where the plaintiff—who was "identified as an anarchist extremist by an FBI agent"—sought records about DOJ's investigation into himself); *Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013) (upholding DOJ's use of Exemption 7(d) in triple homicide case); *Amuso v. DOJ*, 600 F. Supp. 2d 78, 100 (D.D.C. 2009) (affirming use of Exemption 7(d) where FOIA plaintiff was "a member of an organized crime family who has been convicted of racketeering, extortion and murder").

sufficient to carry DOJ's burden absent any evidence in the factual record that supports an inference of possible retaliation against Mr. Gardiner if DOJ releases the Gardiner 302s.

#### 2. Mr. Gardiner's Proximity to Chat 1 Does Not Support an Inference of Confidentiality

As to the second *Roth* factor, DOJ relies on Mr. Gardiner's supposed "proximity . . . to the investigative subjects," and the fact Mr. Gardiner provided "singular" information to DOJ. Hsu Decl. ¶ 55; Seidel Decl. ¶ 44. This factor bears on the Court's analysis insofar as a source's relation to the crime is "a proxy for determining the potential risk of retaliation faced by the source if her identity were disclosed." *King & Spalding*, 330 F. Supp. 3d at 492. Thus, "[t]his factor is relevant to the implied confidentiality analysis 'because sources divulging nonpublic, identifying information are more vulnerable to retaliation.'" *Id.* (quoting *Labow*, 831 F.3d at 531).

The most important consideration for this factor is that Mr. Usher, Mr. Gardiner, and their fellow traders are all white-collar professionals who worked for some of the world's largest financial institutions—"a far cry from the 'witness to a gang-related murder'" that Exemption 7(d) was designed to protect. *Bagwell*, 588 F. Supp. 3d at 71. In *Bagwell*, the court found that—even though Pennsylvania State University was "'at the center of' an investigation into child sexual abuse, a 'serious' criminal charge," it did not produce information in response to a grand jury subpoena with an implied assurance of confidentiality. *Id.* In rejecting DOJ's claim that Penn State's centrality to the crime weighed in favor of an implied assurance of confidentiality, the court found dispositive Penn State's status as "a large and well-represented public institution." *Id.* Similarly, here, the banks and traders about whom Mr. Gardiner provided information are not the sort of violent criminals who are likely to retaliate against cooperators.

That Mr. Gardiner was DOJ's sole percipient witness to Chat 1 does not tip this factor in DOJ's favor. It is true that—like numerous other London currency traders—Mr. Usher and his

colleagues sometimes referred to their chatroom as "the cartel." SOMF ¶ 32. But whatever outlandish name the traders used for their chats, there has never been even a hint of violence or retaliation among the people involved in this nearly-decade old white-collar case. Courts in this district have thus found this factor to support withholding records where an informant has "proximity . . . to . . . violent or potentially violent crimes," *Shapiro v. DOJ*, No. 12-CV-313, 2020 WL 3615511, at *34 (D.D.C. July 2, 2020), but not where a witness spoke to alleged co-conspirators in a virtual chatroom. This factor also weighs against a finding of confidentiality.

#### 3. Mr. Gardiner Voluntarily Gave Up His Privacy Years Ago in Exchange for Immunity

DOJ's declarations do not reflect that Mr. Gardiner received payment for providing information, and this "weighs against a finding of confidentiality." *Labow*, 831 F.3d at 532. Instead, Mr. Gardiner provided information to DOJ in exchange for immunity and testimony. On August 5, 2015, Mr. Gardiner signed an immunity agreement that states, in relevant part,

> Your full, truthful and continuing cooperation will include, but not limited to: . . . (e) when called upon to do so by the Antitrust Division in connection with any Federal Proceeding, testifying in grand jury, trial, or other judicial proceedings in the United States, fully, truthfully, and under oath[.]

Gidley Decl. Ex. 4, at 2. Despite knowing he was required to testify in open court if called upon to do so by DOJ, Mr. Gardiner continued his cooperation and met with prosecutors and the FBI numerous times after August 5, 2015. That Mr. Gardiner voluntarily agreed to testify publicly is strong evidence he never understood DOJ to be providing an implied assurance of confidentiality.

