**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD USHER,<br><br>          Plaintiff,<br><br>     v.<br><br>THE UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>          Defendants. | Civil Docket No. 23-cv-02086 (JMC) |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.    THE GOVERNMENT PROPERLY WITHHELD ATTORNEY WORK
PRODUCT UNDER EXEMPTION 5 ................................................................... 2

    A.    The Government Did Not Waive Work-Product Protection................................... 2

        1.    The government did not produce the FD-302s "voluntarily" ..................... 3

        2.    The circumstances of the disclosure do not suggest a waiver ................... 6

    B.    The Government Established Foreseeable Harm..................................................... 10

        1.    The government's declarations established foreseeable harm................. 10

        2.    Requiring the release of work product disclosed in criminal
discovery would render criminal protective orders meaningless.............. 13

II.    THE GOVERNMENT PROPERLY WITHHELD INFORMATION
PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE UNDER
EXEMPTION 5 .................................................................................................... 15

    A.    The Government Did Not Waive the Deliberative Process Privilege.................. 15

    B.    The Government Established Foreseeable Harm..................................................... 16

    C.    The Government Satisfied Any Segregability Burden ......................................... 17

III.    THE GOVERNMENT PROPERLY WITHHELD INFORMATION
FURNISHED BY A CONFIDENTIAL SOURCE UNDER EXEMPTION 7(D) .......... 19

    A.    The *Roth* Factors Support an Inference of Confidentiality.................................. 19

    B.    The Government Established Foreseeable Harm..................................................... 21

IV.    THE GOVERNMENT PROPERLY WITHHELD GRAND JURY MATERIALS
UNDER EXEMPTION 3................................................................................... 23

V.    THE GOVERNMENT PROPERLY WITHHELD IDENTIFYING
INFORMATION OF THIRD PARTIES UNDER EXEMPTIONS 6 AND 7(C)............ 24

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Am. Ctr. for L. & Just. v. DOJ*,
  325 F. Supp. 3d 162 (D.D.C. 2018) ....................................................................... 18

*Bagwell v. DOJ*,
  588 F. Supp. 3d 58 (D.D.C. 2022) ......................................................................... 20

*Bonner v. U.S. Dep't of State*,
  928 F.2d 1148 (D.C. Cir. 1991) ............................................................................. 24

*Brady v. Maryland*,
  373 U.S. 83 (1963) ................................................................................................... 1

*Bullock v. FBI*,
  577 F. Supp. 2d 75 (D.D.C. 2008) .................................................................... 22, 23

*Campbell v. DOJ*,
  164 F.3d 20 (D.C. Cir. 1998) ................................................................................. 21

*Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*,
  72 F.3d 897, 906 (D.C. Cir. 1996) ......................................................................... 21

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ......................................................................... 3, 4, 8

*CREW v. DHS*,
  525 F. Supp. 3d 181 (D.D.C 2021) .................................................................. 21, 22

*DOJ v. Landano*,
  508 U.S. 165 (1993) ............................................................................................... 20

*Elec. Frontier Found. v. DOJ*,
  739 F.3d 1 (D.C. Cir. 2014) ............................................................................. 15, 18

*Elec. Frontier Found. v. DOJ*,
  890 F. Supp. 2d 35 (D.D.C. 2012) ................................................................... 15, 16

*Friends of the River v. U.S. Army Corps of Eng'rs*,
  No. CV 16-2327 (JMC), 2023 WL 4105168 (D.D.C. June 21, 2023) ............... 10, 11

*FTC v. Meta Platforms*,
  No. CV 20-3590 (JEB), 2022 WL 4078930 (D.D.C. Sept. 6, 2022) ...................... 15

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ................................................................................................. 9

*In re Martin Marietta Corp.*,
  856 F.2d 619 (4th Cir. 1988) ................................................................................. 7

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ............................................................................. 16

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ........................................................................... 6, 7

*In re Subpoenas Duces Tecum*,
  738 F.2d 1367 (D.C. Cir. 1984) ............................................................................ 6

*Judicial Watch, Inc. v. U.S. Department of State*,
  557 F. Supp. 3d 52 (D.D.C. 2021) ................................................................... 16, 17

*King & Spalding LLP v. HHS*,
  330 F. Supp. 3d 477 (D.D.C. 2018) ..................................................................... 19

*Labow v. DOJ*,
  831 F.3d 523 (D.C. Cir. 2016) ......................................................... 19, 20, 23, 24

*Leopold v. DOJ*,
  487 F. Supp. 3d 1 (D.D.C. 2020) ..................................................... 11, 12, 13, 16

*Machado Amadis v. U.S. Dep't of State*,
  971 F.3d 364 (D.C. Cir. 2020) ....................................................................... 12, 17

*Manna v. DOJ*,
  815 F. Supp. 798 (D.N.J. 1993) ........................................................................ 4, 5

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ............................................................................................. 8

*NPR v. DHS*,
  No. 1:20-cv-2468-RCL, 2022 WL 4534730 (D.D.C. Sept. 28, 2022) ................... 12

*N.Y. Times Co. v. DOJ*,
  939 F.3d 479 (2d Cir. 2019) ............................................................................. 8, 9

*Ortiz v. HHS*,
  70 F.3d 729 (2d Cir. 1995) ................................................................................ 22

*Parker v. DOJ*,
  934 F.2d 375 (D.C. Cir. 1991) ........................................................................... 22

*Parker v. DOJ Off. of Pro. Resp.*,
  278 F. Supp. 3d 446 (D.D.C. 2017) ..................................................................... 15

*Protect Democracy Project, Inc. v. Dep't of,*
  *Def.*, 320 F. Supp. 3d 162 (D.D.C. 2018) .................................................................. 9

*Reps. Comm. for Freedom of the Press v. FBI*,
  3 F.4th 350 (D.C. Cir. 2021) ........................................................................................ 17

*Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,
  567 F. Supp. 3d 97 (D.D.C. 2021) .................................................................. 11, 12, 21

*Rockwell Int'l Corp. v. DOJ*,
  235 F.3d 598 (D.C. Cir. 2001) ......................................................................... 6, 7, 9, 10

*Rosenberg v. ICE*,
  13 F. Supp. 3d 92 (D.D.C. 2014) ............................................................................ 19, 20

*Roth v. DOJ*,
  642 F.3d 1161 (D.C. Cir. 2011) ................................................................................... 19

*United States v. Am. Tel. & Tel. Co.*,
  642 F.2d 1285 (D.C. Cir. 1980) ................................................................................. 7, 8