#### 4. Mr. Gardiner's Cooperation Ended Long Ago; There is No "Ongoing Relationship" with Law Enforcement Six Years After the SDNY Trial

DOJ's declarations do not address the final *Roth* factor. Therefore, this factor necessarily weighs in Mr. Usher's favor. *See Sennett v. DOJ*, 39 F. Supp. 3d 72, 81 (D.D.C. 2014). In a single sentence in its motion, DOJ references Mr. Gardiner's "ongoing relationship" with law

enforcement. Defs' Mot., at 22. DOJ fails to note that Mr. Gardiner's cooperation did not begin until after he had been suspended from his employer—and therefore was no longer participating in the chat with his alleged co-conspirators—nor that his cooperation terminated more than four years before Mr. Usher sought the Gardiner 302s in the instant FOIA action. These facts weigh against a finding of confidentiality. *See, e.g.*, *Sennett*, 39 F. Supp. 3d at 81 (stating that an informant's *present-day* relationship with the FBI may support a finding of confidentiality).

### B. DOJ Cannot Show Foreseeable Harm

DOJ's proffered justifications for invoking Exemption 7(d) are untethered from the facts of this case and, therefore, insufficient to establish foreseeable harm. As DOJ well knows, Mr. Gardiner's status as a cooperating witness is public knowledge and has been for years. Much of what Mr. Gardiner provided to DOJ is public knowledge, as he testified at Mr. Usher's trial.

DOJ's foreseeable-harm argument in this case may apply to some cooperating witnesses but have nothing to do with Mr. Gardiner or this case. As discussed above, DOJ largely relies on boilerplate and generic statements about how revealing Mr. Gardiner's identity and the information he supplied to law enforcement would somehow put him at risk of harm. To reiterate once more: (1) the public has known that Mr. Gardiner was cooperating with DOJ since at least April 2016, SOMF ¶ 37, (2) Mr. Usher and his co-defendants know the full extent of Mr. Gardiner's cooperation because they have already seen the Gardiner 302s, *id.* ¶ 54; and (3) the public knows this as well because Mr. Gardiner testified in open court at Mr. Usher's criminal trial, *id.* ¶ 57. Despite all of this, Mr. Gardiner has never been the subject of "violent reprisals," "defamation," "threats," or "retaliation," Seidel Decl. ¶ 44, and DOJ offers no reason to believe such consequences are likely if the Court order DOJ to release the Gardiner 302s Notes.

The FBI's cookie-cutter declaration identifies one other purported harm that would result from public disclosure of the Gardiner 302s. According to the FBI, if the Court orders the release

of the Gardiner 302s, "future sources would be less likely to provide information pursuant to a proffer agreement if they knew the information they provided would be publicly disclosed." Seidel Decl. ¶ 43. This is a quintessential straw man. DOJ has not shown that future cooperating witnesses will be reticent to cooperate if their statements to law enforcement are publicly disclosed *only after the cooperating witness has already testified in open court*. DOJ cites no case accepting the foreseeable-harm argument it makes in a case with similar facts. Instead, DOJ cites cases that predate the 2016 FOIA Improvement Act, Defs' Mot., at 21 n.4, which introduced the foreseeable harm requirement. These cases say that the government does not waive Exemption 7(d) by putting an informant on the witness stand, but they do not address the separate issue of whether and how the government can establish foreseeable harm under Exemption 7(d) where the informant's identity is known to the public and where the informant has already testified at length at a public trial. Thus, DOJ has not carried its burden of showing foreseeable harm as to Exemption 7(d).

## V. DOJ Has Not Established that the Gardiner Notes Contain Grand Jury Materials

DOJ asserts Exemption 3—for records specifically exempt by statute from disclosure—to withhold nine pages of notes. According to DOJ, those nine pages "explicitly reference[] grand jury exhibits and provide[] details about the contents of those documents." Seidel Decl. ¶ 16. DOJ withheld these pages pursuant to Federal Rule of Criminal Procedure 6(e) and Exemption 3.