*United States v. Deloitte LLP*,
  610 F.3d 129 (D.C. Cir. 2010) ...................................................................................... 7

*United States v. Nobles*,
  422 U.S. 225 (1975) ...................................................................................................... 6

**STATUTES**

5 U.S.C. § 552 ..................................................................................................................... 13

15 U.S.C. § 1 ....................................................................................................................... 19

**OTHER AUTHORITIES**

S. Rep. No 89-813 (1965) ..................................................................................................... 8

**INTRODUCTION**

This case is not about what happened in Richard Usher's criminal trial.  What the government's evidence in that case did or did not prove has nothing to do with the FOIA request at issue here or the government's response to that request.  Usher's extended discussion of "foreign exchange . . . market basics," Opp. 3–4, the government's investigation into various banks, Opp. 4–6, and what other witnesses may have told the government in the criminal investigation, Opp. 6–7, is thus irrelevant to the issues in this case.  Nor is this case an opportunity for Usher to rehash his "long, quixotic struggle" to access criminal discovery that he agreed to destroy at the conclusion of his criminal trial.  Opp. 1.

This case is about a narrow legal question:  does the government waive work-product protection over documents that it produces in criminal discovery under a protective order that protects their confidentiality?  On that question, Usher's position is fatally inconsistent.  On the one hand, Usher maintains that the documents he seeks contain "irrefutable evidence of his innocence," Opp. 1, and were materially exculpatory under *Brady v. Maryland*, 373 U.S. 83 (1963), Compl. ¶ 1.  On the other hand, he contends that the government had no obligation to produce the documents whatsoever, but rather did so "voluntarily."  Opp. 2.  Usher cannot have it both ways.  If the discovery was exculpatory as alleged, then the government was compelled to produce it, and so there was no voluntary waiver of work-product protection.

To distract from the fundamental inconsistency in his position, Usher resorts to hyperbolic rhetoric, accusing the Department of Justice of "disdain for this proceeding" and "stonewalling" his attempts to access the documents.  Opp. 3.  Nothing could be further from the truth.  The reason Usher has been unsuccessful is because the relief that he seeks is extraordinary and unprecedented:  access to privileged criminal discovery that he agreed he would use only to

prepare for his criminal case and would destroy at its conclusion.  Judge Berman rejected

Usher's attempt to modify the protective order in the SDNY proceeding to allow him to access

the documents, and there is likewise no basis to compel disclosure of them here.

      The FD-302s and interview notes are exempt from disclosure for a number of

independent reasons.  In addition to being exempt as work product, the interview notes fall under

the deliberative process privilege.  All the withheld materials are also exempt because they

contain information furnished by a confidential source.  Usher dismisses the FBI's and Antitrust

Division's declarations in support of their withholdings as "cookie-cutter," Opp. 3, but, as

explained below, the declarations contain at least as much specificity as declarations that courts

in this district have held sufficient.  The Court should grant summary judgment to Defendants.

## ARGUMENT

## I.     THE GOVERNMENT PROPERLY WITHHELD ATTORNEY WORK PRODUCT UNDER EXEMPTION 5

### A.     The Government Did Not Waive Work-Product Protection

      Usher contends that this case can be resolved by applying a simple, bright-line rule:  a

party always waives work-product protection whenever it voluntarily discloses information to an

adversary, regardless of the circumstances.  Opp. 18.  As an initial matter, this argument fails

because the government did not produce the FD-302s "voluntarily," but did so pursuant to its

criminal discovery obligations.  Defs.' MSJ 13.  More fundamentally, Usher's argument fails

because courts considering waiver have not adopted his categorical approach, but rather consider

all the circumstances of the disclosure, including whether the party's actions were consistent

with the purposes of the privilege.  Here, those circumstances do not suggest waiver, and the

government's actions are consistent with the purposes of the work-product doctrine.

1.     The government did not produce the FD-302s "voluntarily"

Once a defendant has been criminally charged, the government's obligations to provide discovery to him under Federal Rule of Criminal Procedure 16 and the U.S. Constitution attach. At that point, discovery is not "voluntary" in the sense contemplated by the cases addressing waiver, but rather is compelled.  *See, e.g.*, *Cottone v. Reno*, 193 F.3d 550, 556 (D.C. Cir. 1999) (no waiver of Exemption 3 because disclosure was "constitutionally compelled").

Had the government refused to produce the FD-302s of Mr. Gardiner—the government's "key" cooperating witness, Compl. ¶ 64—Usher surely would have moved to compel their production.  In his view, the FD-302s contain "irrefutable evidence of his innocence," Opp. 1, and his complaint alleges 37 times that the FD-302s are exculpatory *Brady* evidence.[1]  Indeed, Usher's FOIA request itself requested the FD-302s that "were previously produced to Mr. Richard Usher as exculpatory material in *United States v. Richard Usher et al.*, No. 17-cr-19 (RMB) (S.D.N.Y.)."  Compl. ¶ 88.  The request thus sought documents that—*by definition*—the government was compelled to produce under *Brady* and Rule 16.  For Usher to suggest now that the government was free to "voluntarily" withhold these FD-302s about meetings with the sole cooperating co-conspirator in his criminal case—and thus that he would not have argued that the law "compelled" their production to him—simply strains credulity.

In contending that the government's disclosure was nonetheless "voluntary," Usher relies principally on a cover letter enclosing the FD-302s, which stated that the government was "voluntarily producing this material," which the government "deem[ed] . . . to be subject to the Protective Order signed by Judge Berman," while "not waiving any privileges."  Gidley Decl. Ex. 3 (8/4/2017 Cover Letter) at 1–2.  By describing the production as "voluntary," however, the

---

[1] *See* Compl. ¶¶ 1, 3–6, 8–9, 12, 19, 20, 44–47, 62, 68, 75, 82, 85, 88, 95, 102.

government obviously did not mean that it had unfettered discretion to produce or withhold the documents.  Rather, as Defendants have explained, prosecutors often produce documents even if they are not specifically named among the specific types of documents that must be produced, but are arguably within the larger sphere of materials that the government must produce.  *See* Defs.' MSJ 16.  This practice is in the interests of justice and efficiency, as it avoids unnecessary litigation over motions to compel.  *Id.*  Such productions are "voluntary" in the sense that the government is not requiring the defendant to move to compel, but they are still being produced pursuant to the government's broader criminal discovery obligations.  *See, e.g.*, *Cottone*, 193 F.3d at 556; *Manna v. DOJ*, 815 F. Supp. 798, 813 (D.N.J. 1993) ("Disclosure of information during the course of a criminal proceeding does not constitute a waiver of a FOIA exemption.").