Rather than substantiate its withholding under Exemption 3, DOJ states in conclusory fashion that "disclosure of the information would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury." Seidel Decl. ¶ 17. The D.C. Circuit and courts in this District have routinely rejected these *exact* words as too conclusory to substantiate withholding under Exemption 3.[11] In *Labow*, 831 F.3d at 530, for instance, the

[11] *See Labow*, 831 F.3d at 530 ("The government's declaration only offers the conclusory statement that '[a]ny disclosure of this information would clearly violate the secrecy of the grand

government sought to withhold under Exemption 3 documents that had been subpoenaed by a grand jury. The court explained,

> Rule 6(e) does not 'draw "a veil of secrecy ... over all matters occurring in the world that happen to be investigated by a grand jury."' Instead, the 'touchstone' is whether the information sought would reveal something about the grand jury's identity, investigation, or deliberation. The mere fact that information has been presented to the grand jury does not itself permit withholding.

*Id.* at 529. The *Labow* court also observed that the plaintiff "did not request documents related to a grand jury." *Id.* Instead, "[t]he *government* revealed the existence of a grand jury by withholding documents under Rule 6(e)." *Id.* "In other words, the government may not bring information into the protection of Rule 6(e), and thereby into the protection afforded by Exemption 3, simply by submitting it as a grand jury exhibit." *Stolt-Nielsen v. DOJ*, 534 F.3d 728, 732 (D.C. Cir. 2008).

The same reasoning applies here. The FBI's declaration only establishes that the withheld pages contain "references" to grand jury exhibits and "details" about the contents of those documents. Seidel Decl. ¶ 16. The considerations favoring grand jury secrecy, however, "are unlikely to be present where 'testimony or data is sought for its own sake for its intrinsic value in furtherance of a lawful investigation,' but the need to shield the information may arise when the material is sought 'to learn what took place before the grand jury.'" *Boehm v. FBI*, 983 F. Supp. 2d 154, 159 (D.D.C. 2013) (quoting *In re Grand Jury Impanelled Oct. 2, 1978*, 510 F. Supp. 112, 114 (D.D.C. 1981)).

Furthermore, Mr. Usher "did not request documents related to a grand jury; he sought documents about particular people." *Bagwell*, 588 F. Supp. 3d at 68. The only reason that one

---

jury proceedings and could reveal the inner workings of a federal grand jury.'"); *Citizens for Resp. & Ethics in Washington*, 746 F.3d at 1100 ("[W]e are told only that the requested documents contain information that 'could be used as evidence before a Federal Grand Jury' or 'may be subpoenaed by a Federal Grand Jury' and therefore that 'any such disclosure would clearly violate the secrecy of the Grand Jury proceedings.' This conclusory explanation is insufficient."); *Shapiro v. DOJ*, 205 F. Supp. 3d 68, 74 (D.D.C. 2016) (similar).

would know the documents referenced on the pages at issue were grand jury exhibits is that DOJ said so in attempting to invoke Exemption 3. *See id.* DOJ's declarations, for example, do not establish that the withheld pages contain "substantive references to the grand jury," "a grand jury 'heading or exhibit stamp,'" or other indicia that would reveal the existence and activities of a grand jury if that person did not already know about the grand jury at issue. *Id.*

Even if there *are* explicit references to the grand jury on these pages, DOJ failed to meet its segregability burden because it could have redacted those references instead of withholding the pages in full. DOJ could even have applied such redactions *without* stating that the redactions were pursuant to Exemption 3 because 5 U.S.C. § 552(b) provides that:

> the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made.

Thus, Mr. Usher is entitled to summary judgment on DOJ's withholdings under Exemption 3.

## VI. The Deliberative Process Privilege Does Not Shield the Gardiner Notes from Release Under Exemption 5

DOJ relied on Exemption 5 to withhold draft typed and handwritten FBI investigative interview notes—that is, not the 302 reports themselves, but only the notes that preceded the 302s—as privileged deliberative and pre-decisional materials. Defs' Mot. at 17-19. *See generally Vaughn* Index. An agency seeking to withhold information under this narrow exemption must provide particularly specific *Vaughn* index descriptions because "the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Animal Legal Def. Fund v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.C. Cir. 1999).

### A. DOJ Has Waived the Deliberative Process Privilege

DOJ's assertion of the deliberative-process privilege fails at the outset because DOJ waived the privilege through voluntary disclosure to Mr. Usher and others. *See supra* Section I.