 This is precisely why prosecutors enter into protective orders that, like the protective order here, prevent defense counsel from further disseminating criminal discovery and require them to destroy the discovery at the conclusion of the criminal case.  By ensuring that the discovery will be kept confidential, such orders allow prosecutors to produce documents without "waiving any privileges."  8/14/2017 Cover Letter at 1–2 (noting that material was deemed "subject to the Protective Order").  But if Usher's novel theory were adopted, it would render such protective orders meaningless, as the government would waive work product by the very act of disclosure, regardless of the protective order.

Usher also criticizes Defendants for relying on a December 18, 2020 joint letter to Judge Berman in support of their argument.  Opp. 20.  But Defendants cited the joint letter because it concerns the precise legal question at issue here:  whether the government had waived work-product protection by producing certain documents pursuant to the protective order.  *See* Robinson Decl. Ex. C ("Joint Letter") at 1, 3–4, 8.  In the letter, Usher's co-defendant, Rohan

4

Ramchandani, argued, as Usher argues here, that "any claim of work product protection was waived when the [documents at issue] were produced to [defendants] in criminal discovery." Joint Letter at 3.[2]  Ramchandani sought, as Usher seeks here, "attorney work-product created by the Department of Justice," including notes of meeting with investigation subjects.  *Id.* at 7.  The government argued that it had not waived work product as to these documents because it produced them "in (partial) fulfillment of the Government's Rule 16, *Brady*, and *Giglio* obligations," and "[c]ompelled disclosure . . . does not waive privilege or work-product."  *Id.* at 8.[3]  That the December 18 letter did not concern the precise documents at issue here does not make it "irrelevant," Opp. 20, as the nature of the documents (notes of meetings with investigation subjects) and the parties' legal arguments are the same as in this case.

Usher also emphasizes minor wording differences in the government's production letters, noting that the government sometimes stated that it was not "conceding" that the documents at issue were exculpatory pursuant to *Brady*, and other times that it was producing documents pursuant to *Brady*.  Opp. 20–21.  But those wording differences cannot change the fundamental point that the government produced the FD-302s pursuant to its criminal discovery obligations. Again, Usher cannot seriously contend that the government was free to withhold these documents, as he has consistently maintained for years that they contain evidence of his innocence that must be disclosed under *Brady*.  Opp. 1.  Nor does the fact that the government denied in its answer some of Usher's allegations about the exculpatory nature of the evidence,

---

[2] Usher also sought to modify the protective order so that he could retain and use the criminal discovery in other proceedings.  *See* ECF No. 244 in No. 17-cr-19 (S.D.N.Y.).  The district court denied Usher's request.  *See id.* ECF No. 273.

[3] The court denied Ramchandani's request, holding that he "ha[d] not rebutted the strong presumption against modification of the Protective Order."  *See* ECF no. 255 in No. 17-cr-19 (S.D.N.Y.).

Opp. 21, show that the government's production was in fact "voluntary." Of course the government's view is that Gardiner's statements were overwhelmingly *inculpatory*—that is among the reasons why it brought the prosecution against Usher in the first place. But that does not mean that the government was free to withhold the FD-302s for the sole cooperating co-conspirator or that its production of them was "voluntary."

      2.    <u>The circumstances of the disclosure do not suggest a waiver</u>

In addition to proceeding from the flawed premise that the government's disclosure was "voluntary," Usher's argument also fails for the more fundamental reason that courts have not adopted Usher's categorical, bright-line approach to waiver. Rather, courts have held that "[w]hat constitutes a waiver with respect to work-product materials depends . . . upon the circumstances." *United States v. Nobles*, 422 U.S. 225, 239 n.14 (1975); *see also Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 606 (D.C. Cir. 2001) (courts have required disclosure in cases where "their particular circumstances made doing so necessary to protect the adversary system"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C. Cir. 1984) (examining "three main factors" to determine whether protection was waived); *In re Sealed Case*, 676 F.2d 793, 817 (D.C. Cir. 1982) (examining a "combination of factors").[4]

In assessing whether a party has waived work-product protection under the circumstances, the overriding "principle" courts apply is whether "the party claiming the

---

[4] Usher asserts that one of Defendants' quotations of *In re Sealed Case* in their opening brief was "incomplete" because it did not include a portion of the opinion referencing "selective disclosure." Opp. 19. But Defendants made clear that the Court was addressing the issue in the context of selective disclosure. *See* Defs.' MSJ 12 ("[C]ourts have held that *selective disclosure* of information—'even in some circumstances to an adversary'—will not necessarily result in waiver of the work-product protection." (emphasis added)(citation omitted)). While this case does not involve selective disclosure specifically, *In re Sealed Case* is still relevant because it shows that courts do not generally apply bright-line rules to the question of waiver of work product but instead consider all the circumstances, particularly the purposes of the privilege.

privilege seeks to use it in a way that is not consistent with the purpose of the privilege." *In re Sealed Case*, 676 F.2d at 818.  For example, in *Rockwell*, the Court rejected the plaintiff's argument that DOJ had waived work product by producing documents to Congress after noting that in each of the cases cited by the plaintiff, disclosure had been "required . . . at least in part because their particular circumstances made doing so necessary to protect the adversary system." 235 F.3d at 606.  Specifically, in the cases discussed by the *Rockwell* court, waiver was found when (1) a party allowed a witness to testify but then, in the same case, asserted work product to deny access to interview notes that the prosecutor sought to use in cross-examination (*Nobles*), (2) a company attempted to invoke work product in a way that would have threatened a criminal defendant's constitutional right to favorable evidence (*In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988)), and (3) a company disclosed work product to gain lenient treatment from the SEC as part of a voluntary disclosure program, but then sought to use the privilege to prevent the same documents from being disclosed to other litigation adversaries (*Sealed Case*).  *See Rockwell*, 235 F.3d at 605-07. Finding no comparable conduct by the government, the *Rockwell* court held that work product had not been waived.  *Id.*