**B. DOJ Has Not Established that Disclosure Would Result in Foreseeable Harm**

Congress added FOIA's "foreseeable harm" requirement in part to address agency overuse of Exemption 5, specifically the deliberative process privilege. *See* H.R. Rep. NO. 391-114th Cong., at 9 (2016) ("The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."). Consistent with Congressional intent, courts in this district hold agencies to this "independent and meaningful burden," demanding a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Reps. Comm.*, 3 F.4th at 369-70 ("Naturally, this inquiry is context specific.").

Even if DOJ had not waived privilege as to the Gardiner 302s, DOJ nevertheless offers no basis for believing that foreseeable harm would result from their release. The D.C. Circuit has warned agencies that such "wholly generalized and conclusory" assertions, essentially "just mouthing the generic rationale for the deliberative process privilege itself" are unacceptable. *Reps. Comm.*, 3 F.4th at 370. But DOJ's generic declarations could apply to virtually any document made by any agency. They are, therefore, precisely the sort of declaration that the D.C. Circuit has said is unacceptable. The conclusory statements in DOJ's declarations are strikingly similar to the averments the D.C. Circuit found insufficient in *Reps. Comm.*, 3 F.4th at 370. *Compare id.*, *with* Seidel Decl. ¶¶ 21-24; Hsu Decl. ¶¶ 35-38.

DOJ says without explanation that if the notes are made public, DOJ and other Executive Branch employees would "self-censor" and be more cautious in their discussions with each other. *See* Seidel Decl. ¶ 24. An "agency cannot carry its burden simply by turning that generic rationale into a game of Mad Libs and filling in the blanks with the name of the agency and the things that it does." *Ams. for Fair Treatment v. USPS*, 663 F. Supp. 3d 39, 60 (D.D.C. 2023). DOJ has not

articulated how these specific records from a years-old, highly publicized investigation would threaten candid agency collaboration and decision making in 2024 and beyond.

DOJ claims that the public will be confused by the fact of inclusion of certain information in the notes that is absent from the 302 reports, Seidel Decl. ¶ 24, but DOJ makes no effort to explain this conclusory assertion. "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm.*, 3 F.4th at 369-70 (holding that the FBI's "boilerplate and generic assertions" failed to demonstrate a chilling effect on internal communications as a result of public release). DOJ's public-confusion argument fails this "would, not could" standard. *See* Seidel Decl. ¶ 23 ("Likewise there *could* also be information contained within the typed and handwritten interview notes that is not included in the official FD-302." (emphasis added)).

**C. DOJ Failed to Meet Its Segregability Burden**

A document's draft nature does not render all its contents deliberative because "[u]nder the deliberative process privilege, factual information generally must be disclosed." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992). Moreover, "[t]he government bears the burden of demonstrating that no reasonably segregable material exists in the withheld documents." *Barouch v. DOJ*, 962 F. Supp. 2d 30, 56 (D.D.C. 2013). Contrary to DOJ's declarations, the notes are fact-based and do not contain mental impressions. SOMF ¶ 55. Even if the notes contain some "thoughts, ideas, impressions, and interpretations," Seidel Decl. ¶ 23, DOJ is only entitled to withhold those narrow portions—not the entire document. *See id.*

**Conclusion**

The Court should grant Mr. Usher's Motion for Summary Judgment, deny DOJ's Motion for Summary Judgment, and order DOJ to release unredacted copies of the Gardiner 302s.

Dated: April 3, 2024

Respectfully submitted,

/s/ J. Mark Gidley
J. Mark Gidley (D.C. Bar No. 417280)
White & Case LLP
701 13th Street N.W.
Washington, DC 20005
(202) 626-3600
mgidley@whitecase.com

Michael Kendall (*pro hac vice*)
C. Kelly Newman (*pro hac vice*)
Daniel Medici (*pro hac vice*)
Abigail Mahoney (*pro hac vice*)
White & Case LLP
75 State Street
Boston, MA 02109
(617) 979-3310
michael.kendall@whitecase.com
kelly.newman@whitecase.com
dan.medici@whitecase.com
abigail.mahoney@whitecase.com

*Counsel for Richard Usher*

## CERTIFICATE OF SERVICE

I, J. Mark Gidley, certify that the foregoing document was filed via the Court's CM/ECF system on April 3, 2024, which automatically served a true and accurate copy on all counsel of record.

/s/ J. Mark Gidley
J. Mark Gidley