In arguing for a categorical approach that ignores the purposes of the privilege, Usher cites cases involving the separate context of whether disclosure to a third party constitutes a waiver for purposes of civil discovery.  *See* Opp. 18–19 (citing *United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010); *United States v. Am. Tel. & Tel. Co. (AT&T)*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).  In that context, courts have stated that "disclosing work product to a third party can waive protection if 'such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary.'"  *Deloitte*, 610 F.3d at 140 (citations omitted).  That is because, unlike the attorney-client privilege, work product is not

necessarily waived when a party discloses information to a third party, and thus courts have developed a standard to assess when such third-party disclosures waive the privilege.  *AT&T*, 642 F.2d at 1299.  Because the principal purpose of the work-product doctrine in civil discovery is to "protect information against opposing parties," courts generally will not find disclosure to a third party to be a waiver if that disclosure was not inconsistent with maintaining secrecy from the disclosing party's adversary.  *Id.*

In the FOIA context, however, the purpose of the work product doctrine is not simply to protect against disclosure to one's "adversary," but to protect against disclosure to the world at large.  *See N.Y. Times Co. v. DOJ*, 939 F.3d 479, 495 (2d Cir. 2019) ("In the FOIA Exemption 5 context (where adversaries often do not exist), the[e] [work product] doctrine provides that *public disclosure* of specific details from an otherwise privileged agency memorandum waives the work product protection with respect to those facts.") (emphasis added)).  Indeed, Congress "had the attorney's work-product privilege specifically in mind when it adopted Exemption 5." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975).  And Congress was particularly concerned that, without an exemption for attorney work product, it "would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to *public scrutiny*."  S. Rep. No. 89-813, at 9 (1965) (emphasis added) (cited in *NLRB*, 421 U.S. at 154).  Congress recognized that "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'"  *Id.*[5]

---

[5] Usher incorrectly contends that the cases Defendants cited concerning "waiver of FOIA exemptions" generally are "off-point."  Opp. 21–22 & n.6.  Those cases explain that the government typically does not waive a FOIA exemption unless the document enters the "public domain."  *See, e.g.*, *Cottone*, 193 F.3d at 556.  Similarly, while the purpose of the work-product doctrine in civil discovery is principally about protection from disclosure to an adversary, "[i]n

Here, when one considers all the circumstances of the disclosure, and particularly the purposes of the work-product doctrine in the FOIA context, those circumstances demonstrate that the government's actions did not amount to a waiver.

*First*, as already discussed, the government did not produce the documents "voluntarily," but rather pursuant to its criminal discovery obligations. *Second*, the government took reasonable steps to "maintain [the documents'] confidentiality," *Rockwell*, 235 F.3d at 605, producing them under a strict protective order, and the documents therefore did not enter the public domain. *Third*, unlike the cases where courts have found waiver, the government did not make a selective disclosure of work product to gain an unfair litigation advantage. *See id.* at 605–07 (discussing and distinguishing cases where courts found disclosure was "necessary to protect the adversary system").

*Finally*, and significantly, the government's actions here—disclosing the documents in the criminal case but withholding them now in this separate FOIA action—are entirely consistent with the purposes of the privilege. Disclosing the documents to Usher's counsel under a protective order served the interests of the adversary system by ensuring that Usher had access to all materials that may have been material to preparing his defense. At the same time, the government ensured that the disclosure was no broader than necessary, recognizing that routine public disclosure of work product in criminal cases would discourage attorneys and their agents from creating such work product as they prepare a case. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). The government's withholding of the documents now is likewise fully consistent with

the FOIA Exemption 5 context," the doctrine guards against "public disclosure." *N.Y. Times Co.*, 939 F.3d at 495. The one case that Usher cites on this issue does not suggest otherwise. *See Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 171 n.3 (D.D.C. 2018) (differentiating between the "official acknowledgment" doctrine and waiver, not between the work-product doctrine and waiver).

the purposes of the privilege, especially in the FOIA context, where the privilege protects against public disclosure of work product.  And allowing this longstanding practice to continue—where prosecutors produce criminal discovery under protective orders that allow them to maintain privilege—serves the broader interests of the adversary system by allowing prosecutors to produce more discovery than may be strictly necessary, which benefits both the government and defense counsel alike.

Usher, by contrast, never explains why requiring the government to release this work product now is "necessary to protect the adversary system." *Rockwell*, 235 F.3d at 606.  The government gained no advantage by disclosing the documents in the SDNY proceeding, so there would be no unfairness in allowing the government to maintain its privilege now. Nor does Usher point to any adversarial proceeding in which he needs to use the documents now, contending instead that he seeks the documents to "expose [them] to the public."  Opp. 1.[6]  Such public disclosure of work product is not only unnecessary "to protect the adversary system," *Rockwell*, 235 F.3d at 606, it is precisely what the work-product doctrine is designed to prevent.

**B.     The Government Established Foreseeable Harm**

1.   The government's declarations established foreseeable harm

"Although the D.C. Circuit has expounded upon the relationship between the foreseeable harm requirement and the deliberative process privilege, the relationship between foreseeable harm and the attorney-client and work-product privileges remains largely undefined." *Friends of the River v. U.S. Army Corps of Eng'rs*, No. CV 16-2327 (JMC), 2023 WL 4105168, at *5

---

[6] Usher previously alleged that he needed the documents to defend himself in an enforcement proceeding brought by the Government of Brazil's Administrative Council for Economic Defense ("CADE").  Compl. ¶ 10.  He then sought (and obtained) expedition of this matter on that basis.  *See* JSR at 4, ECF. No. 16 ("Plaintiff seeks the records . . . to assist in his defense in the CADE Case.").  But Usher makes no mention of the CADE proceedings in his opposition.

(D.D.C. June 21, 2023) (Cobb, J.).  That said, given the "'prominent and sacrosanct' nature of the attorney-client relationship," this Court has stated that "in the case of the attorney-client and/or work product privileges" the "risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated."  *Id.* (quoting *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021)).  Thus, simply "establishing that one or both of those privileges apply 'will go a long way' towards" establishing foreseeable harm.  *Id.* (quoting *Reps. Comm.*, 567 F. Supp. 3d at 124).

In *Leopold v. DOJ*, 487 F. Supp. 3d 1 (D.D.C. 2020), the court held that the government had established that releasing FD-302s would cause foreseeable harm for the same reasons that the government's declarants have explained here.  *Id.* at 10 n.4.  The declarant in *Leopold* explained that

> disclosing the contents of the FD-302s at issue . . . would indirectly reveal the mental impressions, assessments, and thought processes of the attorneys involved in the investigation and of the Special Counsel in particular, contrary to the purpose of the attorney work product doctrine, which would inhibit the flexibility with which future special counsels might structure and pursue investigations.

*Id.* (alteration omitted)  Based on this declaration, the court concluded that the government had "sufficiently identified the foreseeable harm that would result if the information withheld pursuant to the attorney work product privilege . . . were disclosed."  *Id.*

Here, the government's declarants have identified the same foreseeable harm.  *See* Seidel Decl. ¶ 27 (noting that the FD-302s "reflect[] the mental impressions and strategic determinations of the DOJ attorneys" and that "[r]eleas[ing] . . . this information would interfere with government attorneys' ability to properly prepare their legal theories and strategies" and "hinder them in providing the best possible representation of their clients"); *see also* Hsu Decl. ¶ 34.  The government's explanations of foreseeable harm thus are not "generic and conclusory," Opp. 26, but are precisely the same explanations that courts have found sufficient to establish

11

foreseeable harm.  *Leopold*, 487 F. Supp. 3d at 10 n.4; *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (foreseeable harm because agency "concluded that disclosure of . . . information 'would' chill future internal discussions"); *Reps. Comm.*, 567 F. Supp. 3d at 124 (foreseeable harm where declaration stated that "routine disclosure of information protected by attorney-client and/or attorney work product privilege would shake the very foundation of the legal profession, as clients would not feel comfortable asking for advice and attorneys would not feel comfortable providing it").

Usher nonetheless contends that the government cannot establish foreseeable harm here because "there is no ongoing case to which the Gardiner 302s relate" and thus "no risk that DOJ will be prejudiced in any litigation by their release."  Opp. 27.  But the same was true in *Leopold* and *Reporters Committee*, and yet the courts there held that the government had established foreseeable harm.  Taken to its logical conclusion, Usher's argument would mean that the government cannot withhold work product under Exemption 5 after the conclusion of the litigation to which the work product relates.  That is obviously is not the law.

Usher next seems to contend that the government must show there is something *unique* about the Gardiner FD-302s specifically that would result in foreseeable harm if they were released.  But that is not the law either, and the one case Usher cites in support of that proposition concerns the deliberative process privilege, not attorney work product.[7]  In any event, the government's declarants have explained why the Gardiner FD-302s specifically would cause foreseeable harm:  both declarations described those FD-302s and explained that releasing them would reveal the mental impressions and strategies of prosecutors, which would hinder

---

[7] *See NPR v. DHS*, No. 1:20-cv-2468-RCL, 2022 WL 4534730, at *8 (D.D.C. Sept. 28, 2022).

future investigations.  Seidel Decl. ¶ 27; Hsu Decl. ¶ 34.  This is precisely the explanation that the court found sufficient in *Leopold*.  487 F. Supp. 3d at 10 n.4

Nor does the fact that the FD-302s are "between eight and ten years old" mean that no harm would result from their release to the public.  Opp. 27–28.  Unlike for the deliberative process privilege, there is no time period after which work product loses its protection under FOIA.  *See* 5 U.S.C. § 552(b)(5) (deliberative process privilege "shall not apply to records created 25 years or more before the date on which the records were requested").  Usher is also simply wrong that the FD-302s do not contain mental impressions.  Seidel Decl. ¶ 27.  In any event, he cites no authority to suggest that "fact work product" is entitled to less protection than other work product.  Opp. 28.  And the fact that the substance of the FD-302s might "overlap" with Mr. Gardiner's trial testimony is likewise irrelevant.  Opp. 28.  The government has already released those portions of the FD-302s that were disclosed at trial, and the only portions that have been withheld are those that have not entered the public domain.  Defs.' MSJ 13 n.2.

    2.   <u>Requiring the release of work product disclosed in criminal discovery would render criminal protective orders meaningless</u>

In addition to the harm described above, the government has also identified a significant harm that release of the FD-302s would have on the ability of federal prosecutors and criminal defendants to enter criminal protective orders like the one at issue in this case.  Such protective orders are used routinely, to the benefit of both the prosecution and the defense.  But if the Court were to hold that the government waives work product and possibly other privileges whenever it produces criminal discovery under such protective orders, prosecutors would be deterred from using them and thus from producing criminal discovery that they may not be strictly required to produce.  *See* Defs.' MSJ 15–16.

Usher offers various reasons why he believes the government could still rely on criminal protective orders, Opp. 24–26, but his arguments are unconvincing.  Usher first notes that, if a FOIA requester were to seek criminal discovery *during the pendency* of a criminal case, the government could rely on FOIA exemptions 7(A) & (B) to withhold the documents.  *See* Opp. 24. But that provides little comfort to federal prosecutors whose work product could then be released to the world the moment a criminal proceeding concludes.

Usher then lists various other FOIA exemptions that the government might be able to invoke, such as for records that "implicate national security" or for "grand jury materials and wiretap recordings." Opp. 25.  But these exemptions will not protect the vast majority of the documents over which the government would commonly assert privilege, such as attorney communications or the interview summaries and notes that are at issue in this case.  There is nothing "exceedingly rare," Opp. 25, about the government producing such materials to criminal defendants, and Usher offers no persuasive reason why such materials would not routinely be accessible through FOIA once a criminal case concludes.

Finally, Usher asserts that the "main reason" that Exemptions 6 and 7(C) (concerning the privacy interests of certain individuals) do not apply in this case is that Mr. Gardiner "publicly testified at Mr. Usher's trial." Opp. 25.  But the government has invoked Exemptions 6 and 7(C) only to withhold the *identifying information* of certain individuals (such as their names, addresses, and phone numbers), not the substance of what Mr. Gardiner told the FBI.  *See* Seidel Decl. ¶¶ 30–40; Hsu Decl. ¶¶ 41–50.  Thus, it is irrelevant that Gardiner testified at trial or that "97.5% of federal prosecutions" do not go to trial.  Opp. 25.  Usher does not explain why, in a case that does not go to trial, the government could rely on Exemptions 6 and 7(C) to withhold the *substance* of what a cooperating witness tells the FBI (as opposed to the witness's identifying

information).  For the same reason, it is irrelevant that Usher "obtained privacy waivers from his co-defendants," Opp. 25, which could allow the government to release their identifying information.  Even if a third party did not provide a waiver in some future case, a FOIA requester could still argue that the government must disclose the substance of what a cooperating witness tells the FBI, so long as the third party's identifying information is redacted.

## II.   THE GOVERNMENT PROPERLY WITHHELD INFORMATION PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE UNDER EXEMPTION 5

### A.   The Government Did Not Waive the Deliberative Process Privilege

Usher's argument for why the government has waived the deliberative process privilege consists of a one-sentence cross-reference to his argument that the government has waived the work-product privilege.  Opp. 43.  But the privileges serve different purposes, and courts have analyzed the waiver question differently for each privilege.  Cases analyzing waiver of the deliberative process privilege have generally done so in the context of whether the government has "adopt[ed]" or "incorporate[d] by reference" a document that would have otherwise been protected by the privilege, *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 10 (D.C. Cir. 2014), or whether the document has entered the "public domain," *Parker v. DOJ Off. of Pro. Resp.*, 278 F. Supp. 3d 446, 453 (D.D.C. 2017), neither of which applies here.  Usher cites no cases extending the standard for waiver of attorney work product to alleged waivers of the deliberative process privilege, and in fact courts have held that the standard for waiver in the work-product context is "inapplicable to waiver in the context of the deliberative-process privilege." *FTC v. Meta Platforms*, No. CV 20-3590 (JEB), 2022 WL 4078930, at *7 (D.D.C. Sept. 6, 2022).

Some district courts have stated that "voluntary disclosure of privileged material . . . to unnecessary third parties . . . waives the [deliberative process] privilege . . . for the document or information specifically released."  *See, e.g.*, *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35,

46 (D.D.C. 2012) (quoting *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997)). But those decisions have relied on *In re Sealed Case*, which was addressing waiver in the context of the attorney-client privilege, not the deliberative process privilege. 121 F.3d at 741 ("It is true that voluntary disclosure of privileged material subject to the *attorney-client privilege* to unnecessary third parties *in the attorney-client privilege context* 'waives the privilege . . . .'" (emphasis added) (citation omitted)). In any event, even under this standard, the government did not waive the deliberative process privilege here because, as discussed, the government did not "voluntary[ily]" disclose the interview notes to "unnecessary third parties."

### B.    The Government Established Foreseeable Harm

The government offered three separate bases that support a finding of foreseeable harm as to the deliberative process privilege. Defs.' MSJ 28; Seidel Decl. ¶ 24. Usher contends that the government's declarations are "conclusory," Opp. 44, but they provide at least as much specificity as declarations that courts have found sufficient to establish foreseeable harm. As noted, in *Leopold*, the court held that disclosure of FD-302s specifically would result in foreseeable harm to interests served by the work-product doctrine because they would reveal the "mental impressions, assessments, and thought processes" of attorneys, which would "inhibit the flexibility with which future special counsels might structure and pursue investigations." 487 F. Supp. 3d at 10 n.4. That same reasoning applies equally to the deliberative process privilege. Seidel Decl. ¶ 24.

Similarly, in *Judicial Watch, Inc. v. U.S. Department of State*, 557 F. Supp. 3d 52 (D.D.C. 2021), the court held that the government had established foreseeable harm as to certain emails where its declarant stated:

> Without the comfort of knowing that their candid discussions on sensitive legal
> issues will remain private . . . , State officials and attorney-advisers would

16

> foreseeably be discouraged from engaging in those important discussions in the first place, thus seriously harming the Department's internal deliberative processes.

*Id.* at 61; *see also id.* at 60 (government established foreseeable harm where disclosure would deter agency attorneys from discussing sensitive legal issues); *id.* at 63–64 (similar); *Machado Amadis*, 971 F.3d at 371 (similar).  The government's declarations provide at least as much specificity here.  Seidel Decl. ¶ 24; Hsu Decl. ¶ 38.

Usher relies on *Reporters Committee for Freedom of the Press v. Federal Bureau of Investigation*, 3 F.4th 250 (D.C. Cir. 2021), but in that case, the declarations at issue consisted of a "series of boilerplate and generic assertions that release of *any* deliberative material would necessarily chill internal discussions."  *Id.* at 370. Here, by contrast, the FBI focused on the "particular type of material at issue"—interview notes taken to assist in the creation of FD-302s—and explained why "the specific context of the agency action at issue," disclosure would "impede those same agency deliberations going forward.'"  *Judicial Watch*, 557 F. Supp. 3d at 61 (quoting *Reps. Comm.*, 3 F.4th at 370).  The FBI explained that disclosure of these notes specifically "would" impede special agents' ability to prepare FD-302s in the future because agents would be deterred from taking notes during the interview.  Seidel Decl. ¶ 24.  And it likewise explained why release of these notes specifically "would" cause public confusion, as it would reveal information that was not included in the final FD-302.  *Id.*  Accordingly, as in *Leopold*, *Judicial Watch*, and the other cases cited above, the government has established foreseeable harm.

## C.    The Government Satisfied Any Segregability Burden

Usher contends that the government was required to release "reasonably segregable" non-privileged material—specifically, any portions of the notes that "are fact-based," as opposed to

17

those reflecting "thoughts, ideas, impressions, and interpretations." Opp. 45. As an initial

matter, the government withheld all the interview notes in full as attorney work product. If the

Court upholds the government's withholding on this basis, there would be no reason to segregate

and release information that does not fall under the deliberative process privilege, as

segregability is not required for work-product documents under Exemption 5.

 In any event, even if the notes were not protected as work product, the government has

satisfied any segregability burden. As the Seidel declaration explains, the FBI conducted a

"segregability review," and, following that review, it

> determined that almost all FBI information on [the withheld] pages was either
> fully covered by one or more of the cited FOIA exemptions, or determined that
> any non-exempt information on these pages was so intertwined with exempt
> material [that] no information could be reasonably segregated for release without
> triggering foreseeable harm to one or more of the cited FOIA exemptions.

Seidel Decl. ¶ 50. These statements are sufficient to entitle the government to a "presumption

that [it] complied with the obligation to disclose reasonably segregable material." *Am. Ctr. for L.*

*& Just. v. DOJ*, 325 F. Supp. 3d 162, 175 (D.D.C. 2018).

 Plaintiff cannot rebut that presumption by simply asserting that the interview notes—

which Plaintiff and his counsel do not currently possess—"are fact based and do not contain

mental impressions." Opp. 45. "In some circumstances, even material that could be

characterized as 'factual' would so expose the deliberative process that it must be covered by the

privilege." *Elec. Frontier Found.*, 739 F.3d at 13 (citation omitted). "That is, 'purely factual'

material can be 'so inextricably intertwined with the deliberative sections of documents that its

disclosure would inevitably reveal the government's deliberations.'" *Am. Ctr. for L. & Just. v.*

*DOJ*, 325 F. Supp. 3d at 176 (quoting *Elec. Frontier Found.*, 739 F.3d at 13)). The FBI has

explained that this is the case here. *See* Seidel Decl. ¶ 50. Accordingly, the government has

satisfied any segregability burden.

III.   **THE GOVERNMENT PROPERLY WITHHELD INFORMATION FURNISHED BY A CONFIDENTIAL SOURCE UNDER EXEMPTION 7(D)**

A.    **The *Roth* Factors Support an Inference of Confidentiality**

The government also withheld the FD-302s and interview notes under Exemption 7(D) because the circumstances of Mr. Gardiner's cooperation suggest that he provided the information under an implied assurance of confidentiality.  Defs.' MSJ. 19–22.  Usher contends that Mr. Gardiner could not have reasonably made such an inference, relying on the four factors set forth in *Roth v. DOJ*, 642 F.3d 1161, 1184 (D.C. Cir. 2011).  Opp. 35– 40.  These factors, however, support an inference of confidentiality.

*First*, the seriousness of the crime supports an inference of confidentiality.  *See Labow v. DOJ*, 831 F.3d 523, 531 (D.C. Cir. 2016) ("[S]ources likely expect confidentiality when they report on serious or violent crimes, risking retaliation.").  As Usher acknowledges, Mr. Gardiner was a key cooperating witness in the "largest antitrust prosecution in history," that led to the "three largest criminal antitrust fines in U.S. history."  Opp. 1, 8.  Usher contends that the prosecution "destroyed [his] career and reputation" and "caused him major financial losses."  Opp. 1.  Had he been convicted, Usher faced up to 10 years in prison.  15 U.S.C. § 1.  If serious non-violent crimes can support an inference of confidentiality—and they can, *see Rosenberg v. ICE*, 13 F. Supp. 3d 92, 111–12 (D.D.C. 2014)—then certainly the "largest antitrust prosecution in history" supports such an inference.[8]

---

[8] The cases Usher cites where courts found the crime not sufficiently serious to support an inference of confidentiality are readily distinguishable.  *See King & Spalding LLP v. HHS*, 330 F. Supp. 3d 477, 490 (D.D.C. 2018) (investigation into "regulatory" offense of "off-labeling marketing practices, i.e., promoting [medical devices] for uses outside of those approved by the [FDA]"); *Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 906 (D.C. Cir. 1996) (investigation into "computer crimes").

*Second*, Gardiner's proximity to Usher and the other investigative subjects likewise supports an inference of confidentiality. *DOJ v. Landano*, 508 U.S. 165, 179–80 (1993). Gardiner had near-daily conversations in chat rooms that Usher readily admits they referred to as the "mafia" and "cartel." Opp. 5. Usher relies on *Bagwell v. DOJ*, 588 F. Supp. 3d 58 (D.D.C. 2022), to argue that the proximity factor does not support an inference of confidentiality here. Opp. 38. But the cooperating witness in *Bagwell* was not an individual but an "institution"— Penn State University—and it was for that reason that the court found it unlikely that the witness (Penn State) was "unwilling to speak except on the condition of confidentiality." 588 F. Supp. 3d at 71 (quoting *Landano*, 508 U.S, at 179). Here, by contrast, it is reasonable to infer that Mr. Gardiner—a human being—would have been hesitant to cooperate against the three other traders with whom he had regular conversations absent an expectation that the information he provided would be kept confidential.

*Third*, while it is true that Mr. Gardiner was not a "paid informant," *Landano*, 508 U.S. at 179, that fact is "not itself dispositive," *Labow*, 831 F.3d at 532, and courts have found an implied assurance of confidentiality even in the absence of payment, *see, e.g.*, *Rosenberg*, 13 F. Supp. 3d at 109 (witnesses were "not paid sources").

*Fourth*, the "duration of the source's relationship with law enforcement and the manner of communication" support an inference of confidentiality. *Labow*, 831 F.3d at 532. Gardiner "had his first meeting with the Antitrust Division and the FBI on December 5, 2013," and "continued to meet with DOJ for several years; he had 15 meetings with DOJ between December 2013 and May 2016." Opp. 5. This extensive cooperation over a number of years supports an inference of confidentiality. *Labow*, 831 F.3d at 532. Contrary to Usher's contention, a witness need not continue to have a relationship with law enforcement to the "present day" for this factor

to support an inference of confidentiality.  *Id.* ("the fourth *Roth* factor concerns the *duration* of the source's relationship" (emphasis added)).

**B.      The Government Established Foreseeable Harm**

As with attorney work product, simply establishing that Exemption 7(D) applies goes a long way to establishing the foreseeable harm requirement.  That is because "the statutory text of Exemption 7 predating the FOIA Improvement Act already contained an explicit requirement that the agency show a reasonable nexus between the withheld information and a predicated harm."  *CREW v. DHS*, 525 F. Supp. 3d 181, 192 n.4 (D.D.C 2021); *cf. Reps Comm.*, 567 F. Supp. 3d at 127 (noting, in the Exemption 7(E) context, that "fulfilling the terms of [the] exemption[] goes a long way to meeting the foreseeable harm requirement" because the exemption "by its own terms already requires that an agency show a risk of foreseeable harm").  Thus, for the same reasons that Defendants have shown that Exemption 7(D) applies in the first place—*i.e.*, disclosure would reveal information furnished by a confidential source—Defendants have established foreseeable harm.

Usher contends that there could be no foreseeable harm because Gardiner testified in open court at Usher's criminal trial. But while the fact of Mr. Gardiner's cooperation and his trial testimony are public, the full extent of his cooperation, as reflected in the FD-302s and interview notes, are not publicly known.  The FBI believes that disclosure of this information could result in harm to Mr. Gardiner, Seidel Decl. ¶ 44, and that law-enforcement judgment is entitled to deference.  *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998).  Usher disagrees with the FBI's judgment because he and his co-defendants are "white-collar professionals, . . . not violent criminals," Opp. 35, but, even if it were true that white-collar professionals cannot commit violent crimes, Exemption 7(D)'s protection "extends to situations where the danger of

retaliation encompasses more than the source's physical safety." *Ortiz v. HHS*, 70 F.3d 729, 733 (2d Cir. 1995).  The FBI's declaration explains that it is concerned not only with possible violent retaliation against Mr. Gardiner, but also other forms of reprisal, such as defamation or deprivation of business opportunities.  Seidel Decl. ¶ 44.

   Moreover, courts in this circuit have repeatedly rejected the argument that the interests protected by Exemption 7(D) have no relevance if a cooperating witness has already testified at trial.  *See, e.g.*, *Parker v. DOJ*, 934 F.2d 375, 379 (D.C. Cir. 1991); *Bullock v. FBI*, 577 F. Supp. 2d 75, 80 (D.D.C. 2008).  Usher contends that the government cannot rely on these cases because they pre-date the FOIA Improvement Act, Opp. 41, but this case law "continues in force, even though much of it predates the FOIA Improvement Act."  *See CREW*, 525 F. Supp. 3d at 192 (discussing issue in context of Exemption 7(E)).

   The reasons why courts have upheld withholdings under Exemption 7(D) even after a source has testified are self-evident.  Even if the public *now* knows of a witness's cooperation, if Exemption 7(D) applies, it is because the witness expected the information he provided to remain confidential at the time it was communicated.  *See Bullock*, 577 F. Supp. 2d at 80.  And if such information were routinely disclosed through FOIA, "future sources would be less likely to provide information pursuant to a proffer agreement if they knew the information they provided would be publicly disclosed."  Seidel Decl. ¶ 43.

   This is particularly true in antitrust investigations, where "[b]ecause of the highly secretive, circumspect behavior of cartelists and the strong incentives not to cheat on the cartel," the Antitrust Division has created leniency programs to induce cartelists to cooperate.  Hsu Decl. ¶ 8.  Given the possibility of foreign prosecutions and private antitrust class actions, cooperators often "express concern over being discovered as a government cooperator."  *Id.*  They thus "seek

confidential treatment of their identities and the information and evidence they supply."  *Id.*

Disclosure of the information Gardiner provided would thus "harm current and future law

enforcement investigations, as it would diminish the FBI's use of the proffer agreement as a

technique."  Seidel Decl. ¶ 43.

## IV.    THE GOVERNMENT PROPERLY WITHHELD GRAND JURY MATERIALS UNDER EXEMPTION 3

The government redacted certain information on nine pages of one set of interview notes

on the ground that they identify specific records subpoenaed by a grand jury and provide details

about the contents of those documents.  Defs.' MSJ 22–24; Seidel Decl. ¶ 16.

In contending that the government's declarations are insufficient, Usher relies on *Labow*

*v. DOJ*, 831 F.3d 523 (D.C. Cir. 2016), where the court remanded for the district court to

consider whether the release of documents subpoenaed by a grand jury "would reveal something

about the grand jury's investigation."  *Id.* at 530.  In *Labow*, however, the plaintiff sought the

*documents* subpoenaed by the grand jury, not interview notes that identified the documents

subpoenaed by the grand jury, as Usher seeks here.  *Id.*  The court held that producing the

documents themselves may not necessarily reveal that the documents had been subpoenaed by a

grand jury, and so might not reveal anything about the grand jury's investigation.  *Id.* at 530.  But

the court "agreed" that "[i]f the documents would reveal to the requester that they had been

subpoenaed," their disclosure would "reveal the direction of the grand jury's investigation."  *Id.*

529.

Here, unlike in *Labow*, the redacted portions of the interview notes necessarily reveal the

direction of the grand jury's investigation because they "identif[y] specific records subpoenaed

by a federal grand jury" and "provide[] details about the contents of those documents."  Seidel

Decl. ¶¶ 15–16.  That information would thus "reveal the direction of the grand jury's

investigation" and may be redacted under Exemption 3.  *Labow*, 831 F.3d at 529.

      Usher also mistakenly contends that even if there are explicit references to the grand jury

on these pages, the government failed to meet its segregability burden because it could have

redacted those references instead of withholding the pages in full.  Opp. 43.  The government

relied on Exemption 3 only to redact those portions of the nine pages that referenced the grand

jury exhibits; it did not invoke Exemption 3 to withhold these pages in full.  *See* Seidel Decl.

¶ 16.  The government thus satisfied any segregability burden.

## V.    THE GOVERNMENT PROPERLY WITHHELD IDENTIFYING INFORMATION OF THIRD PARTIES UNDER EXEMPTIONS 6 AND 7(C)

      The government redacted the identifying information of various individuals under

Exemptions 6 and 7(C).  Defs.' MSJ 24–27.  Usher challenges those redactions insofar as they

relate to the four chatroom participants.  Opp. 29–35.

      The government did not redact the identifying information of Mr. Usher because he

submitted the FOIA request at issue.  *See* Defs.' MSJ 26.  Because Usher did not provide privacy

waivers from Mr. Ramchandani and Mr. Ashton at the time he submitted his FOIA request, the

government redacted their identifying information in light of their substantial privacy interests in

that information.  *Id.*  Usher has now submitted privacy waivers from Mr. Ramchandani and Mr.

Ashton.  Opp. 29.  Although the appropriateness of an agency's assertion of a FOIA exemption

is judged as of the time the agency processed the FOIA request, *Bonner v. U.S. Dep't of State*,

928 F.2d 1148, 1152 (D.C. Cir. 1991), given that Mr. Ramchandani and Mr. Ashton have now

provided privacy waivers, the Antitrust Division and FBI have agreed not to redact their

identifying information.

As to Mr. Gardiner, the government redacted his identifying information, such as his "date of birth, mailing address, home and cellular telephone numbers, and information concerning his employment and education history," under Exemptions 6 and 7(C).  Seidel Decl. ¶ 36; *see also* Hsu Decl. ¶ 43.  Unlike Mr. Ramchandani and Mr. Ashton, Mr. Gardiner has not provided a privacy waiver, and he maintains substantial privacy interests in his personal identifying information.  Defs.' MSJ 25–26.

Usher's argument to the contrary appears to rest on a misunderstanding.  Opp. 29–35.  Usher argues at length that "to release the Gardiner 302s" would not infringe on Gardiner's privacy interests, and that there is a public interest in "disclosure of the Gardiner 302s."  Opp. 29, 32.  But the government has not withheld the *substance* of the Gardiner 302s under Exemptions 6 and 7(C); it has redacted only Gardner's "identifying information," such as his home address and telephone numbers.  Seidel Decl. ¶ 36.  Thus, it is irrelevant whether Gardiner retains a privacy interest in "the contents of the . . . 302s," Opp. 31, or whether the public has an interest in their substance.  And Usher nowhere explains why Gardiner would not retain a privacy interest in his *identifying* information, such as his home address, or why the public has any interest in the release of that information.  Accordingly, the Court should uphold the government's redactions of Mr. Gardiner's identifying information under Exemptions 6 and 7(C).

## CONCLUSION

The Court should grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion.

Dated:  April 17, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/ John Robinson
JOHN ROBINSON (Bar. No. 1044072)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

*Counsel for Defendants*